# EXHIBIT 9



1334 PARKVIEW AVENUE, SUITE 280 MANHATTAN BEACH, CALIFORNIA 90266
WWW.BLAKELYLAWGROUP.COM T_323-464-7400  F_323-464-7410

E-mail: bblakely@blakelylawgroup.com

August 21, 2024

**VIA E-MAIL**
Xinlin Li Morrow
xinlin@moni.law
Lawrence Yuan
Lawrence@moni.law
Zhener Low
Zhener@moni.law
Morrow NI LLP

Re:  *Deckers Outdoor Corporation v Last Brand, Inc. d/b/a Quince*
     Northern District of California Case No.: 23-cv-04850-AMO

Dear Xinlin,

I'm writing regarding various discovery matters. Pursuant to the Magistrate Judge's Standing Order, paragraph 5, we hereby request a meeting of counsel with respect to the issues set forth below.

I.  **DEPOSITION OF LAST BRAND INC.**

It quickly became apparent during Defendant's FRCP 30(b)(6) deposition that its' designated witness, Sidhartha Gupta, was unprepared to testify concerning numerous topics. Specifically:

**Document searches, including of Defendant's electronic data systems – Topics 1-2.** *See e.g.*:

August 21, 2024
Page 2

```
 4            And do you have any information or knowledge as
 5   to whether anyone at Quince has conducted any searches of
 6   its e-mails relating to the accused mini boot?
 7            MS. MORROW:  Objection to the extent it calls for
 8   attorney-client privileged information.
 9            If you have any independent knowledge that would
10   allow you to answer you can do so.
11       A   I cannot answer the question.
12       Q   I'm sorry.  Did you say I cannot answer your
15       Q   And why is that?
16       A   My attorney just instructed me not to do so.
17            MS. CURRIE:  Sorry.  I must have missed that.
18            Did you instruct him not to answer?
19            MS. MORROW:  No.  I instructed him not to divulge
20   attorney-client privileged communications, but if he had
21   independent knowledge he can answer the question.
22       A   I don't have independent knowledge of that.
23       Q   Okay.  Thank you for clarifying.
```

p. 44 of Depo Trans.

```
23            Do you know anything about the searches that were
24   conducted by Quince in order to search for documents
25   responsive to plaintiff's requests for production?
 1            MS. MORROW:  So I'll caution the witness not to
 2   divulge attorney-client privileged communications.
 3            But what you have as independent knowledge or
 4   from Quince employees without counsel's input or attendance
 5   you can answer.
 6       A   I have no independent knowledge.
```

p. 133-134 of Depo Trans.

### The design of the Accused Products – Topics 3-5, 9-11. *See e.g.*:

```
 2           Do you know if any documents relating to UGG were
 3   used in the design process for the accused mini boot?
 4       A   Not to my knowledge.
 5       Q   And who would -- who should I speak to to get
15       A   I don't know.
```

p. 33-34 of Depo Trans.

```
 7           Are you aware of any e-mail communications from
 8   or to Veronica, Alyssa, Angela, and Matt regarding the
 9   accused mini boot?
10           MS. MORROW:  Objection.  Outside the scope.
11           And you can answer in your individual capacity if
12   you know the answer.
13       A   I'm not personally aware of any communication
14   between them.  It could exist.  It could not.  I don't know.
15   I'm not --
```

p. 37 of Depo Trans.

```
10           Do you know if Quince has ever purchased an
11   authentic UGG Bailey button boot to help with the design of
12   the accused button boot?
13       A   I don't personally know that.
```

August 21, 2024
Page 4

p. 61 of Depo Trans.

### The procurement of the Accused Products – Topics 6-8, 12-14, 66-68. *See e.g.*:

```
12  ████████████████████████████████
13
14
15
16
17
18

20       Q    Okay.  But, Mr. Gupta, are you making an
21  assumption -- you know, I'm not sure whether you're guessing
22  or whether it's on personal experience what you're
23  testifying to right now between what happened with the
24  design team and the manufacturer.
25            So do you have specific information or
 1  knowledge --
 2       A    I don't have specific -- I don't have specific
```

p. 99-100 of Depo Trans.

```
14       Q    Okay.  And with the manufacturer I just showed
15  you, ████████████████ I believe it was, do we know
16  how long Quince has been working with that specific
17  manufacturer just in general, not related to this accused
18  mini boot?
19       A    I don't know.  But, again, I'm sure that's been
20  provided in the documentation.  I don't recall the specific
21  date.
22       Q    Okay.  Do you know how Quince ended up finding
23  this manufacturer?
24       A    I personally don't know.  That would be something
25  Angela would know.
```

August 21, 2024
Page 5

p. 51 of Depo Trans.

```
14              What method of communication do Quince employees
15    use to communicate with ████████████████?
16        A     I don't know because I wasn't involved in the
17    communication.
```

p. 52 of Depo Trans.

