Brent H. Blakely (SBN 157292)
bblakely@blakelylawgroup.com
Jamie Fountain (SBN 316567)
jfountain@blakelylawgroup.com
Iain Hill (SBN 336825)
ihill@blakelylawgroup.com
BLAKELY LAW GROUP
1108 Manhattan Avenue, Suite B
Manhattan Beach, California 90266
Telephone: (310) 546-7400
Facsimile: (310) 546-7401

**Attorneys for Plaintiff**
**Deckers Outdoor Corporation**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DECKERS OUTDOOR CORPORATION, a Delaware Corporation, <br><br> Plaintiff, <br> v. <br><br> LAST BRAND, INC. dba QUINCE, a Delaware Corporation; and DOES 1-10, inclusive, <br> Defendants. | ) Case No.: 3:23-cv-04850-AMO <br> ) <br> ) **PLAINTIFF'S MOTION FOR SUMMARY** <br> ) **JUDGMENT OF THE COMPLAINT AND** <br> ) **DEFENDANTS' AFFIRMATIVE DEFENSES** <br> ) <br> ) <u>Hearing</u> <br> ) <br> ) Date:                April 17, 2025 <br> ) Time:                2:00 PM (PT) <br> ) <br> ) Complaint Filed:        06/12/2023 <br> ) Motion Filing Cut-Off:   03/10/2025 <br> ) Pre-Trial Conference:   08/14/2025 <br> ) Trial Date:              09/15/2025 <br> ) <br> )                Hon. Araceli Martínez-Olguín <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on **Thursday, April 17, 2025** at **2:00 p.m.** in Courtroom 10, of the above-entitled Court, located at the 450 Golden Gate Ave., San Francisco, California, Plaintiff Deckers Outdoor Corporation ("Plaintiff" or "Deckers") will and hereby does move for an order pursuant to Federal Rule of Civil Procedure 56 for summary judgment in favor of Plaintiff and against Defendant Last Brand, Inc. dba Quince ("Defendant" or "Quince") on Plaintiff's (1) First, Second, Third, and Fourth Claims for Trade Dress Infringement [ECF No. 34, 36]; and (2) Fifth and Sixth Claims for Unfair Competition [ECF No. 34, 36].

The Motion will be based on this Notice, the Memorandum of Points and Authorities, the Declaration of Lisa Bereda and exhibits thereto, the declaration of Brent H. Blakely and exhibits thereto, the Court's file and records in this action, and any further evidence or argument that this Court may properly receive at or before the hearing.

DATED: March 10, 2025

BLAKELY LAW GROUP

By:      /s/ Brent H. Blakely
         Brent H. Blakely
         Jamie Fountain
         Iain Hill
         **Attorneys for Plaintiff**
         **Deckers Outdoor Corporation**

**TABLE OF CONTENTS**

I.    INTRODUCTION ...............................................................................1

II.   BACKGROUND ................................................................................3

      A.    The UGG® Brand and Products .......................................3

            1.    The UGG® Classic Ultra Mini . .....................................4

            2.    The UGG® Tasman. ..........................................................5

            3.    The UGG® Bailey Button. .................................................6

      B.    Quince and its Infringing Products ............................................7

            1.    Quince's business model is built on selling knockoffs .....7

            2.     The Accused Products .........................................................8

III.  SUMMARY JUDGMENT STANDARD ..............................................10

IV.   ARGUMENT .....................................................................................11

      A.    Plaintiff Should Prevail on its Trade Dress Infringement
            Claims ......................................................................................11

            1.    The Asserted Trade Dresses are non-functional..............13

            2.    The Asserted Trade Dress have acquired secondary
                  meaning .........................................................................15

            3.    Defendant's deliberate copying of the Asserted Trade
                  Dress is likely to cause consumer confusion .....................17

            4.    Deckers should prevail on its state law claims .................25

V.    CONCLUSION .................................................................................25

**TABLE OF AUTHORITIES**

<u>CASES</u>

*adidas Am., Inc. v. Payless ShoeSource, Inc.*,
 546 F. Supp. 2d 1029, (D. Or. 2008) .................................. 11, 15, 19, 20, 24, 25

*adidas America, Inc. v. Skechers USA, Inc.*,
 2017 U.S. Dist. LEXIS 122459, 2017 WL 3319190, (D. Or. August 3,
 2017) ................................................................................................................ 13, 14

*Adidas-Salomon Ag v. Defendants Corp.*,
 228 F. Supp. 2d 1192 (D. Or. 2002) .............................................................. 15

*American Scientific Chemical, Inc. v. American Hosp. Supply Corp.*,
 690 F.2d 791, 793, 216 U.S.P.Q. 1080 (9th Cir. 1982) ...................................... 17

*Amini Innovation Corp. v. McFerran Home Furnishings, Inc.*,
 68 F. Supp. 3d 1170, (C.D. Cal. 2014) .............................................................. 23

*Art Attacks Ink, LLC v. MGA Entm't Inc.*,
 581 F.3d 1138, (9th Cir. 2009 ....................................................................... 15

*Audio Fidelity, Inc. v. High Fidelity Recordings, Inc.*,
 283 F.2d 551, (9th Cir. 1960) ..................................................................... 16, 25

*Au-Tomotive Gold, Inc. v. Volkswager of America, Inc.*,
 457 F. 3d 1062, (9th Cir. 2006) ...................................................................... 25

*Blumenthal Distrib., Inc. v. Herman Miller, Inc.*,
 963 F.3d 859 (9th Cir. 2020) ...................................................................... 13, 14

*Boldface Licensing + Branding v. By Lee Tillett, Inc.*,
 940 F. Supp. 2d 1178, (C.D. Cal. 2013) ........................................................... 22

*Brookfield Communications v. West Coast Entertainment Corp.*,
 174 F.3d 1036, (9th Cir. 1999) ........................................................................ 20

*Celotex Corp. v. Catrett*,
 477 U.S. 317, (1986) ....................................................................................... 11

*Century 21 Real Estate Corp. v. Sandlin*,
 846 F.2d 1175, (9th Cir. 1988) ....................................................................... 21

*Clamp Mfg. Co. v. Enco Mfg. Co.*,
 870 F.2d 512, (9th Cir), cert denied, 493 U.S. 872 (1989) .............................. 15

*Clicks Billiards, Inc. v. Sixshooters, Inc.*,
 251 F.3d 1252, (9th Cir. 2001) ...................................................... 11, 12, 19, 23

*Coca–Cola Co. v. Overland, Inc.*,
 692 F.2d 1250, 1256 n.16 (9th Cir. 1982) ..................................................... 17

*Devereaux v. Abbey*,
 263 F.3d 1070, (9th Cir. 2001) ...................................................................... 11

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

*Dreamwerks Prod. Grp., Inc. v. SKG Studio,*
142 F.3d 1127, (9th Cir. 1998) ...................................................................................... 17

*E. & J. Gallo Winery v. Gallo Cattle Co.,*
967 F.2d 1280, (9th Cir. 1992) ...................................................................................... 20

*Entrepreneur Media, Inc. v. Smith,*
279 F.3d 1135, (9th Cir. 2002) ...................................................................................... 19

*Exxon Corp. v. Texas Motor Exchange of Houston, Inc.,*
628 F.2d 500, (5th Cir. 1980) ....................................................................................... 24

*Faberge, Inc. v. Saxony Products, Inc.,*
605 F.2d 426, (9th Cir. 1979) ....................................................................................... 16

*Fleischmann Distilling Corp. v. Maier Brewing Co.,*
314 F.2d 149, (9th Cir. 1963) ....................................................................................... 21

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.,*
618 F.3d 1025, (9th Cir. 2010) ...................................................................................... 23

*Govino LLC v. White Poles LLC,*
2017 WL 6442187 (N.D. Cal. Nov. 3, 2017) ................................................................ 14

*Hewlett-Packard Co. v. Packard Press, Inc.,*
281 F.3d 1261, 1265, 62 U.S.P.Q.2d 1001 (Fed. Cir. 2002) ........................................ 17

*HRL Associates, Inc. v. Weiss Associates, Inc.,*
1989 TTAB LEXIS 33, 12 U.S.P.Q.2D (BNA) 1819 (TTAB 1989),
aff'd 902 F.2d 1546 (Fed. Cir. 1990) ............................................................................ 19

*Interstellar Starship Servs., Ltd. v. Epix Inc.,*
184 F.3d 1107, (9th Cir. 1999) ...................................................................................... 21