**The dates the Accused Products were first sold – Topics 33-35.** *See e.g.:*

```
1               Do you recall when Quince first started selling
2    the accused button boot?
3         A     Again, I think it would be in the documents.  I
4    don't have the exact dates.
5         Q     Okay.  Do you have an estimate as to when Quince
6    first starting selling that accused button boot?
7         A     As I share with you, there are three products in
8    question.  Two of them I believe launched in '22 and one
9    launched in '23.  I can't remember at this moment which one
10   was which.
```

p. 55 of Depo Trans.

**Revenue and profits from the sale of the Accused Products – Topics 39-41.** *See e.g.:*

```
21        Q     Earlier you were saying -- and correct me if I'm
22   wrong.  I believe it was your testimony that you assumed
23   that you stopped selling the products after this litigation.
24              Was that your testimony?
25        A     That I understand to believe.  Yes.
```

```
2    A    But I don't know for sure so I'm speculating on
3    that so maybe I shouldn't.  I'm not sure.
```

p. 118-119 of Depo Trans.

Fed. R. Civ. P. 30(a) provides in pertinent part that a party may take the deposition of any person, including a party, by deposition upon oral examination. If a corporation is a party to the lawsuit, a notice of deposition compels the corporation to produce any officer, director, or managing agent named in the deposition notice. The corporation risks sanctions, including default and dismissal, if the designated individual fails to appear. Fed. R. Civ. P. 37(a) and (d); *Bon Air Hotel, Inc. v. Time, Inc.*, 376 F.2d 118, 121 (5th Cir. 1967). Absent a protective order or an order staying the deposition, the party to be deposed is required to appear for a properly noticed deposition. *Anderson v. Air West, Inc.*, 542 F.2d 1090, 1093 (9th Cir. 1976); *Huene v. United States Dep't of Treasury*, 2013 U.S. Dist. LEXIS 13803, 2013 WL 417747, at * 3 (E.D. Cal. Jan. 31, 2013) ("generally, unless a party or witness files a motion for a protective order and seeks and obtains a stay prior to the deposition, a party or witness has no basis to refuse to attend a properly noticed deposition"). Indeed, "The noticed party does not have the option of sitting back, failing to appear, requiring the noticing party to take action, and then crying foul to the court." *Anoruo v. Shinseki*, 2013 U.S. Dist. LEXIS 121819, *6-7, 2013 WL 4546795 (D. Nev. Aug. 27, 2013) (where Court issued sanctions as a result of party's non-appearance at deposition) (citing *Koninklike Philips Electronics N.V. v. KXD Technology, Inc.*, 2007 U.S. Dist. LEXIS 77894, 2007 WL 3101248 at *18 (D. Nev. Oct. 16, 2007); *Abiola v. Abubakar*, 2007 U.S. Dist. LEXIS 20311, 2007 WL 898197 at *7).

"Pursuant to Rule 30(b)(6), the deponent 'must make a conscientious good-faith endeavor to designate the persons having knowledge of the matters sought by [the party noticing the deposition] and to prepare those persons in order that they can answer fully, completely, unevasively, the questions posed ... as to the relevant subject matters." *Bank of New York v. Meridien Biao Bank Tanzania Ltd.*, 171 FRD 135, 151 (S.D.N.Y. 1997) (citations omitted). Under Rule 30(b)(6), "the corporation being deposed must designate persons having knowledge of the subject areas identified by the discovering party and prepare them so that they may give complete, knowledgeable and binding answers on behalf of the corporation." *Gucci Am. Inc. v. Costco Cos.*, 2000 U.S. Dist. LEXIS 602, at *3 (S.D.N.Y. Jan 24 2000) (citations omitted) "Courts treat the production of an unprepared [Rule 30(b)(6)] witnesses as 'tantamount to a failure to appear.'" *Crawford v. Franklin Mgt. Corp.*, 261 FRD 34, 39 (S.D.N.Y. 2009) (quoting *Kyoei Fire & Marine Ins. Co. v. M/V Maritime Antalya*, 248 FRD 126, 152 (S.D.N.Y. 2007).