*Ironhawk Technologies Inc. v. Drop Box,*
2 F. 4th 1150, 1167 (9th Cir. 2021) .............................................................................. 21

*K-Swiss, Inc. v. USA Aisiqi Shoes, Inc.,*
291 F. Supp. 2d 1116, (C.D. Cal. 2003) ....................................................................... 25

*Levi Strauss & Co. v. Blue Bell, Inc.,*
778 F.2d 1352, (9th Cir. 1985) ................................................................................ 16, 18

*Levi Strauss v. Bluebell, Inc.,*
632 F.2d 817 (9th Cir. 1980) ......................................................................................... 18

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,*
799 F.2d 867, (2d Cir. 1986) ......................................................................................... 18

*Macy's Inc. v. Strategic Marks, LLC,*
2016 WL 374147, (N.D. Cal. Feb. 1, 2016) .................................................................. 25

*Mastercrafters Clock & Radio Co. v. Vacheron & Constantin-Le Coultre Watches, Inc,*
221 F. 2d 464 (2d Cir. 1955) ......................................................................................... 18

*Matsushita Elec. Industrial Co. v. Zenith Radio*,
475 U.S. 574, (1986) ................................................................................ 11

*Mattel Inc. v. Walking Mt. Prods.*,
353 F.3d 792, (9th Cir. 2003) .................................................................. 19

*Moroccanoil, Inc. v. Zotos Int'l, Inc.*,
230 F. Supp. 3d 1161, (C.D. Cal. 2017) .................................................. 21

*Multicraft Imps. v. Mariposa United States*,
2018 U.S. Dist. LEXIS 245368 (C.D. Cal. Jan. 19, 2018) ...................... 21

*NEXxUS Products Co. v. Gentle Concepts, Inc.*,
1993 WL 496824, (M.D. Fla. Apr. 30, 1993) ......................................... 23

*Nina Ricci, S.A.R.L. v. E.T.F. Enterprises, Inc.*,
889 F.2d 1070, 1074, 12 U.S.P.Q.2d 1901 (Fed. Cir. 1989) .................. 17

*Official Airline Guides, Inc. v. Goss*,
6 F.3d 1385, (9th Cir. 1993) .............................................................. 20, 21

*P & P Imps. LLC v. Johnson Enters., LLC*,
46 F.4th 953, (9th Cir. 2022) ................................................................... 15

*Pac. Sunwear of Cal. Inc. v. KP Fashion Co.*,
2009 U.S. Dist. LEXIS 139342 (C.D. Cal. March 20, 2009) .................. 24

*Payless Shoesource, Inc. v. Reebok Intern. Ltd.*,
998 F.2d 985, (Fed. Cir. 1993) ........................................................... 18, 24

*Playboy Enters. v. Netscape Communs. Corp.*,
354 F.3d 1020, (9th Cir. 2004) ................................................................ 24

*Thane Intern., Inc. v. Trek Bicycle Corp.*,
305 F.3d 894, (9th Cir. 2002) .................................................................. 24

*Vans Inc. v. ACI Int'l*,
2023 U.S. Dist. LEXIS 189978, (C.D. Cal. Oct. 11, 2023) ............... 13, 14

*Vans, Inc. v. Walmart, Inc.*,
2022 U.S. Dist. LEXIS 95244 (C.D. Cal. March 31, 2022) 19, 20, 21, 22, 23, 24

*Vision Sports, Inc. v. Melville Corp.*,
888 F.2d 609, (9th Cir. 1989) ............................................................. 15, 18

*Volkswagenwerk Aktiengesellschaft v. Wheeler*,
814 F. 2d 812, (1st Cir. 1987) .................................................................. 17

OTHER AUTHORITIES

J.Thomas McCarthy,
*McCarthy on Trademarks and Unfair Competition*, § 32:190 ........ 16, 17, 18, 25

RULES

Fed. R. Civ. P. 56(c) ...................................................................................... 11

Fed. R. Civ. P. 56(e) ........................................................................................... 11

## I.    <u>INTRODUCTION</u>

Deckers Outdoor Corporation ("Plaintiff" or "Deckers"), one of the most respected footwear companies in the United States, commenced this action shortly after learning that Defendant Last Brand, Inc. dba Quince ("Defendant" or "Quince") was selling knockoffs of *three* of Deckers' popular products: the UGG® Classic Ultra Mini, UGG® Tasman, and UGG® Bailey Button, which are protected by Deckers' trade dress and/or design patents as shown below:







| UGG® Classic Ultra Mini, embodiment of the Classic Ultra Mini Trade Dress | Quince Mini Boot | '161 Patent |





|  UGG® Bailey Button embodiment of the Bailey Button Boot Trade Dress | Quince Button Boot |





 UGG® Tasman embodiment of the Tasman Trade Dress

Quince Clog Boot

1

It's no accident that Defendant's products (collectively, the "Accused Products") look identical to Deckers' UGG® products. Defendant's design documents and communications between Defendant and its supplier demonstrate that Defendant set out to deliberately copy Plaintiff's successful UGG® Classic Ultra Mini, UGG® Bailey Button, and UGG® Tasman when it selected and designed the Accused Products by directly referencing the authentic UGG® products (as shown below). Declaration of Brent H. Blakely ("Blakely Dec."), ¶ 19 Ex. 17.



In fact, communications between Defendant and its supplier, demonstrate Defendant's intent to knock-off numerous other UGG® styles: Blakely Dec., ¶ 15, 16, 23, 32, 33 Ex. 13, 14, 21, 30, 31.

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

The present motion is made on the grounds that there is no genuine issue of material fact regarding (a) the acquisition of secondary meaning in each of the Asserted Trade Dress; (b) the non-functionality of the Asserted Trade Dress; and (c) the likelihood of consumer confusion between each of the Accused Products and the authentic UGG® products.

## II.    BACKGROUND

### A.    The UGG® Brand and Products

Deckers is one of the biggest footwear companies in the United States with an impressive portfolio of brands including the iconic UGG® brand - one of the most well-recognized premium comfort-leisure footwear brands in the U.S. and world-wide. Bereda Dec. ¶ 3. In addition, Deckers owns numerous design patents to the various styles of footwear it offers under its brands, including the UGG® brand, including the '161 Patent at issue in this case. Id at. ¶ 9, Ex. 2. Additionally, Deckers has trade dress rights in the Classic Ultra Mini Trade Dress, Bailey Button Trade Dress, and the Tasman Trade Dress (the "Asserted Trade Dress"). Id. at ¶ 8-15, 16-23, 24-33.

Since its founding in 1979, the UGG® brand has come to symbolize a bold free-spirited expression of style. Id. at ¶ 8-33. In gaining prominence, the UGG® brand became synonymous with the UGG® classic boot. Id. at ¶ 4. However, over the last several years, the UGG® brand has taken strides to reposition itself from a seasonal footwear brand to a lifestyle brand. Id. at ¶ 5. As a result, Deckers' UGG® brand is invested in creating fun, bold, innovative new designs. Id. This is reflected in the UGG® brand's design process in which ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Id. This allows enough time, attention, and detail to perfect the designs and ensure a quality end-product. Id.

Deckers understands the value of exposure granted by influencers and often collaborates with influencers and fashion brands across different product lines including the UGG® brand. Id. at ¶ 6. It also utilizes social media channels to market its products, including but not limited to YouTube, Instagram, Pinterest, Threads, and TikTok. Id. at ¶ 31, Ex. 15. In addition to social media, Deckers advertises its UGG® brand and products through paid-for display banners and videos, paid social media advertisements, paid search terms, and product listing advertisements. Id. at ¶ 32. For the UGG® brand specifically, Deckers has spent over ███████ on advertising and marketing in the U.S. from 2020 to present. Id. at ¶ 33, Ex. 16. As a result, of Deckers' impressive advertising and marketing efforts many of its products achieve status as "cult favorites". Id. at ¶ 14, 22, 29, 34 Ex. 4, 9, 13. However, with success comes imitation and Deckers' UGG® branded products are often targeted by competitors for knock-offs, including the three UGG® products at issue here: the UGG® Classic Ultra Mini, UGG® Tasman, and UGG® Bailey Button. Id. at ¶ 15, 23, 30, 35 Ex. 5, 10, 14.