As the Court held in *Garcia v. LQ Mgmt., LLC*, 2022 U.S. Dist. LEXIS 68309 (CD Cal. March 29, 2022):

> If the entity party, intentionally or otherwise, **designates a witness who lacks knowledge of the matters specified in the notice, or otherwise provides misleading information**, the deposing party may seek reimbursement of expenses incurred in taking the deposition (including reasonable attorney fees).

> *Taylor*, 166 F.R.D. at 363 (producing unprepared witness tantamount to failure to appear for deposition for purposes of imposing sanctions under Fed. R. Civ. P. 37(d), which — by reference to Fed. R. Civ. P. 37(b)(2) — provides a panoply of sanctions from the imposition of costs to the entry of default) (citing Resolution Trust Corp. v. Southern Union Co., 985 F.2d 196, 197 (5th Cir. 1993)). Likewise, a party served with a Rule 30(b)(6) notice **may be sanctioned for producing a partially educated witness with selective knowledge that only benefits the corporate party.** Schwarzer, Tashima & Wagstaffe, Cal. Prac. Guide: Fed. Civ. Pro. Before Trial ¶ 11:1414.3 (The Rutter Group 2021) (citing Sciarretta v. Lincoln Nat'l Life Ins. Co., 778 F.3d 1205, 1213 (11th Cir. 2015) ("Preparing a designated corporate witness with only the self-serving half of the story that is the subject of his testimony is not an act of good faith.")).

(emphasis added).

As demonstrated by the above snippets of deposition testimony, with additional examples in the full transcript, Mr. Gupta was either (a) not prepared nor knowledgeable about certain topics or (b) would make assumptions and fabricate testimony when it benefited the corporation, especially when asked about questions relating to the design/supply of the Accused Products and using UGG products as a reference point. *See e.g.,* p. 33-35, 44, 55-56, 61, 63-64, 86-87, 96-103, 106-108, 133-134 of Depo Trans. Even basic information as to the identity of the manufacturer of the Accused Products was something Mr. Gupta was ill-equipped to testify on. Despite testifying that he talked to at least two pertinent individuals – Matt Lippert and Alyssa Burgos – that preparation was only partial as no discussions relating to the involvement of UGG products (directly at issue here) were had. Mr. Gupta conveniently had no knowledge of facts giving rise to willfulness or intent, and that was likely by design and preparation (or lack thereof) of the witness.

For most, if not all, of the above topics, Defendant indicated that it would produce a witness in that regard. *See* Defendant's Objections and Responses to Depo Notice. It thus appears that Defendant should have no issue with either re-producing Mr. Gupta to further testify on these topics or designating Mr. Lippert and/or Ms. Burgos, as they were directly involved in the design and manufacture of the Accused Products.

Defendant's designee was also improperly instructed not to answer questions regarding Defendant's financial condition (Topic 77) and cease and desist letters relating to IP infringement (Topic 54): *See e.g.*:

```
17       Q    Okay.  How much did Quince make in revenue last
18  year?
19            MS. MORROW:  Objection.  And we've also objected
20  in our written objection.  This is not relevant to this case
21  and I will instruct the witness not to answer.
22            MS. CURRIE:  You cannot instruct the witness not
23  to answer because it's not privileged.  This relates to the
24  common law causes of action that were alleged and the
25  punitive damages claim.  We are entitled to know the
```

```
 2            Are you going to listen to your attorney's
 3    instruction not to answer?
 4       A    Yes.

 7            Does Quince have any documents reflecting what it
 8    has earned?
 9            MS. MORROW:  Same objection and instruction to
10    the witness.
11       A    Yeah.  I'm going to listen to my attorney and not
12    respond.
```

p. 129-131 of Depo Trans.

```
 4       Q    Has Quince ever received any cease and desist
 5    letters related to intellectual property infringement?
 6            MS. MORROW:  And again, we restate our objections
 7    in the written objection and responses.  This is outside --
 8    this not relevant to the issue in the case.
 9            If the witness has personal knowledge he can
10    answer in his individual capacity.
11       A    Those are all privileged communications.
12       Q    I'm just -- it's a yes or no question.
13            Has Quince ever received any cease and desist
14    letters related to IP infringement?
15       A    I'm giving you a very fair answer.  It's
16    privileged communications.
```

p. 129 of Depo Trans.