**1.    The UGG® Classic Ultra Mini:** UGG® is currently one of the world's hottest footwear brands, and one of its most popular styles is the UGG® Classic Ultra Mini, the embodiment of the Classic Ultra Mini Trade Dress and the design of the '161 Patent. Bereda Dec., at ¶ 5, 8-9, 13-14 Ex. 1-4. Since its introduction in 2020 and through at least February 2025, it has sold over ██ ████ units generating $████████ in the U.S. making it one of UGG®'s top selling items. Id. at ¶ 13, Ex. 3. The UGG® Classic Ultra Mini has received immense unsolicited media attention and is often featured on celebrities as seen below.







*Elle*
**Emily Ratajkowski and Kendall Jenner wearing UGG® Classic Ultra Mini**

**Hailey Bieber and Kendall Jenner via Instagram (@haileybieber / @kendalljenner) Hailey Bieber wearing UGG® Classic Ultra Mini**

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**



***Vogue***
**Kaia Gerber wearing UGG® Classic Ultra Mini**

**Just Jared Jr. via Instagram (@justjaredjr)**
**Addison Rae wearing UGG® Classic Ultra Mini**

Id. at ¶ 14, Ex. 4. As can be expected from the vast sales and commercial recognition generated, a survey conducted by Matthew Ezell ("Ezell") demonstrated that 73% of consumers associated the appearance of the UGG® Classic Ultra Mini with a single source: UGG®. Declaration of Matthew Ezell ("Ezell Dec."), ¶ 5, 16-17 Ex. 2. As noted above, the UGG® Classic Ultra Mini has been repeatedly targeted by competitors and Deckers has filed several lawsuits against infringers attempting to trade on the success of the UGG® Classic Ultra Mini. Bereda Dec., at ¶ 15, Ex. 5.

**2.     The UGG® Tasman:** Likewise, the UGG® Tasman has and continues to be a popular style with consumers and celebrities alike; receiving high levels of unsolicited media attention as exemplified below.



**Bam Adebayo via Instagram (@bam1of1)**
**wearing the UGG® Tasman**



**Just Jared via Instagram (@justjared)**
**Kendall Jenner wearing the UGG® Tasman**



***Mail Online*, Shawn Mendes in UGG® Tasman**



**Patrick Mahomes via Instagram**
**(@patrickmahomes) wearing the UGG®**

Bereda Dec., at ¶ 28-29, Ex. 12-13. For more than twenty years, Deckers has sold the UGG®

Tasman, marketed under and featuring the design elements protected under the Tasman Trade Dress.

Id. at ¶ 24-25. As a result of its longevity and high recognition as an UGG® brand staple, the UGG®

Tasman has sold over ▮▮▮▮▮▮ units generating approximately $▮▮▮▮▮▮ in the U.S. between

April 2016 and March 4, 2025. Id. at ¶ 28, Ex. 12.

      **3.**      **The UGG® Bailey Button:** Deckers introduced the UGG® Bailey Button, the

embodiment of the Bailey Button Trade Dress, in 2009. Bereda Dec., at ¶ 16, 18, Ex. 6. That same

year, the USPTO granted Deckers a design patent (U.S. Design Patent D599,999 (the "'999 Patent"))

which covered the design of the UGG® Bailey Button. Id. at ¶ 17, Ex. 7. Since its introduction the

UGG® Bailey Button has become one Deckers' most popular UGG® products with over ▮▮▮▮▮▮

units sold in the U.S. between April 2016 and March 4, 2025, generating approximately ▮▮▮▮▮▮.

Id. at ¶ 21-22, Ex. 8-9. Like its fellow UGG® products discussed above, the UGG® Bailey Button is

popular with both consumers and celebrities (as exemplified below) and the Bailey Button Trade

Dress has achieved secondary meaning as demonstrated by the survey conducted by Ezell showing

that 62% of consumers associated the appearance of the UGG® Bailey Button with a single source:

UGG®. Ezell Dec., ¶ 4, 18-19, Ex. 1.



*ET*
**Selena Gomez wearing the UGG® Bailey Button**



*InStyle*
**Kelly Rowland wearing the UGG® Bailey Button**



*FootwearNews*
**Jennifer Lopez wearing the UGG® Bailey Button**



**Lana Condor via Instagram (@lanacondor) wearing the UGG® Bailey Button**

6

Bereda Dec., at ¶ 22, Ex. 9.  Additionally, over the years because of the UGG® Bailey Button's success it has been targeted by competitors for low-quality knockoffs which has prompted Deckers to file lawsuits against these infringers. Id. at ¶ 23, Ex. 10.

**B.    Quince and its Infringing Products**

**1.    Quince's business model is built on selling knockoffs:**  Founded in 2018, Quince is an e-commerce retailer which sells a wide range of products including apparel and footwear on its website. Blakely Dec., ¶ 3, 4, Ex 1[1], 2.[2] However, unlike Deckers, Quince does not have in-house designers for its footwear, nor does Quince own any design patens for footwear design. Blakely Dec., ¶ 5, 6 Ex. 3,[3] 4.[4] Instead, Quince has built its business on the backs of others' ingenuity. Blakely Dec., ¶ 5, 6 Ex.3,[5] 4.[6] Specifically, Quince regularly combs the websites of competitors to determine what products are "███████████████████" and what products are trending. Blakely Dec., ¶ 4, 5, 6 Ex. 2,[7] 3,[8] 4.[9] Then Quince decides what of these "████████" it wants to also sell and then uses images of these high revenue driving styles as a base to copy. Blakely Dec., ¶ 6, 3 Ex. 4,[10] 1[11]. Consequently, Quince's catalogue of footwear consists of copies of products that are already in the marketplace. Blakely Dec., ¶ 6, Ex. 4.[12] Through this business model Quince avoids the cost of designing its own products, the intensive marketing and advertising of those products to create demand in the marketplace, and the cost associated with designing numerous other products that may not be successful. As a result, Quince can offer similar products at much lower prices. Blakely Dec., ¶ 11-12, 30, Ex. 9-10, 28.

---

[1] Burgos Depo, p. 16:3-7
[2] Gupta Depo, p. 17:23-24; 24:1-2
[3] Gupta Depo, p. 27:20-28:6; 43:18-22)
[4] Lippert Depo, p. 32:6-9
[5] Gupta Depo p. 46:18-47:9
[6] Lippert Depo, p. 22:14-25:18; 34:24-35:14; 47:7-25
[7] Gupta Depo, p. 21:11-15
[8] Gupta Depo, p. 46:18-47:9
[9] Lippert Depo, p. 22:14-25:18; 47:7-25
[10] Lippert Depo, p. 47:7-25
[11] Burgos Depo, p. 28:3-17
[12] Lippert Depo, p. 34:24-35:14

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**2.**    **The Accused Products:** The Accused Products in this case were created in line with Quince's general business model – it began by reviewing UGG®'s website, ugg.com, to see what products were currently trending and doing well in the marketplace. Blakely Dec., ¶ 3, 17, 18, Ex. 1,[13] 15, 16. Already familiar with the UGG® brand and its products the UGG® Tasman, the UGG® Bailey Button Boot, and the UGG® Classic Ultra Mini, Quince then used images of these authentic UGG® products as a base copy for its Accused Products. Blakely Dec., ¶ 3, 4, 6, 10, 21, 23, Ex.1,[14] 2,[15] 4,[16] 8,[17] 19, 21. In email exchanges between Quince and its manufacturing partner, Quince specifically requests that the Accused Products look like authentic UGG® products. Blakely Dec., ¶ 19, 20 Ex. 17, 18.   Further demonstrating Quince's intent to keep the Accused Products as close to the authentic UGG® product designs as possible the only changes that Quince made to its own knock-off versions was to the outsole and making the fabric waterproof.



---

[13] Burgos Depo, p. 23:25-25:2; 78:24-79:4; 79:11-17; 80:13-22
[14] Burgos Depo, p. 28:18-25-29:1-9; 29:16-23; 42:13-15; 58:22-24; 60:20-22; 64:3-24; 73:3-6; 74:8-12
[15] Gupta Depo, p. 68:11-14; 12:20-13:9
[16] Lippert Depo, p. 25:19-25
[17] Defendant's Supplemental Response to Interrogatory, Set One, No. 23 (2024.09.26); Defendant's Supplemental Response to Interrogatory, Set One, No. 24 (2024.09.26); Defendant's Supplemental Response to Interrogatory, Set One, No. 8 (2024.09.26))

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Blakely Dec., ¶ 3, 19 Ex. 1,[18] 17. Quince also aimed to ensure that its Accused Product care tags matched UGG® care tags. Blakely Dec., ¶ 22, Ex. 20.