Defendant's financial condition is relevant as Plaintiff is seeking punitive damages in connection with its state law claims. "Discovery of Defendants' net worth and financial condition is clearly relevant to the issue of punitive damages." *Vieste, LLC v. Hill Redwood Dev.*, 2011 U.S. Dist. LEXIS 29137 (ND Cal. March 9, 2011), citing *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 270, 101 S. Ct. 2748, 69 L. Ed. 2d 616 (1981). Furthermore, absent privilege and violation of a court order, it is inappropriate to instruct a witness not to answer questions. Counsel "may instruct a deponent not to answer [a question] only when necessary to preserve a privilege, to enforce a limitation directed by the court, or to present a motion under Rule 30(d)(4). FRCP 30(d)(1); *Carter v. Telecare Corp.*, 2019 U.S. Dist. LEXIS 215165 (CD Cal. Aug. 16, 2019).

To many of these topics, Defendant's counsel objected as to the testimony as being outside the scope and would caution the witness regarding attorney-client privileged communications so often that it appeared to fear the witness into providing straightforward answers or otherwise altered the testimony that he might have provided without counsel's coaching. Even if the question was outside the scope, Defendant was required to obtain a protective order from the Court to prevent such questioning; otherwise, Plaintiff is entitled to ask any question if it does not invade privilege or violate a court order.

Plaintiff is entitled to a witness prepared to testify on the above topics. Furthermore, Defendant also needs to provide a witness prepared to testify concerning Defendant's financial condition. Plaintiff requests that Defendant provide witnesses prepared to testify for a resumed FRCP 30(b)(6) deposition, and that Defendant pay the court reporter fees for the resumed deposition. Otherwise, Plaintiff will be forced to seek all available remedies pursuant to FRCP 26 and 37.

Finally, while I understand that you have represented that Defendant will not be asserting and advice of counsel defense to willfulness (Topics 63-65), during his deposition Mr. Gupta testified that he relied on counsel's advice in connection with whether to move forward with certain products:



```
 1   ████████████████████████████████████████
 2   ████████████████████████████████████████
 3        Q    Did you receive any advise of counsel in
 4   connection with the accused mini boot?
 5             MS. MORROW:  Objection.
 6        Q    Prior to selling?
 7             MS. MORROW:  I'm sorry.
 8             Objection.  We have objected to this topic -- or
 9   these three topics relating to advice of counsel because
10   we've already confirmed written discovery that Quince is not
11   relying on advice of counsel defense.

25             MS. CURRIE:  Okay.  So are you instructing him
 1   not to answer?
 2             MS. MORROW:  Yes.
```

p. 59-61 of Depo Trans.

```
 3        Q    Okay.  And do Quince employees undergo any
 4   training to look out for or be aware of intellectual
 5   property of others?
 6   ████████████████████████████████████████
 7   ████████████████████████████████████████
```

p. 66 of Depo Trans.

    Can you please confirm that Defendant is not asserting an advice of counsel defense or otherwise claiming it acted in good faith because of communications with counsel.

## II. INTERROGATORIES, SETS ONE AND TWO

It appears that Defendant's responses to Plaintiff's interrogatories remain incomplete and otherwise insufficient.

**Interrogatories 8, 23 & 24** request that Defendant describe in detail the circumstances under which Quince first became aware of the: 8) UGG Classic Mini and/or the Classic Ultra Mini Trade Dress; 23) UGG Bailey Button Boot and/or the Bailey Button Boot Trade Dress; and 24) UGG Tasman and/or the Tasman Trade Dress. While Defendant's amended responses provide approximate dates that it became aware of the various products, it does not "provide in detail the circumstances which Quince first became aware" of each product. Plaintiff would like a full and complete response to these interrogatories.

**Interrogatories 1, 2, 11, 12** ask Defendant to identify the name, item number, UPC code and description various products. While Defendant has provided the name, it has not provided the items number, UPC code, and where relevant the description of the products in question.