Additionally, for at least the Quince knock-off the UGG® Classic Ultra Mini, Quince reviewed prospective manufacturing partners with an eye towards using one who either manufactured for UGG® and/or was capable of producing a similar product Blakely Dec., ¶ 4, 6 Ex. 2,[19] 4.[20] Finally, if there were any doubts whether Quince knew what it was doing when it selected and sold the Accused Products, one need not look any further than Quince's internal documents and emails regarding Google AdWords, which contain terms, including but not limited to: *UGG Slipper Dupes*, *UGG lookalikes*, *UGG Shearling Slippers*, *UGG Shearling Clog*, *UGG Shearling Boots*. Blakely Dec., ¶ 14, Ex. 12.

Quince began selling the Accused Product Mini Boot on December 13, 2022; the Accused Product Button Boot on November 23, 2023; and the Accused Product Clog Slipper on December 12, 2022. Blakely Dec., ¶ 7, 8 Ex. 5,[21] 6.[22] Each of the three Accused Products was marketed towards consumers over the age of 18 through influencer marketing, social media, Google, and

---

[18] Burgos Depo, p. 46:4-17; 52:9-22
[19] Gupta Depo, p. 68:11-14
[20] Lippert Depo, p. 35:25-14; 77:24-78:1; 84:21-85:15; 40:25-41:20
[21] Interrogatory Resp., Set One, No. 5 dated 2024.02.19
[22] Interrogatory Resp., Set Two, No. 17-18 dated 2024.02.29

9

advertisements through both print and TV/streaming services. Blakely Dec., ¶ 4, Ex. 2.[23] On June 12, 2023, Deckers initiated this instant action against Quince. Bereda Dec., ¶ 35. However, even after receiving notice of Deckers' claims, Quince continued to sell the Accused Products until at least September 2024. Blakely Dec., ¶ 11-12, Ex. 9-10.

Quince's efforts to create undeniable look-a-likes of authentic UGG® Classic Ultra Mini, UGG® Tasman, and UGG® Bailey Button Boots were undoubtably rewarded. Blakely Dec., ¶ 3, 4, 6, 10, 21, 23, Ex.1,[24] 2,[25] 4,[26] 8,[27] 19, 21. This is particularly evident in the context of post-sale confusion. Ezell Dec., ¶ 6-7, 20-27 Ex. 3-4. First, confusion surveys conducted by Ezell and David Franklyn ("Franklyn") demonstrated that: 76.5% of survey respondents mistakenly believed that the Accused Mini Boots are made by, have the authorization or approval of, or have a business affiliation or business connection with Plaintiff; 54.5% of survey respondents mistakenly believed the Accused Product Button Boots are associated with Plaintiff; and 34.6% of survey respondents believed the Accused Product Clog Slipper is associated with Plaintiff. Ezell Dec., ¶ 6-7, 20-27 Ex. 3-4; Declaration of David Franklyn ("Franklyn Dec."), ¶ 3, 14 Ex. 1.  Second, Quince's own witnesses, including its CEO/co-founder and Sr. Merchandising Manager, were unable to tell the Accused Products from authentic UGG® products noting that they would have to see the product labels and/or the outsole to determine which product was which brand. Blakely Dec., ¶ 3, 4 Ex. 1,[28] 2.[29]

## III.    SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper where no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. In responding to a motion for summary judgment, the non-moving party may not simply rely upon the

[23] Gupta Depo, p. 127:2-12; 126:18-127:1
[24] Burgos Depo, p. 28:18-25-29:1-9; 29:16-23; 42:13-15; 58:22-24; 60:20-22; 64:3-24; 73:3-6; 74:8-12
[25] Gupta Depo, p. 68:11-14; 12:20-13:9
[26] Lippert Depo, p. 25:19-25
[27] Defendant's Supplemental Response to Interrogatory, Set One, No. 23 (2024.09.26); Defendant's Supplemental Response to Interrogatory, Set One, No. 24 (2024.09.26); Defendant's Supplemental Response to Interrogatory, Set One, No. 8 (2024.09.26))
[28] Burgos Depo, p. 37:3-39:4
[29] Gupta Depo., p. 11:21-12:7

pleadings to designate specific facts establishing a genuine issue for trial. Fed. R. Civ. P. 56(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Instead, it must demonstrate the existence of a genuine issue of material fact through the use of affidavits, depositions, answers to interrogatories, and admissions.  *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(c).  If "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Industrial Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).

The movant must also demonstrate the lack of any genuine dispute of material fact as to affirmative defenses asserted by the defendant. *Celotex Corp.*, 477 U.S. at 323. With respect to the affirmative defenses of a non-moving defendant, a plaintiff may meet its burden by simply pointing out the absence of evidence from the defendant on an essential element. *Id*. at 325. When the non-moving party has the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001). "[S]ummary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." *adidas Am., Inc. v. Payless ShoeSource, Inc*., 546 F. Supp. 2d 1029, 1044 (D. Or. 2008) (citing *Celotex*, 477 U.S. at 323).

Plaintiff's evidence and Defendant's lack of any facts on the issues regarding trade dress infringement sufficiently establishes Defendant *intentionally* infringed Plaintiff's Asserted Trade Dress. Further, Defendant has provided no evidence to support its affirmative defenses going to liability. Thus, judgment should be entered in Plaintiff's favor.

## IV.    ARGUMENT

### A.    Plaintiff Should Prevail on its Trade Dress Infringement Claims

To succeed on a claim for infringement of an unregistered trade dress, a party must "prove: (1) that its claimed dress is nonfunctional; (2) that its claimed dress serves a source-identifying role either because it is inherently distinctive or has acquired secondary meaning; and (3) that the defendant's product or service creates a likelihood of consumer confusion." *Clicks Billiards, Inc. v. Sixshooters, Inc*., 251 F.3d 1252, 1258 (9th Cir. 2001).  The Ninth Circuit has stressed that in evaluating the elements of a trade dress claim, "it is crucial that [courts] focus not on the individual

elements, but rather on the overall visual impression that the combination and arrangement of those elements create." *Clicks Billiards* at 1259.

Deckers has specifically defined its Asserted Trade Dress for each of the three UGG® products at issue as follows:

| **Classic Ultra Mini Trade Dress** | **Bailey Button Boot Trade Dress** | **Tasman Trade Dress** |
|---|---|---|
| a. An ankle-high boot;<br>b. Classic suede boot styling;<br>c. An exaggerated, raised and exposed circular stitch pattern;<br>d. Exposed tufting;<br>e. A raised and rounded vamp;<br>f. A suede heel overlay on the boots exterior;<br>g. Fabric binding along the top of the boot and along the sole;<br>h. A thick, flat sole; and<br>i. A top line that is higher in the front and lower in the back. | a. Classic suede boot styling made famous by the UGG® brand;<br>b. Overlapping of front and rear panels on the lateral side of the boot shaft;<br>c. Curved top edges on the overlapping panels;<br>d. Exposed fleece-type lining edging the overlapping panels and top of the boot shaft; and<br>e. One or more buttons (depending on the height of the boot) prominently featured on the lateral side of the boot shaft adjacent the overlapping panels, on the front panel. | a. An embroidered braid around the opening of the upper;<br>b. A raised prominent seam on the front part of the upper running longitudinally down the center of the upper;<br>c. A raised and rounded dome shaped toe;<br>d. Brushed suede-like exterior; and<br>e. A thick, flat outsole. |

Blakely Dec., ¶ 13, Ex. 11 at ¶ 22, 35, 48.  In addition to the defined elements above, Deckers also included the following photographs exemplifying the Asserted Trade Dress as follows:

| **Classic Ultra Mini Trade Dress** | **Bailey Button Boot Trade Dress** | **Tasman Trade Dress** |
|---|---|---|

     

Blakely Dec., ¶ 13, Ex. 11 at ¶ 23, 36, 49.  Thus, Deckers has specifically defined the respective trade dresses at issue in this action. *See e.g.*, *adidas America, Inc. v. Skechers USA, Inc.*, 2017 U.S. Dist.

LEXIS 122459, 2017 WL 3319190, at * 8 (D. Or. August 3, 2017); *Vans Inc. v. ACI Int'l*, 2023 U.S. Dist. LEXIS 189978, at *22-23 (C.D. Cal. Oct. 11, 2023).