**Interrogatories 4, 10, 13, 14 & 15** ask for the identity of various individuals and their contact information. In response, Defendant has provided names and the representation: "These Quince employees may be contacted by directing correspondence to counsel of record for Quince." Please let me know if you are authorized to accept service on behalf of each of the individuals identified in response to these requests. If you are not authorized, please provide their contact information.

**Interrogatories 5, 17 & 18** asks Defendant to identify "the date QUINCE first offered the ACCUSED PRODUCTS for sale, and separately for each month thereafter, the quantity of ACCUSED PRODUCTS sold by QUINCE." While Defendant has identified the date of first sale, it has not identified, by month, the quantity of Accused Products sold. Please provide a full and complete response to these requests.

**Interrogatories 7, 21 and 22** seek sales information for the Accused Products. It appears that many additional units of the Accused Products have been sold since the date of these responses, February 29, 2024. Pursuant to FRCP 26(e), these interrogatories should be updated to include sales to date.

**Interrogatories 4, 15 & 16** ask Defendant to describe in detail how the Accused Products were designed and procured/supplied, including but not limited to the roles and principal responsibilities of each person or entity who participated in the design, procurement of the Accused Products. While Defendant has identified various individuals and companies, it has not described in detail how the Accused Products were designed and procured. Furthermore, it has not identified the responsibilities of each person or entity in the design or procurement of the Accused Products. Plaintiff is entitled to a full and complete response.

## III. REQUEST FOR PRODUCTION, SETS ONE AND TWO

### a. Document Production

**Supplemental Disclosures Pursuant to FRCP 26(e):**

August 21, 2024
Page 12

FRCP 26(e) placed parties under an affirmative duty to supplement their discovery responses. *Hernandez v. Polanco Enters., Inc.*, 19 F. Supp. 3d 918, 933 (N.D. Cal. 2013) (Rule 26(e) places litigants under an affirmative duty to supplement, even after the discovery cut-off date); see also *Switch Communs. Group v. Ballard*, 2012 U.S. Dist. LEXIS 85148 at *19 (D. Nev. June 19, 2012) (duty to supplement includes documents created after the party's initial response).

> A party which responds to a request . . . that the only responsive documents are those described in the response, and then at a later time creates another responsive document which the party then knows, or reasonably should know, is materially within the scope of the earlier request most certainly "learns" of the existence of the document thereby triggering the duty to timely serve a supplemental response bringing the fact of its creation and existence to the attention of the adversary party. To argue otherwise would effectively defeat the long-standing salutary purpose of Rule 26(e) . . . . Such a construction could create an unfair barrier to discovery where the later creation of a responsive document occurs after a discovery cut-off date imposed under a scheduling order entered pursuant to Fed. R. Civ. P. 16(b) leaving the adversary party potentially without an opportunity to serve a formal request for supplementation while insulating the responding party from the responsibility to provide supplementation.

*Reinsdorf v. Skechers U.S.A., Inc.*, 2013 U.S. Dist. LEXIS 200627 at *23-24 (C.D. Cal. Sept. 9, 2013) (citing *Robbins & Myers, Inc. v. J.M. Huber Corp.*, 274 F.R.D. 63, 77 (W.D.N.Y. 2011).

Here, many months have passed since Defendant first responded to Plaintiff's document requests. It appears that after providing its initial documents and interrogatory responses, Defendant continued to sell the Accused Product. For instance,

**Request Nos. 9, 68, 69** seek documents sufficient to identify the last date Defendant sold the Accused Products.

**Request Nos. 20, 70, 71**, seek documents sufficient to identify Defendant's current inventory of the Accused Products.

**Request Nos. 21, 72, 73** seek information related to the revenue, income and profit derived from the sale of the accused products, showing the number of units sold per month or quarter.

**Request Nos. 11, 52, 53**: seek documents related to consumer opinions of the Accused Products.

**Request Nos. 12, 54 & 55** seek all complaints by consumers regarding the Accused Products.

**Requests Nos. 13, 56, 57** seek instances of actual confusion.

**Request Nos. 15, 60, 61** seeks comments on social media including the term UGG or Bailey Button, Ultra Mini, Tasman.

To the extent it already hasn't, please confirm that Defendant will be supplementing its documents production to provide all the foregoing information to date.