### 1.    The Asserted Trade Dresses are non-functional

The three Asserted Trade Dress are clearly non-functional. It is improper to find a product design functional simply because it includes elements that are functional. *Blumenthal Distrib., Inc. v. Herman Miller, Inc.*, 963 F.3d 859 (9th Cir. 2020). The Ninth Circuit's standard for non-functionality is forgiving—it is perfectly appropriate for a plaintiff to define its trade dress as "the 'overall appearance' of its product," and the proper standard for functionality in such a scenario is whether "'protecting the trade dress threatens to eliminate a substantial swath of competitive alternatives in the relevant market.'" *Id.* at 864-7.

In *Blumenthal* the Ninth Circuit explained: "[E]very chair's appearance is affected by having a backrest. . . which serves the utilitarian function of providing back support.  But that does not mean that every chair's overall appearance is functional as a matter of law."  *Id*. at 867. Rather, a claimed design has utilitarian functionality only if the four *Disc Golf* factors weigh in factor of such a finding. *Id*. Those factors are: (1) whether the design yields a utilitarian advantage; (2) whether alternative designs are available; (3) whether advertising touts the utilitarian advantages of the design; and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture. *Id*.  The Ninth Circuit rejected the  argument that Herman Miller's iconic Eames chairs were functional, noting that they were "nothing like" the "thoroughly utilitarian products" the Court previously found to be functional, which included "a pocket-knife-like tool," "a tool used in emergencies to quickly cut people out of wheelchairs," and "a piece of industrial machinery called a 'traction hoist.'"  *Id*. at *6.  It noted: "In each of those cases, the product's form followed its utilitarian functions, and there was no evidence of any non-utilitarian design choices."  *Id*.  The Court also reversed judgment that Herman Miller's highly ergonomic and comfortable Aeron chairs were functional because it relied on "an erroneously broad definition of functionality."  *Id*. at 867-8.

Here, like the chair designs at issue in *Blumenthal*, the three Trade Dresses are nothing like "thoroughly utilitarian" pocket-knives and traction hoists. None of the three Asserted Trade Dress provide a utilitarian advantage over another boot and/or clog design in the market. Declaration of

Caroline de Baere ("de Baere Dec."), ¶ 2, Ex. 1 at p. 41-52, 54-62, 63-71. And many designs exist as alternatives to the Asserted Trade Dress. *Vans Inc. v. ACI*, at *15 ("there are thousands of different shoe configurations that can still serve the function of a skate shoe."); *adidas v. Skechers* at *14 ("Instead of adopting one of those alternatives, Skechers elected to design a shoe which deliberately cloned the Stan Smith down to the millimeter."); de Baere Dec., ¶ 2, Ex. 1 at p. 41-52, 54-62, 63-71. The design of the UGG® Classic Ultra Mini, UGG® Bailey Button, and UGG® Tasman do not result from an inexpensive method of manufacturing. *Id*. Nor does Deckers advertise that the overall appearance of UGG® Classic Ultra Mini, UGG® Bailey Button and/or UGG® Tasman (i.e., the combination of elements that make up the Classic Ultra Mini Trade Dress, Bailey Button Boot Trade Dress, and Tasman Trade Dress, respectively) provide any sort of functional advantage. *See Vans Inc. v. ACI* at *19. Finally, Deckers obtained design patents on the UGG® Classic Ultra Mini and UGG® Bailey Button. Bereda Dec., at ¶ 9, 17 Ex. 2, 7. A design patent is presumptive evidence of non-functionality, evidence that may support a similar trade dress claim. *See Govino LLC v. White Poles LLC*, 2017 WL 6442187 at *9 (N.D. Cal. Nov. 3, 2017).

While boots and clogs (like chairs) are designed for comfort, there are many boots and clogs in the marketplace that may serve the same functions as the UGG® Classic Ultra Mini, UGG® Bailey Button and UGG® Tasman, but which look entirely different. *Id*; de Baere Dec., ¶ 2, Ex. 1 at p. 41-52, 54-62, 63-71. And while *some* of these elements may serve a function, much like the chair backrest in *Blumenthal*, the proper inquiry regarding functionality is to look to the *overall* visual impression of the elements taken in combination. Here, Plaintiff's expert has opined that the Classic Ultra Mini Trade Dress, Bailey Button Boot Trade Dress and Tasman Trade Dress are, indeed, non-functional. de Baere Dec., ¶ 2, Ex. 1 at p. 41-52, 54-62, 63-71; *see Vans Inc. v. ACI Int'l*, 2023 U.S. Dist. LEXIS 189978, at *11-21 (Vans trade dress non-functional); [30] *adidas America, Inc. v. Skechers USA, Inc*., 2017 U.S. Dist. LEXIS 122459, 2017 WL 3319190, at *13-15 (MSJ granted in

---

[30] "Vans' shoes are far different from these purely utilitarian products. Of course, Vans' shoes, and each component of them, serve some function. But it does not follow that "the[ir] overall design" is functional." *Vans Inc. v. ACI Int'l*, 2023 U.S. Dist. LEXIS 189978, at *11-21.

favor of adidas finding trade dress non-functional); *adidas v. Payless*, 546 F. Supp. 2nd 1029, 1083-85 (D. Or. 2008) ("adidas is entitled to summary judgment on the issue of functionality".)

### 2.     The Asserted Trade Dress have acquired secondary meaning

"To succeed on a trade dress infringement based on product design, the plaintiff must show that her design has attained secondary meaning." *Art Attacks Ink, LLC v. MGA Entm't Inc.*, 581 F.3d 1138, 1145 (9th Cir. 2009.  When deciding whether secondary meaning exists for a particular trade dress, courts consider such things as: (1) whether actual purchasers associate the dress with the source; (2) the degree and manner of advertising by the party seeking protection; (3) the length and manner of use of the dress, and (4) whether the use by the party seeking protection has been exclusive. See *Clamp Mfg. Co. v. Enco Mfg. Co.*, 870 F.2d 512, 517 (9th Cir), cert denied, 493 U.S. 872 (1989). Other considerations such as sales success and attempts by others to imitate the mark also favor finding secondary meaning. See *Clicks Billiards*, 251 F.3d at 1266.  Finally, if a defendant deliberately copies a trade-dress, an strong inference arises of secondary-meaning. *Id.*; *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 615 (9th Cir. 1989) ("[P]roof of copying strongly supports an inference of secondary meaning.");*Adidas-Salomon Ag v. Defendants Corp.*, 228 F. Supp. 2d 1192 (D. Or. 2002).  That is because competitors generally copy "to realize upon a secondary meaning that is in existence." *P & P Imps. LLC v. Johnson Enters., LLC*, 46 F.4th 953, 961-2 (9th Cir. 2022).

All three UGG® products in this action have generated significant sales over the years: since its introduction in 2020, the UGG® Classic Ultra Mini has sold over ▇▇▇▇ pairs generating over $▇▇▇▇ in the U.S. making it one of UGG®'s best-selling production. Bereda Dec., at ¶ 13, Ex. 3. Likewise, the UGG® Tasman and the UGG® Bailey Button have enjoyed significant sales numbers over the past decade – the UGG® Tasman, introduced over twenty years ago, has sold over ▇▇▇▇ pairs generating over $▇▇▇▇ and the UGG® Bailey Button, introduced in 2009, has sold over ▇▇▇▇ units generating $▇▇▇▇ in the U.S. since April 2016. Id. at ¶ 21, 28, Ex. 8, 12. The success of each of these three products is due in part to Deckers extensive advertising and marketing efforts. Deckers spent approximately $▇▇▇▇ on advertising and marketing associated with the UGG® brand and its products, including the UGG® Classic Ultra Mini, UGG® Bailey Button, and UGG® Tasman. Id. at ¶ 33, Ex. 16. The strong secondary meaning of the Asserted Trade

Dress is also demonstrated by the extensive celebrity and social media coverage that each product has received. Id. at ¶ 14, 21, 29 Ex. 4, 8, 13; *See adidas America*, 890 F.3d at 754 ("Also indicative of secondary meaning is the considerable amount of unsolicited media coverage praising the Stan Smith's influence and iconic status as one of the most famous sneakers of all time.")