Case 3:23-cv-04451-AMO    Document 76-9    Filed 09/13/24    Page 13 of 16

**Sales in Other Countries**: Defendant's responses and production all appear to be limited to sales in the United States. "'Relevancy for discovery…has a broader meaning than admissibility at trial.'" *Phoenix Solutions Inc. v. Wells Fargo*, 254 F.R.D. 568, 582 (N.D. Cal. 2008). In the Ninth Circuit, the Lanham Act may apply to extraterritorial sales where: (1) the alleged violations create some effect on American foreign commerce; (2) the effect is sufficiently great to present a cognizable injury to the plaintiffs under the Lanham Act; and (3) the interests of and links to American foreign commerce are sufficiently strong in relation to those of other nations to justify an assertion of extraterritorial authority. *Timberlane Lumber Co. v. Bank of America*, 549 F.2d 597, 606 (9th Cir. 1976); see also *Trader Joe's Co. v. Hallatt*, 835 F.3d 960 (9th Cir. 2016) (reversing district court's determination regarding extraterritorial reach of the Lanham Act since Canadian grocery store's alleged quality-control lapses and its inflated prices could have a detrimental effect on the reputation of Trader Joe's operations in the United States).

Deckers needs discovery on Defendant's foreign sales to prove the *Timberlane* factors. For instance, Deckers needs discovery on the amounts and locations of Defendant's foreign sales of the infringing shoes so it can prove the effect such infringing shoe sales are having on American commerce (e.g., the likelihood of such shoes flowing back into the U.S.). Deckers is entitled to a list of the foreign countries where any of the subject shoes have been sold by Defendant (or any of Defendant's subsidiaries) and the revenues for the sales in such foreign countries.

**Request No. 7:** Seeks documents analyzing the '161 Patent. It doesn't appear that Defendant has provided any such documents.

**Request No. 30:** Seeks documents related to other intellectual property lawsuits wherein Defendant has been sued for infringement. Prior accusations of infringement are relevant in determining the issue of intent and whether the infringement was done with knowledge or willfully. As the Ninth Circuit has observed, an infringer, once caught, should have his/her conduct carefully scrutinized in any future operations so as to determine his intent. *Plough, Inc. v. Kreis Laboratories*, 314 F.2d 635, 639 (9th Cir. 1963).

Furthermore, it is well established that under the Lanham Act, a defendant who "turns a blind eye" to infringement is tantamount to willfulness and reckless disregard. Courts have found willful blindness where infringers, once caught selling infringing goods, fail to take action or implement procedures to ensure infringing goods are not sold. *Fendi SRL v. Burlington Coat Factory*, 689 F. Supp. 2d 585 (S.D.N.Y. 2010). Even when a defendant has policies in place, failing to follow these polices can be evidence of reckless disregard. Id. As the Court held in *Timber Prods. Inspection v. Coastal Container Corp*., 827 F. Supp. 2d 819 (W.D. Mich. 2011), "an infringer 'cannot be naive and be like ostriches and put their heads in the sand and ignore obvious facts' and then later claim entitlement to status as an 'innocent infringer.'" See also, *National Business Forms & Printing, Inc. v. Ford Motor Co*., 2009 U.S. Dist. LEXIS 102152, 2009 WL 3570387 at *6 (S.D. Tex., Oct. 30, 2009) (printer not entitled to innocent infringer status where it blindly relied on customers' representation that they were authorized to use the mark in question); see also *Louis Vuitton S.A. v. Pun Yang Lee*, 875 F.2d 584 (7th Cir. 1989) (failure to inquire enough because defendant was afraid of what the inquiry would yield. Willful blindness is knowledge enough); *Levi Strauss & Co. v. Diaz*, 778 F. Supp. 1206 (S.D. Fla. 1991); *Microsoft Corp. v. CMOS Technologies*, 872 F. Supp. 1329 (NJ 1994); *A&M Records v. Napster, Inc*., 239 F.3d 1004 (9th Cir. 1991) (Turning a blind eye to detectable acts of infringement for the sake of profit gives rise to liability).

Courts routinely allow discovery into past accusations of infringement against an alleged recidivist infringer. For example, in *Playboy Enterprises, Inc. v. Chen*, 45 U.S.P.Q.2D 1400, 1997 U.S. Dist. LEXIS 21916 (C.D. Cal. Oct. 1, 1997), the court admitted evidence of five prior cases against defendants to show that defendants, "once caught," were on notice as to the requirements of trademark law with regard to its clothing business. "[T]he evidence of involvement in prior suits is admissible if offered to show something other than propensity. Prior acts may be used to demonstrate knowledge, intent or absence of mistake, precisely the elements at issue here. Fed. R. Evid. 404(b)." Id. at 34.