Deckers UGG® Classic Ultra Mini, UGG® Tasman, and UGG® Bailey Button have not only caught consumer and celebrity attention, but also that of competitors who have attempted to sell their knockoffs. Id. at ¶ 15, 23, 30, Ex. 5, 10, 14. Deckers has filed numerous lawsuits against infringers, including but not limited to Romeo and Juliette (Bearpaw), Target, Cushionaire, Walmart, Steve Madden, Gap, and others in connection with the UGG® Classic Ultra Mini, Bailey Button and/or Tasman. Id. at ¶ 15, 23, 30, Ex. 5, 10, 14. As discussed above, Defendant's intentional and close copying of Deckers' Asserted Trade Dress, alone, is sufficient to establish secondary meaning in the Asserted Trade Dress. Blakely Dec., ¶ 3, 4, 6, 10, 21, 23, Ex.1,[31] 2,[32] 4,[33] 8,[34] 19, 21; *Faberge, Inc. v. Saxony Products, Inc*., 605 F.2d 426, 428 (9th Cir. 1979). "There is no logical reason for the precise copying save an attempt to realize upon a secondary meaning that is in existence." *Audio Fidelity, Inc. v. High Fidelity Recordings, Inc.*, 283 F.2d 551, 558 (9th Cir. 1960).

Finally, with regards to the Classic Ultra Mini, Bailey Button Boot, and Tasman Trade Dresses, Deckers has provided expert surveys demonstrating that each has achieved secondary meaning. *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1358 (9th Cir. 1985) ("An expert survey of purchasers can provide the most persuasive evidence on secondary meaning."). Ezell conducted secondary meaning surveys for both the UGG® Classic Ultra Mini and UGG® Bailey Button, finding a net secondary meaning of 73% and 62%, respectively. Ezell Dec., ¶ 4-5, 14-19 Ex. 1-2. These findings fall within the range that courts have found to be sufficient to support secondary meaning. *See* 6 J.Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 32:190.

[31] Burgos Depo, p. 28:18-25-29:1-9; 29:16-23; 42:13-15; 58:22-24; 60:20-22; 64:3-24; 73:3-6; 74:8-12

[32] Gupta Depo, p. 68:11-14; 12:20-13:9

[33] Lippert Depo, p. 25:19-25

[34] Defendant's Supplemental Response to Interrogatory, Set One, No. 23 (2024.09.26); Defendant's Supplemental Response to Interrogatory, Set One, No. 24 (2024.09.26); Defendant's Supplemental Response to Interrogatory, Set One, No. 8 (2024.09.26))

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Deckers also provided an *Eveready* survey conducted by Franklyn for the UGG® Tasman in the post-sale context, which is relevant to a finding of secondary meaning. Franklyn Dec., ¶ 3, 14 Ex. 1; 2 *McCarthy on Trademarks* § 15:11 ("If there is reliable evidence of actual customer confusion, then it follows logically that there must also be some secondary meaning in the senior user's designation. If people were not aware of the trademark significance of the senior mark, how could they be confused as to source or affiliation?"); *see also American Scientific Chemical, Inc. v. American Hosp. Supply Corp.*, 690 F.2d 791, 793, 216 U.S.P.Q. 1080 (9th Cir. 1982)

### 3.     Defendant's deliberate copying of the Asserted Trade Dress is likely to cause consumer confusion

"In the Ninth Circuit, neither an intent to confuse, nor actual confusion are required elements of a trademark infringement claim." *Payless*, 546 F. Supp. 2d at 1051 (citing *Coca–Cola Co. v. Overland, Inc.*, 692 F.2d 1250, 1256 n.16 (9th Cir. 1982)). The key question is whether the two marks are sufficiently similar that a "reasonably prudent consumer in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." *Dreamwerks Prod. Grp., Inc. v. SKG Studio,* 142 F.3d 1127, 1129 (9th Cir. 1998) (internal quotation marks omitted).

When a manufacturer launches a new product into an established market, it has an affirmative duty to avoid causing confusion with existing brands. *Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F. 2d 812, 817-818 (1st Cir. 1987); *Hewlett-Packard Co. v. Packard Press, Inc.*, 281 F.3d 1261, 1265, 62 U.S.P.Q.2d 1001 (Fed. Cir. 2002); *Nina Ricci, S.A.R.L. v. E.T.F. Enterprises, Inc.*, 889 F.2d 1070, 1074, 12 U.S.P.Q.2d 1901 (Fed. Cir. 1989) ("[W]e must reiterate the teaching of our predecessor court that there is 'no excuse for even approaching the well-known trademark of a competitor […] and that all doubt as to whether confusion, mistake, or deception is likely is to be resolved against the newcomer, especially where the established mark is one which is famous […]'")

Likelihood of confusion in the trade dress context is evaluated by reference to the same *Sleekcraft* [35] factors used in the ordinary trademark context: strength of the trade dress, similarity between plaintiff's and defendant's trade dress, evidence of actual confusion, marketing channels

---

[35] *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 346 (9th Cir. 1979)

used, type of goods and likely degree of purchaser care, and the defendant's intent in selecting its trade dress. *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 616 (9th Cir. 1989). This case is primarily one of post-sale confusion; *i.e.* the similarity of the trade dress when considered away from the point of sale and stripped of any packaging that may be attached to the product and removed upon use, as well as initial interest confusion, which is customer confusion that creates initial interest in a competitor's product. *See Levi Strauss v. Bluebell, Inc.*, 632 F.2d 817 (9th Cir. 1980).

Confusion can be of several sorts. An analysis of the type of infringement is critical to the underlying question of who is being confused and about what. The classic case of direct confusion occurs when customers want to buy the plaintiff's product and because of the similarity of the marks, mistakenly buy the defendant's product instead. McCarthy at § 23:10. However, in this case, Deckers is asserting a claim of *post-sale confusion*. As Judge Frank instructed in the leading case on point, likely confusion of those other than a purchaser of an article is actionable. *Mastercrafters Clock & Radio Co. v. Vacheron & Constantin-Le Coultre Watches, Inc*, 221 F. 2d 464 (2d Cir. 1955).  Post sale confusion occurs when consumers see defendant's products outside the retail context and mistakenly associate them with the plaintiff's mark. "[S]uch confusion occurs, for example, when a consumer observes someone wearing a pair of Payless accused shoes and believes that the shoes are Reebok's. Consequently, the consumer may attribute any perceived inferior quality of Payless shoes to Reebok, thus damaging Reebok's reputation and image." *Payless Shoesource, Inc. v. Reebok Intern. Ltd.*, 998 F.2d 985, 989 (Fed. Cir. 1993). In *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 873 (2d Cir. 1986) the court recognized the potential for post-sale confusion where a "consumer seeing the familiar stitching pattern [on defendant's jeans] will associate the jeans with [plaintiff Levi] and that association will influence his buying decisions." *See also Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F. 2d 817 (9th Cir. 1980)("Wrangler's use of its projecting label is likely to cause confusion of Strauss's mark and who observe Wrangler's projecting label after the point of sale.") Courts have consistently held that a likelihood of post-sale confusion by the general public is sufficient to establish liability for trademark infringement. *See* 3 MCCARTHY, supra, § 23:7 (citing and discussing cases).

Under a post-sale confusion analysis, strength of the mark, similarity of the mark, and similarity of goods are of *primary importance*, whereas actual confusion, the junior user's intent, marketing channels, and degree of purchaser care are *less significant*. *See adidas-America, Inc. v. Payless Shoesource, Inc*., 546 F.Supp.2d 1029, 1055 (D. Or. 2008);  *Payless*, 998 F. 2d at 989–90 (factors such as channels of trade are "directed to pre-sale confusion," and are "immaterial to […] whether actionable confusion is likely to occur after the marked product has entered the public arena."); *Vans, Inc. v. Walmart, Inc*., 2022 U.S. Dist. LEXIS 95244 *25 (C.D. Cal. March 31, 2022) ("Given that Vans is arguing only postsale confusion, this factor does not weigh into the analysis."); *Payless*, 998 F. 2d at 990 ("post-sale observers may be unaware that Payless and [adidas] shoes are sold in different stores or at different prices, yet their confusion may be detrimental to [adidas].")