Likewise, in *Burberry Ltd. v. Salim*, 2013 U.S. Dist. LEXIS 198030 (C.D. Cal. July 12, 2013) the court observed that Defendant's repeated pattern of trademark infringement was relevant to the instant suit because "Defendant as 'an infringer, 'once caught,' should have his conduct carefully scrutinized in any future operations so as to determine his intent in going as far as he does.'"

In *Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849 (2nd Cir. 1995) the Second Circuit affirmed a default judgment entered against the defendant as a sanction for willful violation of the discovery orders. In affirming the judgment, the court stated that the record amply supported the finding that defendants intentionally infringed the plaintiffs' trademark. As part of the evidence of intentional infringement, the court noted that "defendants had been sued in a similar trademark infringement case in the past." Bambu, 58 F.3d at 854.

In *GTFM, Inc. v. Solid Clothing, Inc.*, 215 F.Supp.2d 273 (S.D.N.Y. 2002) the district court found defendant liable for intentional infringement following a bench trial. The evidence showed that defendant "has repeatedly received cease and desist letters from third parties complaining that it infringed their intellectual property rights." The court further noted: "Nearly all of these disputes have resulted in settlements whereby Solid agreed to cease and desist. Some also involved cash payments." *GTFM*, 215 F.Supp.2d at 283-84. Among other facts that supported the conclusion that defendant was a willful infringer, the court stated that defendant's "long practice of knocking-off other trademarks belies its argument that it was an innocent infringer." Id.

**Request Nos. 28, 82, and 83** seek documents related to any advice of counsel. As above, please confirm that Defendant is not asserting an advice of counsel defense or otherwise arguing that it acted in good faith because it relied on communications with counsel.

      **b. Privilege Log**

**Request Nos. 1, 2, 4-22, 24-27, 31, 33, 34, 36, 37, 40-75, and 78-81**, Defendant either objected to the extent the Request calls for privileged material, or states that it will produce "non-privileged" documents. My understanding is that we have agreed that litigation counsel do not need to log their respective communications (if Defendant is not asserting an advice of counsel defense).

**ESI DISCOVERY**

Pursuant to the Court's Order (ECF No. 56), we are required to meet and confer on or before August 28, 2024, regarding custodians for search terms. In preparation for this meeting, Plaintiff suggests the following ten (10) custodians: Matthew Lippert, Alyssa Burgos, Angela Bo, Veronica

Tan, Sidhartha Gupta, Sourabh Mahajan, Antonieta Moreland, Sean Milligan, Zuna Mattal, Daphne de Chatellus.

Pursuant to the Court's Scheduling Order, I'd like to schedule a videoconference to discuss these discovery issues. Given the upcoming September 27, 2024, discovery cutoff and need for further depositions, as well as the need to comply with the Court's Order (ECF No. 56), please let me know when you available next Monday to Wednesday.

**DEFENDANT'S ISSUES**

**August 20, 2024 letter**

<u>Reasonable Royalty and Lost Profits</u>: I should have an answer to you in the next few days. If Deckers decides to seek royalties and/or lost profits, it will produce additional documents and provide another witness to testify on this topic.

<u>Product Reviews</u>: I'm looking into this with Deckers.

<u>Depositions</u>: I'll get back to you on confirmation. I have a hearing in the SDNY on another case that day. I should be able to stagger the times.

**August 7, 2024 email 11:16 pm**

**RFP #2**: Documents relied upon in answering interrogatories. This would necessarily include attorney work product.

**RFP: #45**: If Plaintiff decides to proceed with a reasonable royalty theory of damages, it will produce applicable license agreements. From my experience with Deckers, I'm not sure there are any so this may be moot.

**RFP #47**: The only prior art that I'm aware a third-party has asserted in connection with the '161 patent was in <u>Deckers v. Next Step Group</u>. The recent decision by the Patent Trial and Appeal Board is attached.

**RFP #53-54**: Deckers' discovery responses in other cases relating to the same patent and trade dresses. See discussion above concerning other lawsuits in which Defendant has been accused of infringement.

Regards,

/s/ Brent Blakely

Brent H. Blakely