**The Parties' Respective Trade Dress are Highly Similar** - The similarity of the marks "has always been considered a critical question in the likelihood-of-confusion analysis." *Vans. v. Walmart*, 2022 U.S. Dist. LEXIS 95244, at *21. "[T]he greater the similarity between the two marks at issue, the greater the likelihood of confusion." *Id*. The Ninth Circuit has "developed three axioms that apply to the 'similarity' analysis: 1) Marks should be considered in their entirety and as they appear in the marketplace; 2) Similarity is best adjudged by appearance, sound, and meaning; and 3) Similarities weigh more heavily than differences." *Id*., citing *Entrepreneur Media, Inc. v. Smith,* 279 F.3d 1135, 1144 (9th Cir. 2002). As with trademarks, "[s]imilarities weigh more heavily than differences." *Mattel Inc. v. Walking Mt. Prods*., 353 F.3d 792, 808 (9th Cir. 2003) In trade dress cases, courts have cautioned that "the mark must be examined as a whole, not by its individual constituent parts." *Vans. v. Walmart*, 2022 U.S. Dist. LEXIS 95244, at *21., citing *Clicks Billiards,Inc. v. Sixshooters, Inc*., 251 F.3d 1252, 1259 (9th Cir. 2001).  In addition, a lesser degree of similarity between two parties' marks is required when the marks are applied to identical goods or services. *See HRL Associates, Inc. v. Weiss Associates, Inc*., 1989 TTAB LEXIS 33, 12 U.S.P.Q.2D (BNA) 1819 (TTAB 1989), aff'd 902 F.2d 1546 (Fed. Cir. 1990).  As Deckers' expert sets forth in detail, and as this Court can see with its very own eyes, the Accused Products are strikingly similar to the design of the Asserted Trade Dress. de Baere Dec., ¶ 2, Ex. 1 at p. 255-268, 269-279, 280-290. The similarity between the products is not only unmistakable, but they are also intentional as evidenced by the emails between

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Quince and its manufacturer, internal design documents, and Quince's deposition testimony. <u>Blakely Dec.</u>, ¶ 3, 4, 6, 10, 21, 23, Ex.1,[36] 2,[37] 4,[38] 8,[39] 19, 21; *See Clicks Billiards*, 251 F.3d 1252, 1257 (9th Cir. 2001) ("[I]t is crucial that we focus *not* on the individual elements, but rather on the overall visual impression that the combination and arrangement of those elements create."). This factor weighs strongly in favor of Deckers. *Vans v. Walmart*, 2022 U.S. Dist. LEXIS 95244, at \*24.

**The Parties' Products are Identical** - Relatedness of the parties' goods, reflects the common-sense intuition that "the danger of consumer confusion is heightened" where goods are related or complementary.  *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291 (9th Cir. 1992).  Where "the products are very similar," a "lower showing of similarity between the marks" is required.  *adidas v. Payless*, 546 F. Supp. 2d at 1054-55. Related goods are more likely to cause confusion than unrelated goods, and therefore the Ninth Circuit has held that a diminished standard of similarity is applied when comparing the marks of closely related goods. *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1392 (9th Cir. 1993). The goods in question are essentially the same product – they are "reasonably interchangeable by buyers for the same purposes," and thus competitive. *adidas v. Payless*, 546 F. Supp. 2d at 1054-55. This is evidenced not only by the plain comparison between the products but by Quince's own website where it advertises its Accused Products in relation to the authentic UGG® product. <u>Blakely Dec.</u>, ¶ 30, Ex. 28. Thus, this factor weighs heavily in favor of Deckers. *Vans v. Walmart*, 2022 U.S. Dist. LEXIS 95244 at \*25; *adidas v. Payless*, 546 F. Supp. 2d at 1054; *Brookfield Communications v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1056 (9th Cir. 1999) ("In light of the virtual identity of the marks, if they were used with identical products or services likelihood of confusion would follow as a matter of course.")

**The Asserted Trade Dress are Incredibly Strong** - Strength of the trade dress is demonstrated by "extensive advertising, length of time in business, public recognition and

---

[36] Burgos Depo, p. 28:18-25-29:1-9; 29:16-23; 42:13-15; 58:22-24; 60:20-22; 64:3-24; 73:3-6; 74:8-12
[37] Gupta Depo, p. 68:11-14; 12:20-13:9
[38] Lippert Depo, p. 25:19-25
[39] Defendant's Supplemental Response to Interrogatory, Set One, No. 23 (2024.09.26); Defendant's Supplemental Response to Interrogatory, Set One, No. 24 (2024.09.26); Defendant's Supplemental Response to Interrogatory, Set One, No. 8 (2024.09.26))

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

uniqueness." *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1179 (9th Cir. 1988). Conceptual strength rests on its distinctiveness, which, in turn, is related to the question of secondary meaning.  Because there is evidence of the secondary meaning achieved in each of the Asserted Trade Dress (see above), the Court need not evaluate the level of inherent distinctiveness of the trade dress. *Multicraft Imps. v. Mariposa United States*, 2018 U.S. Dist. LEXIS 245368 *26 (C.D. Cal. Jan. 19, 2018). Notably, commercial strength also concerns the marketplace recognition of the trade dress at issue. *Id*.  Here, Deckers has presented evidence that each of the Asserted Trade Dress is commercially strong.

**Defendant Acted with Bad Intent** – "When an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public." Of*ficial Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1394 (9th Cir. 1993). In the Ninth Circuit, intent is presumed when a defendant adopts a trademark with knowledge of a similar mark.  Id.; *Interstellar Starship Servs., Ltd. v. Epix Inc.*, 184 F.3d 1107, 1111 (9th Cir. 1999); *Ironhawk Technologies Inc. v. Drop Box*, 2 F. 4th 1150, 1167 (9th Cir. 2021); *Moroccanoil, Inc. v. Zotos Int'l, Inc.*, 230 F. Supp. 3d 1161, 1177 (C.D. Cal. 2017); *Vans v. Walmart*, **28-29; *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 157-58 (9th Cir. 1963). Here, Quince cannot deny that it knew of the existence of the UGG® brand, or its products, including the UGG® Classic Ultra Mini, UGG® Tasman, and UGG® Bailey Button. Blakely Dec., ¶ 3, 4, 6, 10, 21, 23, Ex.1,[40] 2,[41] 4,[42] 8,[43] 19, 21. In fact, Quince admitted to selecting prospective manufacturing partners for the Accused Products with an eye towards who has manufactured UGG® products and/or could produce a similar product. Blakely Dec., ¶ 6, Ex. 4.[44] During deposition, Quince's 30(b)(6) witness, and Sr. Merchandising Manager, admitted that she was familiar with the UGG® Tasman and UGG® Classic Ultra Mini and, in fact, owned a pair of UGG®

---

[40] Burgos Depo, p. 28:18-25-29:1-9; 29:16-23; 42:13-15; 58:22-24; 60:20-22; 64:3-24; 73:3-6; 74:8-12

[41] Gupta Depo, p. 68:11-14; 12:20-13:9

[42] Lippert Depo, p. 25:19-25

[43] Defendant's Supplemental Response to Interrogatory, Set One, No. 23 (2024.09.26); Defendant's Supplemental Response to Interrogatory, Set One, No. 24 (2024.09.26); Defendant's Supplemental Response to Interrogatory, Set One, No. 8 (2024.09.26))

[44] Lippert Depo, p. 35:25-14; 77:24-78:1; 84:21-85:15; 40:25-41:20

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Classic Ultra Mini. <u>Blakely Dec.</u>, ¶ 3, 10, Ex. 1,[45] 8.[46] Likewise, Quince's CEO admitted he was familiar with the UGG® Bailey Button prior to the lawsuit, and Quince's discovery responses indicated familiarity with all three products prior to the lawsuit. <u>Blakely Dec.</u>, ¶ 4, Ex. 2.[47]

Nor can Quince deny that it intended the Accused Products to be UGG® look-a-likes. Quince admitted that its business practice is to review the websites of competitors to see what items are currently trending and are best sellers; that it was familiar with each of the authentic UGG® products and that it reviewed UGG®'s website. <u>Blakely Dec.</u>, ¶ 3, 17, 18 Ex. 1,[48] 15, 16. It then admitted that it takes its competitor's bestselling products as a base copy to its manufacturing partners to have look-a-like items made for sale, and that in this case it used images of authentic UGG® products as a base copy for its Accused Products. <u>Blakely Dec.</u>, ¶ 3, 4, 6, 10, 19, 20, 21, 23,  Ex. 1,[49] 2,[50] 4,[51] 8,[52] <u>17, 18, 19, 21</u>. Quince's intent to create an undistinguishable look-a-like is further exemplified by email communications demonstrating Quince's intent to copy the care label on authentic UGG® products, and by the only two changes it made to the Accused Products: changing the outsole so it did not say "UGG" and making the fabric of waterproof. <u>Blakely Dec.</u>, ¶ 3, 19, 22 Ex.1,[53] <u>17, 20.</u>

Further, Quince continued selling the Accused Products after being sued by Deckers. <u>Blakely Dec.</u>, ¶ 11-12, Ex. 9-10;</u> *See Boldface Licensing + Branding v. By Lee Tillett, Inc.*, 940 F. Supp. 2d 1178, 1195 (C.D. Cal. 2013) (finding that defendant had actual knowledge of plaintiff's trademark rights where defendant received cease and desist letter from plaintiff); *Vans v. Walmart* at *29.

Finally, the high degree of similarity between the Accused Products and the respective UGG® products raises an inference of intent to confuse. *See Adidas America*, 149 F. Supp. 3d at 1244 ("given the striking similarity between the shoes, there is but one inference to draw: that Skechers

---

[45] Burgos Depo, p. 28:18-25-29:1-9; 29:16-23
[46] Defendant's Supplemental Response to Interrogatory, Set One, No. 8, 24 (2024.09.26)
[47] Gupta Depo, p. 12:20-13:9
[48] Burgos Depo, p. 23:25-25:2; 78:24-79:4; 79:11-17; 80:13-22
[49] Burgos Depo, p. 58:22-24; 60:20-22; 64:3-24; 73:3-6; 74:8-12; 42:13-15; 28:18-25-29:1-9; 29:16-23
[50] Gupta Depo, p. 12:20-13:9; 68:11-14
[51] Lippert Depo, p. 25:19-25
[52] Defendant's Supplemental Response to Interrogatory, Set One, No. 8, 23, 24 (2024.09.26)
[53] Burgos Depo, p. 46:4-17; 52:9-22

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

knowingly adopted a mark very similar to the Stan Smith to draw off the success of adidas's iconic shoe."); *Amini Innovation Corp. v. McFerran Home Furnishings, Inc.*, 68 F. Supp. 3d 1170, 1175 (C.D. Cal. 2014) (similarity is "circumstantial evidence of intentional copying*"); NEXxUS Products Co. v. Gentle Concepts, Inc.*, 1993 WL 496824, at *7 (M.D. Fla. Apr. 30, 1993) ("[s]uch similarity could not have been accomplished ... without a deliberate intent to copy"). This is especially true given that Quince has copied numerous UGG® designs. *Vans v. Walmart* at *29.

 

UGG® Classic Ultra Mini            Quince Mini Boot

 

UGG® Bailey Button            Quince Button Boot

 

UGG® Tasman            Quince Clog Boot

**Actual Confusion** - Like intent to confuse, evidence of actual confusion is not required for a plaintiff to succeed in a trademark infringement claim. *Brookfield*, 174 F.3d at 1060. However, evidence of actual confusion "constitutes persuasive proof that future confusion is likely." *Clicks Billiards*, 251 F.3d at 1265. The Ninth Circuit has held that actual confusion may be established by survey evidence. *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1035 (9th Cir. 2010). Here, confusion surveys conducted by Ezell and Franklyn demonstrated that: 76.5% of survey respondents mistakenly believed that the Accused Mini Boots are

made by, have the authorization or approval of, or have a business affiliation or business connection with Plaintiff; 54.5% of survey respondents mistakenly believed the Accused Product Button Boots are associated with Plaintiff; and 34.6% of survey respondents believed the Accused Product Clog Slipper is associated with Plaintiff. Ezell Dec., ¶ 6-7, 20-27 Ex. 3-4; Franklyn Dec. ¶ 3, 14 Ex. 1. These findings are sufficient to support a finding of actual confusion. *Thane Intern., Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 903 (9th Cir. 2002) (27.7% consumer confusion sufficient to support actual confusion); *Exxon Corp. v. Texas Motor Exchange of Houston, Inc.*, 628 F.2d 500, 507 (5th Cir. 1980) (15% sufficient); *adidas v. Payless*, 546 F. Supp. 2d at 1059. (citing cases).[54]

**Marketing Channels are Irrelevant to Post-Sale Confusion**- Convergent marketing channels "increase the likelihood of confusion." *Pom Wonderful*, 775 F.3d at 1130. However, because marketing channels are directed towards pre-sale confusion they are "immaterial to the issue of whether actionable confusion is likely to occur *after* the marked product has entered the public arena," *ie*. when the Plaintiff is arguing *post sale* confusion. *Payless v. Reebok Int'l., Ltd.* 998 F.2d 985, 989-90 (Fed. Cir. 1993); *Vans, Inc. v. Walmart, Inc.*, 2022 U.S. Dist. LEXIS 95244 *25 (C.D. Cal. March 31, 2022). Given that Deckers is arguing post-sale confusion, this factor does not weigh into the analysis. *See Vans, Inc.*, at *25; *adidas v. Payless*, 546 F. Supp. 2d at 1055 ("[C]hannels of trade are largely irrelevant in determining the likelihood of post-sale confusion.")

**The Degree of Care Factor Favors Deckers** - Confusion can occur even among careful purchasers of expensive products, such as the high-end boats at issue in *Sleekcraft*. 599 F.2d at 353. Likelihood of confusion increases, however, "when goods are inexpensive and unsophisticated." *Pac. Sunwear of Cal. Inc. v. KP Fashion Co.*, 2009 U.S. Dist. LEXIS 139342 (C.D. Cal. March 20, 2009); *see also Playboy Enters. v. Netscape Communs. Corp.*, 354 F.3d 1020, 1028 (9th Cir. 2004). Here, both parties sell boots and clogs to consumers, and numerous courts have held that such customers are not particularly sophisticated. *E.g.*, *Macy's Inc. v. Strategic Marks, LLC*, 2016 WL 374147, at *8

---

[54] In addition to the confusion surveys, Quince's own 30(b)(6) witness' depositions are evidence of confusion as its CEO/co-founder and its Sr. Merchandising Manager were unable to tell the Accused Products from authentic UGG® products stating that they would have to see the product labels and/or the outsole to determine which product was which brand. Blakely Dec., ¶ 3, 4 Ex. 1 at p. 37:3-39:4; 2 at pp.11:21-12:7.

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

(N.D. Cal. Feb. 1, 2016) (low degree of care for t-shirts priced from $24-$29.99); *K-Swiss, Inc. v. USA Aisiqi Shoes, Inc.*, 291 F. Supp. 2d 1116, 1125 (C.D. Cal. 2003) (holding that consumers exhibit a low degree of care in purchasing athletic shoes); *Vans, Inc.*, 2022 U.S. Dist. LEXIST 95244 at *23-25 (same). Although Deckers' mid-market price points are higher than Defendant's prices, they are still several orders of magnitude below the price points of goods typically described by courts as "expensive" in the degree-of-care analysis. McCarthy § 23:97 (identifying homes, race cars, yachts, and residential schools as "expensive" goods receiving greater degree of care).  Further, under a post-sale analysis, degree of purchaser care is of less significance. *See Payless* at 988-89; *adidas-America, Inc. v. Payless Shoesource*, Inc., 546 F.Supp.2d at 1055; *K-Swiss, Inc. v. USA Aisiqi Shoes Inc*., 291 F. Supp. 2d 1116, 1125 (C.D. Cal. 2003) ("Post-purchaser confusion is likely to occur in this case despite the fact that the price ranges and types of stores that sell the shoes are dissimilar."); *Payless* at 989–90 (factors such as channels of trade are "directed to pre-sale confusion," and are "immaterial to […] whether actionable confusion is likely to occur after the marked product has entered the public arena."); *Payless* at 990 ("post-sale observers may be unaware that Payless and [adidas] shoes are sold in different stores or at different prices, yet their confusion may be detrimental to [adidas]."); *Au-Tomotive Gold, Inc. v. Volkswager of America, Inc*., 457 F. 3d 1062, 1077 (9th Cir. 2006).

### 4. Deckers should prevail on its state law claims

As the standard for trade dress infringement is the same under both state and federal law, for the reasons discussed above, Deckers should also prevail on its state law claims for trade dress infringement and unfair competition. *Audio Fidelity Inc. v. High Fidelity Recordings, Inc.*, 283 F.2d 551, 554-555 (9th Cir. 1960).

## V.    CONCLUSION

Based upon the foregoing, Deckers' respectfully requests that this Court grant Plaintiff's Motion for Summary Judgment in its entirety on the federal and state claims of liability for trade dress infringement, and summary judgment against Defendant on its Affirmative Defenses.

DATED:    March 10, 2025                    BLAKELY LAW GROUP

                                           By:    */s/* Brent. H. Blakely
                                                  Brent H. Blakely
                                                  **Attorneys for Plaintiff**