Xinlin Li Morrow (SBN 281707)
Ryan McMenamin (*pro hac vice*)
Lawrence Yichu Yuan (*pro hac vice*)
**Morrow Ni LLP**
xinlin@moni.law
ryan@moni.law
lawrence@moni.law
3333 Michelson Drive Suite 300
Irvine, CA 92612
Telephone: (213) 282-8166

*Attorneys for Defendant Last Brand, Inc. d/b/a Quince*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| DECKERS OUTDOOR CORPORATION,<br><br>*Plaintiff,*<br><br>v.<br><br>LAST BRAND, INC. d/b/a QUINCE,<br><br>*Defendant.* | Case No. 23-cv-04850-AMO-LJC<br><br>Hon. Araceli Martínez-Olguín<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>[Filed concurrently with Declaration of Xinlin Li Morrow; and (Proposed) Order]<br><br>Date: July 3, 2025<br>Time: 2:00 p.m.<br>Place: Courtroom 10<br>Complaint Filed: June 12, 2023<br>Trial Date: September 15, 2025 |

Defendant's Notice of Motion and Motion for Partial Summary Judgment

**NOTICE OF MOTION AND MOTION**

**TO PLAINTIFF AND ITS ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on July 3, 2025 at 2:00 p.m. or as soon thereafter as the matter may be heard, in Courtroom 10, of the United States District Court, Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California 94102, Defendant Last Brand, Inc. d/b/a Quince will and hereby does seek an order from this Court granting its Motion for Partial Summary Judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure. Quince seeks partial summary judgment, on Plaintiff Deckers Outdoor Corporation's claims on the following grounds:

1.      Deckers' "lost profits" damages theory fails as a matter of law for lack of causation.

2.      Deckers' "lost profits" damages theory for its patent claim must be barred for failure to disclose such theory in its initial disclosures and discovery responses as required by Fed. R. Civ. P. 26 and 37(c).

3.      Deckers' first cause of action for Trade Dress Infringement of the Asserted Classic Ultra Mini Trade Dress fails as a matter of law because undisputed facts demonstrate that the Asserted Classic Ultra Mini Trade Dress is generic and therefore is not entitled to trade dress protection under the Lanham Act.

4.      Deckers' third cause of action for Trade Dress Infringement of the Asserted Tasman Trade Dress fails as a matter of law because undisputed facts demonstrate that the Asserted Tasman Trade Dress is generic and has no secondary meaning and therefore is not entitled to trade dress protection under the Lanham Act.

5.      Deckers' fourth cause of action for Trade Dress Infringement of the Asserted Classic Ultra Mini and Tasman Trade Dress fails as a matter of law because undisputed facts demonstrate that they are generic or have no secondary meaning and therefore are not entitled to trade dress protection under California common law.

6.      Deckers' fifth and sixth causes of action for Unfair Competition based on the Asserted Classic Ultra Mini and Tasman Trade Dress fail as matter of law because undisputed

Defendant's Notice of Motion and Motion for Partial Summary Judgment

facts demonstrate that there is no unfair competition in violation of Cal. Bus. & Prof. Code, § 17200 *et. seq.* and California common law.

       7.    Deckers' seventh cause of action for patent infringement of U.S. Patent No. D927,161 (the "'161 Patent") fails as a matter of law because the asserted patent is invalid as primarily functional and/or indefinite.


DATED: March 10, 2025

Xinlin Li Morrow (SBN 281707)
Ryan McMenamin (*pro hac vice*)
Lawrence Yichu Yuan (*pro hac vice*)
**Morrow Ni LLP**
xinlin@moni.law
ryan@moni.law
lawrence@moni.law
3333 Michelson Drive Suite 300
Irvine, CA 92612
Telephone: (213) 282-8166

*Attorneys for Defendant Last Brand,*
*Inc. d/b/a Quince*

Defendant's Notice of Motion and Motion for Partial Summary Judgment

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     STATEMENT OF ISSUES TO BE DECIDED [N.D. CAL. L.R. 7-4(A)(3)] ................. 1

III.    Statement of Undisputed Material Facts ........................................................ 2

        A.     Deckers' "Lost Profits" Damages Theory ............................................ 2

        B.     The Asserted Classic Ultra Mini Trade Dress ..................................... 4

        C.     The Asserted Tasman Trade Dress ....................................................... 5

        D.     The '161 Patent .................................................................................... 7

IV.     LEGAL STANDARD ......................................................................................... 7

        A.     Summary Judgment ............................................................................. 7

        B.     Damages ............................................................................................... 7

        C.     Trade Dress Infringement ................................................................... 9

        D.     Design Patent Invalidity .................................................................... 10

V.      ARGUMENTS .................................................................................................. 11

        A.     Deckers Cannot Prove "Lost Profits" ................................................ 11

               1.     Deckers' "Lost Profits" Theory Fails for Lack of But-For Causation ........ 11

               2.     Deckers' Brand Expert Undermines Decker's Theory of Lost Profits ........ 13

               3.     Deckers Failed to Disclose "Lost Profits" Theory for Patent
                      Infringement .................................................................................... 15

        B.     The Asserted Classic Ultra Mini and Tasman Trade Dresses Are Generic. ... 16

               1.     The Asserted Classic Ultra Mini and Tasman Trade Dresses Are
                      Overbroad or Too Generalized ......................................................... 16

               2.     The Asserted Classic Ultra Mini and Tasman Trade Dresses Are the
                      Basic Form of a Type of Product. .................................................... 19

               3.     The Asserted Classic Ultra Mini and Tasman Trade Dresses Are So
                      Common in the Industry That It Cannot Be Said to Identify a
                      Particular Source. ........................................................................... 20

        C.     The Asserted Tasman Trade Dress Lacks Secondary Meaning. ..................... 21

        D.     The State Law Claims Based on Asserted Classic Ultra Mini and Tasman
               Trade Dress Should Be Dismissed. .................................................... 22

        E.     The '161 Patent Is Invalid. ................................................................ 22

VI.     CONCLUSION ................................................................................................ 26

Defendant's Notice of Motion and Motion for Partial Summary Judgment

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*2KDirect, LLC v. Azoogleads US, Inc.*,
   No. CV 08-3340-VBF(JWJX), 2010 WL 11455972 (C.D. Cal. Apr. 19, 2010) ......................10

*Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*,
   280 F.3d 619 (6th Cir. 2002)................................................................................................1, 9

*Acad. of Motion Picture Arts & Scis. v. Creative House Promotions, Inc.*,
   944 F.2d 1446 (9th Cir. 1991)....................................................................................................22

*AdGear, Inc. v. Liu*,
   No. CV-11-05398 JCS, 2012 WL 2367805, at *18 (N.D. Cal. June 21, 2012),
   *report and recommendation adopted*, 2012 WL 4005454 (N.D. Cal. Sept. 11,
   2012).........................................................................................................................................15

*Akamai Techs., Inc. v. Cable & Wireless Internet Servs., Inc.*,
   344 F.3d 1186 (Fed. Cir. 2003)..................................................................................................10

*ALPO Petfoods, Inc. v. Ralston Purina Co.*,
   913 F.2d 958 (D.C. Cir. 1990) ....................................................................................................8

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ....................................................................................................................7

*Art Attacks Ink, LLC v. MGA Enter. Inc.*,
   581 F.3d 1138 (9th Cir. 2009)....................................................................................................9

*BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*,
   1 F.3d 1214 (Fed. Cir. 1993).............................................................................................12, 15

*City & Cty. of San Francisco v. Tutor-Saliba Corp.*,
   218 F.R.D. 219 (N.D. Cal. 2003) ................................................................................................8

*Deckers Outdoor Corp. v. Wal-Mart Stores, Inc.*,
   No. 2:20-CV-09521-FLA (EX), ECF No. 160 (C.D. Cal. Apr. 9, 2024)..................................23

*Egyptian Goddess, Inc. v. Swisa, Inc.*,
   543 F.3d 665 (Fed. Cir. 2008).....................................................................................................23

*Eldon Indus., Inc. v. Vanier Mfg., Inc.*,
   923 F.2d 869 (Fed. Cir. 1990) ...................................................................................................10

*Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*,
   796 F.3d 1312 (Fed. Cir. 2015)............................................................................................10, 11

Defendant's Notice of Motion and Motion for Partial Summary Judgment

*Filipino Yellow Pages, Inc. v. Asian J. Publications, Inc.*,
    198 F.3d 1143 (9th Cir. 1999)...................................................................9

*First Act Inc. v. Kids Station (U.S.) Inc.*,
    No. CV 05-12114-REK, 2006 WL 8458337 (D. Mass. Apr. 4, 2006) ......................17

*Five Star Mfg., Inc. v. Ramp Lite Mfg., Inc.*,
    4 F. App'x 922 (Fed. Cir. 2001)...............................................................10

*Glassybaby, LLC v. Provide Gifts, Inc.*,
    2011 WL 4571876 (W.D. Wash. Sept. 30, 2011) ...............................9, 18, 19

*Gucci Am., Inc. v. Guess?, Inc.*,
    868 F. Supp. 2d 207, 239 (S.D.N.Y. 2012) ....................................................13

*Hoffman v. Constr. Protective Servs., Inc.*,
    541 F.3d 1175 (9th Cir. 2008)....................................................................9

*Indonesian Imports, Inc. v. Smith*,
    No. C97–3534 FMS, 1999 WL 183629 (N.D. Cal. Mar. 30, 1999) .........................20

*Invicta Plastics (USA) Ltd. v. Mego Corp.*,
    523 F. Supp. 619 (S.D.N.Y. 1981) ...............................................................12

*Jada Toys, inc. v. Mattel, Inc.*,
    518 F.3d 628 (9th Cir. 2008)....................................................................22

*Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*,
    150 F.3d 1042 (9th Cir. 1998).............................................................9, 21

*Lanard Toys Ltd. v. Dolgencorp LLC*,
    958 F.3d 1337 (Fed. Cir. 2020)..................................................................23

*Landscape Forms, Inc. v. Columbia Cascade Co.*,
    113 F.3d 373 (2d Cir.1997).......................................................................20

*Lindy Pen Co. v. Bic Pen Corp.*,
    982 F.2d 1400 (9th Cir. 1993)................................................................7, 8

*Lumens Co. v. GoEco LED LLC*,
    No. SACV1401286CJCDFMX, 2018 WL 1942768 (C.D. Cal. Jan. 3, 2018),
    aff'd, 807 F. App'x 612 (9th Cir. 2020).......................................................8

*In re Maatita*,
    900 F.3d 1369 (Fed. Cir. 2018)..........................................................11, 24

*Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.*,
    292 F. Supp. 2d 535 (S.D.N.Y. 2003)...........................................................17

Defendant's Notice of Motion and Motion for Partial Summary Judgment

*Mana Prods. Inc. v. Columbia Cosmetics Manufacturing Inc.*,
 65 F.3d 1063 (2d Cir. 1995) ............................................................21

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
 475 U.S. 574 (1986) ......................................................................7

*McGlinchy v. Shell Chem. Co.*,
 845 F.2d 802 (9th Cir. 1988)........................................................8, 12

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
 572 U.S. 898 (2014) ....................................................................11

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
 521 F.3d 1351 (Fed. Cir. 2008)..................................................10, 23

*Oracle USA, Inc. v. SAP AG*,
 264 F.R.D. 541 (N.D. Cal. 2009) ...................................................16

*Oyster Software, Inc. v. Forms Processing, Inc.*,
 No. C-00-724-JCS, 2001 WL 1736382 (N.D. Cal. Dec. 6, 2001) ...........................15

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*,
 575 F.2d 1152 (6th Cir. 1978).....................................................8, 15

*Park N' Fly Inc. v. Dollar Park and Fly, Inc.*,
 469 U.S. 189 (1985) ....................................................................19

*PHG Techs., LLC v. St. John Cos., Inc.*,
 469 F.3d 1361 (Fed. Cir. 2006) ......................................................10

*Pioneer Photo Albums, Inc. v. Holson Co.*,
 654 F. Supp. 87 (C.D. Cal. 1987).....................................................22

*Rite-Hite Corp. v. Kelley Co., Inc.*,
 56 F.3d 1538 (Fed. Cir. 1995) .........................................................8

*Rudolph Int'l Inc. v. Realys, Inc.*,
 482 F.3d 1195 (9th Cir. 2007)........................................................18

*Salt Optics, Inc. v. Jand, Inc.*,
 No. SACV 10-0828 DOC, 2010 WL 4961702 (C.D. Cal. Nov. 19, 2010)..............................22

*SG Servs. Inc. v. God's Girls Inc.*,
 No. CV 06-989 AHM, 2007 WL 2315437 (C.D. Cal. May 9, 2007) ...........................10

*Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*,
 637 F.3d 1269 (Fed. Cir. 2011).........................................................8

*Sport Dimension, Inc. v. Coleman Co.*,
 820 F.3d 1316 (Fed. Cir. 2016).......................................................10

Defendant's Notice of Motion and Motion for Partial Summary Judgment

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
    789 F.3d 1335 (Fed. Cir. 2015) ...............................................................................11

*Times Three Clothier, LLC v. Spanx, Inc.*,
    Case Nos. 13-cv-2157, 13-cv-7260, 2014 WL 1688130 (S.D.N.Y. Apr. 29,
    2014).......................................................................................................................24

*Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*,
    221 F. Supp. 2d 410 (S.D.N.Y. 2002) .....................................................................13

*Toyo Tire & Rubber Co. v. Hong Kong Tri-Ace Tire Co.*,
    281 F. Supp. 3d 967 (C.D. Cal. 2017) .....................................................................12

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
    505 U.S. 763 (1992) ..............................................................................................9, 19

*Vinotemp International Corp. v. Wine Master Cellars LLC*,
    No. 11-CV-1543-ABC-PLA (C.D. Cal. Feb. 5, 2013)..............................................16

*Wal–Mart Stores, Inc. v. Samara Bros., Inc.*,
    529 U.S. 205 (2000) ................................................................................................18

*Walker & Zanger, Inc. v. Paragon Indus., Inc.*,
    549 F. Supp. 2d 1168 (N.D. Cal. 2007) .......................................................... 9, passim

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
    259 F.3d 1101 (9th Cir. 2001) ...................................................................................9

*Yurman Design, Inc. v. PAJ, Inc.*,
    262 F.3d 101 (2d Cir. 2001) ....................................................................................19

**STATE CASES**

*Magic Kitchen LLC v. Good Things Int'l., Ltd.*,
    153 Cal. App. 4th 1144 (2007) .................................................................................22

**FEDERAL STATUTES**

15 U.S.C. § 1117(a) .........................................................................................................7

35 U.S.C. § 112 ..............................................................................................................11

**STATE STATUTES**

Cal. Bus. & Prof. Code §§ 17200 *et seq.* ........................................................................22

**FEDERAL RULES**

Fed. R. Civ. P. 26(a)(1) ....................................................................................................2

Fed. R. Civ. P. 26(a)(1)(A)(iii)..........................................................................................8

Defendant's Notice of Motion and Motion for Partial Summary Judgment

Fed. R. Civ. P. 26(e) ..................................................................................................8

Fed. R. Civ. P. 30b(6) .............................................................................................4, 6

Fed. R. Civ. P. 37 .....................................................................................................9

Fed. R. Civ. P. 37(c) .................................................................................................9

Fed. R. Civ. P. 37(e) .................................................................................................8

Fed. R. Civ. P. 56(a) .................................................................................................7

Fed. R. Civ. P. 56(c) .................................................................................................7

**RULES - OTHER**

N.D. CAL. L.R. 7-4(A)(3) ..........................................................................................1

**OTHER AUTHORITIES**

McCarthy on Trademarks and Unfair Competition § 23:7 (5th ed.)...............................13

Defendant's Notice of Motion and Motion for Partial Summary Judgment

## I.    INTRODUCTION

This case is about Deckers' attempt to unfairly monopolize the sheepskin footwear market and stifle healthy competition. Among other things, Deckers claims that Quince's essential-style sheepskin shoes infringe Deckers' alleged trade dress rights in the Classic Ultra Mini and Tasman shoes, as well as a design patent. These claims overreach and fail as a matter of law.

*First*, Deckers' damages theory for "lost profits" is speculative and legally deficient. Deckers relies on unsupported assumptions, disregards market realities, and first advanced an undisclosed theory relating to its patent claim after fact discovery. As a result, Deckers cannot establish causation that links Quince's alleged conduct to Deckers' purported lost profits.

*Second*, Deckers' generic trade dresses are not entitled to protection. The alleged Classic Ultra Mini and Tasman trade dresses consist of overbroad, generalized elements that are common in the industry and represent the basic form of sheepskin ankle-high boots and slippers. "[N]o designer should have a monopoly on [basic, generic] designs…." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 638 (6th Cir. 2002).

*Third*, Deckers' patent infringement claim fails because the '161 Patent is invalid. The claimed design is either primarily functional or, to the extent it contains non-functional elements, is indefinite and non-enabling due to inconsistencies in the patent drawings.

For these reasons, Quince respectfully requests that the Court grant partial summary judgment in its favor.[1] Deckers' claims fail as a matter of law in view of the undisputed facts, and judgment in Quince's favor is warranted.

## II.    STATEMENT OF ISSUES TO BE DECIDED [N.D. CAL. L.R. 7-4(A)(3)]

This Motion concerns the following issues:

A.    Whether Deckers failed to establish lost profits as a matter of law.

B.    Whether Deckers's "lost profits" damages for its patent claim should be excluded

---

[1] If the Court rules in Quince's favor on all issues raised in this motion, the only remaining issue would be the alleged infringement of a third asserted trade dress relating to a small number of accused products on a damages theory of disgorgement of defendant's profits only. It would streamline the case for trial and may lead to prompt resolution of the case before trial.

Defendant's Notice of Motion and Motion for Partial Summary Judgment

for failure to disclose.

       C.      Whether the Asserted Classic Ultra Mini Trade Dress is generic and therefore not entitled to trade dress protection under the Lanham Act or common law.

       D.      Whether the Asserted Tasman Trade Dress is generic and lacks secondary meaning and therefore not entitled to trade dress protection under the Lanham Act or common law.

       E.      Whether the state law unfair competition claims based on the Asserted Classic Ultra Mini and Tasman Trade Dresses fail because there is no protectable trade dress.

       F.      Whether the '161 Patent is invalid for being primarily functional and/or indefinite.

## III.    STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.    Deckers' "Lost Profits" Damages Theory

1.      On January 29, 2024, Deckers submitted its supplemental initial disclosures pursuant to Fed. R. Civ. P. 26(a)(1). In a section of Deckers' supplemental initial disclosures titled "Initial Computation Damages," Deckers referenced a "lost profits" theory for its trade dress infringement and unfair competition claims but not for its patent claim. *See* Ex. 1[2] at 5-7 (identifying "infringer" profits as the basis for damages but omitting any reference to lost profits).

2.      On January 23, 2024, Quince served its First Set of Interrogatories. Quince's Interrogatory No. 18 sought:

> Separately for each cause of action asserted in the Complaint, describe in detail all harm, whether reparable or irreparable, that Plaintiff claims to have suffered as a result of Defendant's alleged conduct, including the measure and proper calculation of any and all damages and harm claimed by Plaintiff in this litigation, which includes, without limitation, the measure and proper calculation, if any, of a reasonable royalty, royalty base, royalty rate, lost profits, and price erosion.

Ex. 2 at 2-3.

3.      Deckers' response to Interrogatory 18 made no mention of lost profits in connection with the patent claim. *Id.* at 3-4 (Deckers' Responses to First Set of Interrogatories).

4.      Fact discovery closed on September 27, 2024. ECF No. 32. On November 15, 2024,

---

[2] Unless otherwise specified, all exhibits in this motion refer to the exhibits attached to the concurrently filed declaration of Xinlin Li Morrow ("Morrow Decl.").

Defendant's Notice of Motion and Motion for Partial Summary Judgment

1    Deckers' damages expert, David S. Hanson, submitted an opening expert report. Ex. 3. Mr.

2    Hanson's opening report disclosed for the first time that Deckers intended to pursue a "lost

3    profits" theory of damages in connection with its patent claim. Ex. 3 (Hanson Report) at 6-7.

4         5.     Mr. Hanson did not offer any opinions or analysis on causation of damages. Ex. 3

5    (Hanson Report) at 12; Ex. 4 (Hanson Tr.) at 22:24-25; 23-26. Instead, he was instructed ███

6    ████████████████████████████ Ex. 4 (Hanson Tr.) at 26:6-25.

7         6.     Thus far, Deckers has only proffered evidence of alleged post-sale confusion, but

8    not any evidence of point-of-sale confusion or initial interest confusion. *See* Exs. 5-7 (Deckers'

9    confusion survey reports).

10        7.     On November 15, 2024, Deckers' branding expert, Dr. Erich Joachimsthaler,

11   submitted an opening expert report asserting that Deckers suffered brand and reputational harm

12   due to Quince's sales of the accused products. Ex. 8 (Joachimsthaler Report). Specifically, Dr.

13   Joachimsthaler concluded that "████████████████████████████

14   ███████████████████████████████████████████

15   ███████████████████████████████████████████

16   █████████████████████████████████████

17   ██████████████████████████████" Ex. 8 ¶13(d).

18        8.     In his report, Dr. Joachimsthaler did not quantify the alleged brand and reputational

19   harm. Ex. 8 (Joachimsthaler Report); Ex. 9 (Joachimsthaler Tr.) at 38:15-18.

20        9.     Dr. Joachimsthaler testified that it is "███████████████████

21   ████████████████. *See, e.g.,* Ex. 9 at 89:22-25; 90:1-4 ("████████

22   ████████████████████████"); *id.* at 90:8-12 ("████

23   ███████████████████████████████████████

24   ████████████."); *id.* at 92:7-13 ("████████████████

25   ███████████████████████████████████████

26   ████████████████████"); *id.* at 93:4-5 ("████

27   ███████████████████████████████████████").

28        10.     Dr. Joachimsthaler further testified that it is ██████████████

Defendant's Notice of Motion and Motion for Partial Summary Judgment

1    ███████████████████████████████████. Ex. 9 at 125:3.

2    **B.    The Asserted Classic Ultra Mini Trade Dress**

3    11.    Deckers defines the Asserted Classic Ultra Mini Trade Dress as follows:

4        a.    An ankle-high boot;
5        b.    Classic suede boot styling;
         c.    An exaggerated, raised and exposed circular stitch pattern;
6        d.    Exposed tufting;
         e.    A raised and rounded vamp;
7        f.    A suede heel overlay on the boots exterior;
         g.    Fabric binding along the top of the boot and along the sole;
8        h.    A thick, flat sole; and
9        i.    A top line that is higher in the front and lower in the back.

10    ECF No. 34-1 (Second Amended Complaint) ¶ 22.

11    12.    The Asserted Classic Ultra Mini Trade Dress is the basic form of an ankle high

12    sheepskin boot—a category of footwear that is common in the industry. Ex. 10 (Comeau Rebuttal)

13    ¶ 118-122.

14    13.    "[A]n ankle-high boot" is a fundamental footwear category that describes any boot

15    reaching approximately to the ankle. *Id.* ¶ 88. This basic height designation has been used across

16    the footwear industry for centuries and appears in countless manufacturer catalogs and design

17    specifications. *Id.* For example, Native Americans have designed ankle-high boots, even ankle

18    high-suede boots, over a century ago. *Id.*

19    14.    "Classic suede boot styling" could describe any boot made of suede material in a

20    traditional shape. *Id.* ¶ 87. Deckers' corporate representative testified that "████████████████

21    ███████████████████████████████████████" Ex. 11 (Rule 30b(6) Bereda Tr.) at 21:2-6.

22    15.    The term "exposed tufting" has various definitions, including: (1) a general

23    descriptor for the "overall appearance"; (2) a term invented to describe sheepskin; (3) a term

24    invented to describe any material that gives "plush, fuzzy texture"; and (4) a term interchangeable

25    with stitches and fabric binding. Ex. 10 (Comeau Rebuttal) ¶¶ 90-95; Ex. 11 (Rule 30b(6) Bereda

26    Tr.) at 22:5-6, 23:1-3, 13-19, 24:20-22, 24:23-25:8. Deckers' expert introduced a fifth definition—

27    claiming that ████████████████████████████████████████████████████████████

28    ██████████████████████. Ex. 12 (de Baere Tr. (rough)) at 219:16 – 220:4.

16.     Even assuming "exposed tufting" or "exposed circular stitch pattern" refers to the texture and configuration of the surface, these terms are described without specific parameters regarding their locations, spacing, or specific patterns. They could describe some or all of the seven stitches that are "exposed" "exaggerated" or "raised," with at least five holding a circular shape in whole or in part. Ex. 10 (Comeau Rebuttal) ¶¶ 98-99. There are also countless ways of having "exposed" "exaggerated" or "raised" stitches and tufting—design elements that are inherently basic and commonplace. *Id.* ¶ 99.

17.     Additionally, features like "a raised and rounded vamp" and "a thick, flat sole" are common design elements. *Id*. ¶¶ 105, 107 (illustrating numerous boot products variations in thickness, raisedness, and roundedness). These vague descriptions make it impossible for designers to determine what would constitute infringement of these basic design elements. *Id*. ¶ 106.

18.     A quality sheepskin ankle-high boot will necessarily include features such as: a cut at ankle height (*id*. ¶¶ 154-58), a heel overlay (*id*. ¶¶121, 148-153), stitches/tufting (including the butt seams) (*id*. ¶¶ 119, 159-73), and a fabric binding along the top of the boot (*id*. ¶¶ 120, 174-178) and along the sole. *Id*. ¶¶ 120, 179-86. Moreover, a quality sheepskin ankle-high boot usually employs a raised and rounded vamp (*id*. ¶¶ 122, 93-196), a thick, flat sole (*id*. ¶¶ 122, 197-201) and the topline that sits higher in front and lower in back (*id*. ¶¶ 122, 187-91). These features are ergonomics elements adopted by countless footwear manufacturers and dictated by the fundamental biomechanical necessities of a human foot. *Id*. ¶ 122.

19.     At least 14 competitors in the market sell ankle-high sheepskin boots that are similar to the Asserted Classic Ultra Mini Trade Dress. Ex. 10 (Comeau Rebuttal) ¶ 123.

20.     At least 16 products predating Deckers' launch of the UGG Classic Ultra Mini possess the same design elements as the Asserted Classic Ultra Mini Trade Dress. *Id*. ¶ 163.

**C.     The Asserted Tasman Trade Dress**

21.     Deckers defines the Asserted Tasman Trade Dress as follows:

    a.     An embroidered braid around the opening of the upper;
    b.     A raised prominent seam on the front part of the upper running longitudinally down the center of the upper;
    c.     A raised and rounded dome shaped toe;
    d.     Brushed suede-like exterior; and

Defendant's Notice of Motion and Motion for Partial Summary Judgment

1              e.      A thick, flat outsole.

2    ECF No. 34-1 (Second Amended Complaint) ¶ 48.

3        22.     The Asserted Tasman Trade Dress is the basic form of a clog or moccasin slipper—

4    and a category of footwear that is common in the industry. Ex. 10 (Comeau Rebuttal) ¶ 124. Clog

5    slippers are a more structured version of slip-on slippers, featuring a firmer sole and added

6    support. *Id*. ¶ 125. Moccasin slippers, inspired by traditional Native American footwear, tend to

7    feature a flat sole, stitched detailing, and a soft leather or suede upper. *Id*. To manufacture a

8    durable clog or moccasin slipper, a center seam is necessary to create its three-dimensional shape,

9    as traditional crimping techniques are unsuitable due to their wool-lined construction. *Id*. ¶ 126.

10       23.     The embroidered braid around the opening of the upper is a functional necessity for

11   both clog and moccasin slippers. Without it, the raw edges of both the suede upper and sheepskin

12   lining would be exposed to wear, leading to fraying and unraveling. *Id*. ¶ 128. The braid also

13   serves an aesthetic purpose—as its absence would make it look like a "cheaper" more economical

14   shoe. *Id*. Additionally, the geometric braid pattern is a classic design element derived from Native

15   American cultures, making it particularly common in moccasin-style footwear. *Id.* ¶¶ 111-15.

16       24.     The degree of elevation required for a toe to be considered "raised" is unclear, as is

17   the curvature of the "dome." The raised and rounded dome shaped toe is an ergonomic design

18   element present in countless footwear styles. *Id*. ¶ 129. The raised vamp facilitates natural walking

19   motion, while the rounded shape accommodates the natural spread of toes during movement. *Id*.

20       25.     "Brushed suede-like exterior" could apply to any boot made of suede or suede-like

21   material. *Id.* ¶ 87. Deckers' corporate representative could not identify ██████████████

22   ███████████████████████████████████████████████ Ex. 11 (Rule 30b(6) Bereda Tr.)

23   at 36:21-39:9. Suede has been a traditional material for moccasin slippers since their Native

24   American origins, and its soft, fuzzy finish— derived from the underside of animal skin—is a

25   standard material used in countless leather footwear uppers. Ex. 10 (Comeau Rebuttal) ¶ 130.

26       26.     As to the "thick, flat outsole," Deckers' trade dress definition fails to provide

27   specific measurements or parameters to distinguish what degree of "thickness" or "flatness" is

28   claimed. It could refer to any sole of substantial height with a flat bottom surface. *Id*. ¶ 104. A

thick sole is a fundamental feature of clog slippers, providing better traction compared to lightweight house slippers with thin soles. *Id.* ¶ 127. A flat sole is also a fundamental feature of moccasin slippers, as evidenced by traditional Native American shoe designs. *Id.*

27.    At least nine competitors sell a similar moccasin or clog slipper. *Id.* ¶ 131.

**D.    The '161 Patent**

28.    Deckers asserts patent infringement of the '161 Patent, entitled "Footwear Upper." ECF No. 25-1; Ex. 13 ('161 Patent). The '161 Patent contains seven figures and claims "[t]he ornamental design for a footwear upper, as shown and described." Ex. 13 at 1.

29.    The vertical and horizontal seams of the claimed boot design are functional necessities for manufacturing sheepskin boots. Ex. 15 (Comeau Report) ¶¶ 66-81. They are structurally necessary to connect the sheepskin pieces and to maintain the shape. *Id.* ¶¶ 69-70, 76. Without the vertical seams, the boots would cost significantly more to manufacture. *Id.* ¶¶ 76-80. The presence of vertical and horizontal seams is ubiquitous in prior art boots. *Id.* ¶ 71 (chart).

**IV.    LEGAL STANDARD**

**A.    Summary Judgment**

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.10 (1986); *see also* Fed. R. Civ. P. 56(c). A genuine issue of material fact exists only where "the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**B.    Damages**

Under the Lanham Act, a plaintiff may recover "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). A plaintiff's recovery of a monetary award is "subject to the principles of equity," meaning "that such a remedy should not be granted as a matter of right." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1405 (9th Cir. 1993). To recover actual damages (such as plaintiff's lost profits), a plaintiff must provide

evidence that "adequately supports all items of damages claimed and establishes a causal link between the damages and the defendant's conduct." *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 969-70 (D.C. Cir. 1990). Speculative, remote, or contingent damages cannot form the basis for recovery. *Lumens Co. v. GoEco LED LLC*, No. SACV1401286CJCDFMX, 2018 WL 1942768, at *6, n.7 (C.D. Cal. Jan. 3, 2018), *aff'd*, 807 F. App'x 612 (9th Cir. 2020) (noting that promises to provide data at trial do not relieve a party of its burden to present admissible evidence at summary judgment); *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 808 (9th Cir. 1988) (affirming summary judgment where plaintiffs "did not make a showing sufficient to establish the amount, causation, or fact of damages"). In Lanham Act cases, "proof of actual damage is often difficult . . . ." *Lindy*, 982 F.2d at 1407. Actual damages "must be established with reasonable certainty." *Id.* "Many courts have denied a monetary award in infringement cases when damages are remote and speculative." *Id.* at 1408.

In order to recover lost profits on a patent infringement claim, a patent owner must specifically prove "causation in fact, establishing that but for the infringement, he would have made additional profits." *Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1287 (Fed. Cir. 2011) (internal quotes omitted). A widely accepted framework for assessing lost profits in patent cases is the *Panduit* test: (1) a demand for the patented product, (2) an absence of acceptable noninfringing substitutes, (3) the manufacturing and marketing capability to exploit the demand, and (4) the amount of profit the patent owner would have made. *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995) (citing *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978)).

Federal Rule of Civil Procedure 26(a)(1)(A)(iii) requires parties to disclose "a computation of each category of damages claimed by the disclosing party" and to make available the supporting documents or evidentiary materials. The "computation" of damages must include enough analysis to allow the opposing party to "understand the contours of its potential exposure and make informed decisions as to settlement and discovery." *City & Cty. of San Francisco v. Tutor-Saliba Corp.*, 218 F.R.D. 219, 221 (N.D. Cal. 2003). Rules 26(e) and 37(e) further require parties to supplement disclosures in a timely manner if prior responses are incomplete or incorrect. Failure to

comply with these rules triggers sanctions under Rule 37(c), which bars the use of undisclosed information at trial. *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001); *Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175, 1179 (9th Cir. 2008). The Ninth Circuit considers Rule 37 a "self-executing, automatic sanction to provide a strong inducement for disclosure of material," and a finding of willfulness or bad faith is not required. *Hoffman*, 541 F.3d at 1180 (quoting *Yeti by Molly*, 259 F.3d at 1106).

### C.     Trade Dress Infringement

"Trade dress protection applies to a combination of any elements in which a product is presented to a buyer, including the shape and design of a product." *Art Attacks Ink, LLC v. MGA Enter. Inc.*, 581 F.3d 1138, 1145 (9th Cir. 2009) (cleaned up). "Courts exercise 'particular caution' when extending protection to product designs because such claims present an acute risk of stifling competition." *Walker & Zanger, Inc. v. Paragon Indus., Inc.*, 549 F. Supp. 2d 1168, 1174 (N.D. Cal. 2007) (citation omitted).

The Lanham Act does not protect generic trade dresses.  *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1048 (9th Cir. 1998) (affirming summary judgment that grape leaves are generic emblem for wine and not entitled to trademark or trade dress protection). "[T]he plaintiff has the burden of proving nongenericness once the defendant asserts genericness as a defense." *Filipino Yellow Pages, Inc. v. Asian J. Publications, Inc.*, 198 F.3d 1143, 1146 (9th Cir. 1999) (collecting cases). "[G]eneric product configurations," or "designs regarded by the public as the basic form of a particular item," should not be protectable even upon a showing of secondary meaning. *Abercrombie*, 280 F.3d at 638; *see also Glassybaby, LLC v. Provide Gifts, Inc.*, 2011 WL 4571876, at *2 (W.D. Wash. Sept. 30, 2011) ("if the object is generic, the question of secondary meaning is irrelevant.") (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)).

"Cases addressing product design suggest that the term 'genericness' covers three situations: (1) if the definition of a product design is overbroad or too generalized; (2) if a product design is the basic form of a type of product; or (3) if the product design is so common in the industry that it cannot be said to identify a particular source." *Walker*, 549 F. Supp. 2d 1168, 1174 (collecting cases).

Defendant's Notice of Motion and Motion for Partial Summary Judgment

Additionally, "the lack of any admissible evidence of secondary meaning" mandates summary judgment of trade dress non-infringement. *2KDirect, LLC v. Azoogleads US, Inc.*, No. CV 08-3340-VBF(JWJX), 2010 WL 11455972, at *8 (C.D. Cal. Apr. 19, 2010); *see also SG Servs. Inc. v. God's Girls Inc.*, No. CV 06-989 AHM, 2007 WL 2315437, at *10 (C.D. Cal. May 9, 2007) (summary judgment for defendant granted where plaintiff presents no or "at best" "very dubious" evidence of secondary meaning of the trade dress).

### D.    Design Patent Invalidity

"The first step in any invalidity analysis is claim construction, an issue of law…." *Akamai Techs., Inc. v. Cable & Wireless Internet Servs., Inc.*, 344 F.3d 1186, 1192 (Fed. Cir. 2003). "When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008).

The scope of a design patent is "limited to the ornamental aspects of the design and does not extend to 'the broader general design concept.'" *Sport Dimension, Inc. v. Coleman Co.*, 820 F.3d 1316, 1320 (Fed. Cir. 2016) (citation omitted). Courts have not "mandated applying any particular test for determining whether a claimed design is dictated by its function and therefore impermissibly functional." *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1329 (Fed. Cir. 2015). Courts have, however, considered "whether the protected design represents the best design; whether alternative designs would adversely affect the utility of the specified article; whether there are any concomitant utility patents; whether the advertising touts particular features of the design as having specific utility; and whether there are any elements in the design or an overall appearance clearly not dictated by function." *PHG Techs., LLC v. St. John Cos., Inc.*, 469 F.3d 1361, 1366 (Fed. Cir. 2006). Also, if the proposed alternative designs would "cost significantly" more than the patented design, the proposed designs were not true alternatives. *Five Star Mfg., Inc. v. Ramp Lite Mfg., Inc.*, 4 F. App'x 922, 924 (Fed. Cir. 2001).

"A design patent is invalid if the patented design is 'primarily functional,' rather than primarily ornamental, or if function dictates the design." *Eldon Indus., Inc. v. Vanier Mfg., Inc.*, 923 F.2d 869 (Fed. Cir. 1990) (citation omitted).

Defendant's Notice of Motion and Motion for Partial Summary Judgment

1    Any patent, including a design patent, is invalid if it is indefinite. 35 U.S.C. § 112; *Nautilus,*

2    *Inc. v. Biosig Instruments, Inc.,* 572 U.S. 898, 902 (2014). "Indefiniteness is a question of law."

3    *Teva Pharms. USA, Inc. v. Sandoz, Inc.,* 789 F.3d 1335, 1341 (Fed. Cir. 2015). A design patent "is

4    indefinite for § 112 purposes whenever its claim, read in light of the visual disclosure, fails to

5    inform, with reasonable certainty, those skilled in the art about the scope of the invention." *In re*

6    *Maatita*, 900 F.3d 1369, 1375 (Fed. Cir. 2018) (cleaned up). "In the design patent context, one

7    skilled in the art would look to the perspective of the ordinary observer since that is the perspective

8    from which infringement is judged." *Maatita*, 900 F. 3d at 1376-77.

9    "Because design patent claims are limited to what is shown in the application drawings, ...

10   there is often little difference in the design patent context between the concepts of definiteness

11   (whether the scope of the claim is clear with reasonable certainty) and enablement (whether the

12   specification sufficiently describes the design to enable an average designer to make the design)."

13   *Id.*, at 1375 (cleaned up).

14   The party challenging the validity of a design patent has the burden of proving invalidity by

15   clear and convincing evidence. *Ethicon*, 796 F.3d at 1328.

16   **V.    ARGUMENTS**

17       **A.    Deckers Cannot Prove "Lost Profits"**

18   Deckers seeks to recover "lost profits" damages under its trade dress infringement, unfair

19   competition, and patent infringement claims. But its damages theory is built on a foundation of

20   unsupported assumptions. Deckers has failed to establish a causal link between Quince's alleged

21   conduct and its purported injury, and its methodology for calculating damages for lost profits relies

22   on conjecture and disregards market realities. Compounding these deficiencies, Deckers did not

23   properly disclose its "lost profits" theory for its patent infringement claims during discovery,

24   depriving Quince of the opportunity to investigate and challenge it.

25           ***1.    Deckers' "Lost Profits" Theory Fails for Lack of But-For Causation***

26   Deckers' asserted lost profits theory fails for all claims because Deckers has not established

27   causation sufficient to sustain damages as a matter of law. Deckers' methodology for calculating

28   lost profits is fundamentally defective. It assumes, without any basis, █████████████████

Defendant's Notice of Motion and Motion for Partial Summary Judgment

1    ███████████████████████████████████████. Ex. 3 (Hanson Report) at 12; Ex. 4 (Hanson Tr.)

2    at 22:24-25; 23-26. Specifically, Deckers computes its "lost profits" ███████████████

3    ████████████████████████████████████████████████████████████████████████

4    ███████████████████████████████████. *Id.* This simplistic approach lacks the rigor

5    required to establish a causal link between Quince's alleged conduct and Deckers' purported losses.

6         This methodology is untenable and contrary to law. It entirely disregards critical market

7    realities, such as market segmentation, price sensitivity, brand loyalty, and the availability of

8    alternative products to consumers. Ex. 14 (Brady Rebuttal), ¶¶ 71-80, 90-97. Tellingly, Deckers'

9    own brand harm expert admitted that it is "███████████████████████████████████████

10   █████████████████████████████████"[3] UMF No. 10; Ex. 9 at 125:3

11   (emphasis added). Courts consistently rejected damages theories that rely on unsupported assertions

12   linking defendant's wrongful conduct to plaintiff's claimed injury. For example, in *McGlinchy*, 845

13   F.2d 802, 808 (9th Cir. 1988), the Ninth Circuit affirmed summary judgment where the plaintiffs

14   failed to establish the amount, causation, or fact of damages. In *Toyo Tire & Rubber Co. v. Hong*

15   *Kong Tri-Ace Tire Co.*, 281 F. Supp. 3d 967, 990 (C.D. Cal. 2017), the court rejected speculative

16   lost profits based on plaintiff's employee's "gut feeling" that 50% of the accused infringer's sales

17   would have gone to plaintiff. Here, Deckers' showing is even weaker. Its damages expert relied ██

18   ████████████████████████████████████████████████████████████████████████

19   ███████████████████. UMF No. 5; *see Invicta Plastics (USA) Ltd. v. Mego Corp.*, 523 F.

20   Supp. 619, 624 (S.D.N.Y. 1981) ("[actual] damages will not be awarded in the absence of credible

21   evidence demonstrating injury to the plaintiff from defendant's sales."); *BIC Leisure Prods., Inc. v.*

22   *Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1218 (Fed. Cir. 1993) ("The district court clearly erred by

23   failing to apply the 'but for' test before awarding lost profits. The record in this case does not

24   evince a reasonable probability that Windsurfing would have made its pro rata share of BIC's sales

25   had BIC not been in the market."). Deckers' approach, based on unsupported assumptions and

26   speculation, fails to meet the legal standard for proving damages and therefore must be rejected.

27   _____

28   [3] Deckers products cost about twice as much as Quince products. *See, e.g.*, Ex. 14 (Brady Rebuttal), ¶ 76, Table 4.

Defendant's Notice of Motion and Motion for Partial Summary Judgment

1        In fact, the flawed assumption that Deckers lost any sales at all is directly contradicted by

2  Deckers' own sales data, ████████████████████████████████████████

3  ██████████████████████████████████████████████. Ex. 14 (Brady

4  Rebuttal) ¶¶ 67-68, Figs. 5-7. This baseless assumption that Deckers would have captured 100%

5  of Quince's sales does not form the basis for a legally viable damages theory.

6        Moreover, Deckers' theory of liability of "post-sale consumer confusion" (UMF No. 6)

7  reinforces the conclusion that Deckers cannot establish its lost profits. If consumers were not

8  confused at the point of sale[4], then, by definition, Deckers could not have lost any sales to Quince

9  due to any confusion between the products. Indeed, actual damages arising from post-sale

10  confusion typically involve harm to "reputation," "image," and "goodwill"[5]—such as when non-

11  purchasers mistakenly believe the trade dress owner's products are of inferior quality[6] or less

12  exclusivity—rather than lost profits. McCarthy on Trademarks and Unfair Competition § 23:7 (5th

13  ed.); *see also Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 239 (S.D.N.Y. 2012) (noting

14  that "the harm that is addressed by post-sale confusion claims is not a misdirected purchase, but a

15  purchase intended to confuse" and that "Gucci has no evidence of, and hence can only speculate

16  about, actual damages in the form of lost sales or harm to brand value. Accordingly, the only

17  possible basis for recovery of actual damages is a reasonable royalty.").

18        **2.  *Deckers' Brand Expert Undermines Decker's Theory of Lost Profits***

19        Deckers may attempt to salvage its damages theory by relying on the speculative opinions

---

[4] Quince's products are only available for sale on its website, where its comparative advertising prominently distinguishes its products from Deckers'. Ex. 16 (product webpages); *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F. Supp. 2d 410, 423 (S.D.N.Y. 2002) ("[C]omparative advertising is not only permissible, but encouraged. Such advertisements serve the beneficial purpose of imparting factual information about the relative merits of competing products.") (cleaned up). Given that Quince's advertising clearly differentiates its products from Deckers', Deckers cannot credibly assert a theory of point-of-sale confusion—and, in fact, has not done so.

[5] Deckers submitted a report from a brand harm expert, Dr. Erich Joachimsthaler, to suggest that it suffered brand and reputational harm. UMF No. 7. But neither its brand harm expert nor its damages expert quantified the alleged brand and reputational harm. UMF Nos. 5, 8.

[6] Both sides' experts agree that Quince products are ███████████████████████████████████ ███████. Ex. 10 (Comeau Rebuttal) ¶ 244; Ex. 9 (Joachimsthaler Tr.) 121:17 ("███████████").

Defendant's Notice of Motion and Motion for Partial Summary Judgment

1  of Dr. Joachimsthaler, its branding and marketing expert, to establish lost sales. That attempt

2  would also fail as a matter of law.

3        Although Dr. Joachimsthaler argues that Quince's alleged conduct "████████████████

4  ████████"[7] Ex. 8 at ¶ 13(d); UMF No. 7, he never reviewed ████████████████

5  ████████████████████████████████████████████████████████

6  ████. Ex. 9 at 37:2-15; 38:15-18. He also testified that he did not attempt ████████████

7  ████████████████████████. UMF No. 8. Throughout his testimony, he repeatedly emphasized

8  that he was not opining ████████████████████████████████████████

9  ████████████████████████████████. For example, when asked whether survey results

10 showing ████████████████████████████ could be linked to the sale of

11 the Quince products, he stated, "I could not say. . . . I cannot make a causal relationship based on

12 that. ████████████████████████████████████████████████

13 ████████████████" including that simply "████████████" Ex. 9 at 111:16-112-9

14 (emphasis added).

15       His brand harm opinions are similarly defective. His assertions that the presence of

16 Quince's products in the marketplace could lead consumers ████████████████

17 ████████████████████████████████████████████████████████

18 ████████████████████████████████████████████████—are

19 speculative and untethered to any facts specific to this case. UMF No. 9.  Dr. Joachimsthaler

20 admitted he never analyzed ████████████████████████████████████

21 ████████, Ex. 9 at 65:2-17, nor did he assess whether ████████████████████, *id.* at

22 93:6-9. Furthermore, he conceded that he did not research—and has no opinion on—how, in a

23 ████████████████████████████████████████████████

24 ████████████████████████████████████████████████

25 ████████████████████████████████████████. *Id.* at 35:7-18. These

26 _____

27 [7] While his report does not mention ████████████, Dr. Joachimsthaler claimed at his deposition that he
   meant ████████████████████████████████████ Ex. 9 (Joachimsthaler Tr.) at

28 36:10-21; 114:19-25.

Defendant's Notice of Motion and Motion for Partial Summary Judgment

1  admissions underscore the speculative and unsupported nature of his conclusions, which are the
2  subject of a separate *Daubert* motion.

3      To the extent Deckers relies on Dr. Joachimsthaler to establish its lost profits, he has not
4  shown that Deckers lost any sales or that Quince caused Deckers to lose any sales.

5      These deficiencies are particularly glaring in the context of Lanham Act and patent claims,
6  where plaintiffs must prove that the defendant's wrongful acts caused the loss of sales. Courts
7  have consistently denied monetary awards in infringement cases absent such a showing. For
8  example, in *eAdGear, Inc. v. Liu*, No. CV–11–05398 JCS, 2012 WL 2367805, at *18 (N.D. Cal.
9  June 21, 2012), *report and recommendation adopted*, 2012 WL 4005454 (N.D. Cal. Sept. 11,
10 2012), the court found "insufficient evidence to support the contention that 'but for' Defendant's
11 actions, revenue would have continued to increase at the same rate as it did in the three months
12 prior to the opening of Defendant's website." Similarly, in *Oyster Software, Inc. v. Forms
13 Processing, Inc.*, No. C-00-724-JCS, 2001 WL 1736382, *3-5 (N.D. Cal. Dec. 6, 2001), the court
14 dismissed as speculative a lost profits claim based on reduced web traffic. *See also BIC*, 1 F.3d
15 1214, 1219 (Fed. Cir. 1993) (finding that a plaintiff's lost profits theory in a patent case did not
16 satisfy the "but for" test under the *Panduit* factors in part because "the infringer's customers
17 would not necessarily transfer their demand to the patent owner's product in the absence of the
18 infringer's product.")[8]. Like the plaintiffs in these cases, Deckers has failed to provide the
19 necessary evidence to support its "lost profits" theory.

20     In sum, Deckers' "lost profits" theory for all of its claims fails as a matter of law. Without
21 evidence of causation or actual lost sales, Deckers' damages theory must be rejected.

22     **3. Deckers Failed to Disclose "Lost Profits" Theory for Patent Infringement**

23     As to Deckers' "lost profits" theory for its patent infringement claim, in addition to a
24 failure of proof, Deckers also failed to disclose the theory as required by the Rules. Although
25 Deckers vaguely referenced a "lost profits" theory in its initial disclosures for its trade dress
26 infringement and unfair competition claims, it entirely omitted any such theory for its patent

27 _____

28 [8] Indeed, neither Mr. Hanson nor Dr. Joachimsthaler even referenced the *Panduit* factors in their
reports. Ex. 3; Ex. 8.

Defendant's Notice of Motion and Motion for Partial Summary Judgment

claim. Deckers' initial disclosures did not identify lost profits as a type of damages it intended to seek under its patent claim. UMF No. 1. Deckers' response to Interrogatory 18, which sought detailed information about all alleged harm caused by Quince's conduct, including the "measure and proper calculation of any and all damages," made no mention of lost profits in connection with the patent claim. UMF No. 3. These omissions are significant because Deckers' expert first articulated a "lost profits" theory for patent infringement in his opening report—well after the close of fact discovery. UMF No. 4.

Deckers' failure to disclose its "lost profits" damages theory for its patent infringement claim warrants preclusion. Courts consistently reject attempts to introduce damages theories belatedly, particularly when those theories were not disclosed during discovery. For example, in *Vinotemp International Corp. v. Wine Master Cellars LLC*, No. 11-CV-1543-ABC-PLA, at *3 (C.D. Cal. Feb. 5, 2013), the court excluded an undisclosed lost profits theory, emphasizing that even minimal damages must be properly disclosed to allow the opposing party to prepare a defense. Similarly, in *Oracle USA, Inc. v. SAP AG*, 264 F.R.D. 541, 549 (N.D. Cal. 2009), the court excluded plaintiff's vague lost profits theory due to the failure to disclose its theory during discovery. Deckers' failure to disclose its "lost profits" theory for the patent claim falls squarely within this line of authority, warranting preclusion.

**B.      The Asserted Classic Ultra Mini and Tasman Trade Dresses Are Generic.**

The Asserted Classic Ultra Mini and Tasman Trade Dresses are generic for three independent and cumulative reasons: (1) they are overbroad or too generalized; (2) they are the basic form of a type of product; and (3) they are so common in the industry that they cannot identify a particular source.

***1.      The Asserted Classic Ultra Mini and Tasman Trade Dresses Are Overbroad or Too Generalized.***

*The Asserted Classic Ultra Mini Trade Dress.* First, it remains unclear what "[c]lassic suede boot styling" is. "Classic suede boot styling" can generally describe any boot made of suede material in a traditional shape. UMF No. 15. The term provides no specificity about what makes the styling "classic." UMF No. 16. Indeed, Deckers' own corporate representative

Defendant's Notice of Motion and Motion for Partial Summary Judgment

explained that "classic suede boot styling" just means "the styling of the Classic suede boot." UMF No. 14. This level of abstraction makes it impossible for designers to understand what aspects of suede boot design would potentially infringe. Ex. 10 (Comeau Rebuttal) ¶ 87.[9] This "fail[s] to provide *adequate* notice to competitors in the [footwear] business regarding the *breadth* of plaintiff's exclusivity rights." *Walker*, 549 F. Supp. 2d at 1176 (determining that "the trade dress proposed by plaintiff is generic", concluding that "some of the elements of plaintiff's proposed trade dress are overbroad" because "some terms leave the boundary of plaintiff's trade dress rights *unclear*, such as the terms '*rustic look*,' '*weathered look*,' '*architectural character*' or even 'Old World handiwork'") (emphasis added).

The same goes for "tufting"—on which Deckers' corporate representative gave inconsistent definitions, including (1) a general descriptor for the "overall appearance"; (2) a term invented to describe sheepskin; (3) a term invented to describe any material that gives "plush, fuzzy texture"; (4) a term interchangeable with stitches and fabric binding. UMF No. 15. Indeed, Plaintiff's expert added a fifth definition—something "cream off-white" on the shoe— apparently referring to the furry lining. *Id.* "Plaintiff's five separate definitions of trade dress do not provide [the court] with sufficient guidance to determine whether plaintiff will be able to meet the requirements of the Lanham Act for trade dress infringement[.]" *First Act Inc. v. Kids Station (U.S.) Inc.*, No. CV 05-12114-REK, 2006 WL 8458337, at *4 (D. Mass. Apr. 4, 2006); *see also Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.*, 292 F. Supp. 2d 535, 545 (S.D.N.Y. 2003) (alleged trade dress consisting of "nine elements either 'alone or in combination'" was "overbroad . . . because neither a juror, in adjudicating the issue, nor a Court, in formulating an injunction, would know exactly which particular combination of numerous elements claimed would trigger trade dress protection").

The description of the tufting and stitch pattern also lacks clarity under *Walker*, which held that "instead of defining the three-dimensional relief as '*complex*,' plaintiff should provide

---

[9] Deckers own survey export admitted that "I don't know what the classic styling may mean." Ex. 19 (Ezell Tr. (rough)) at 22:20.

Defendant's Notice of Motion and Motion for Partial Summary Judgment

the *magnitude* and *angle* of relief that render plaintiff's tiles distinctive." 549 F. Supp. 2d at 1176 (emphasis added). While there is no "magnitude and angle of relief" to describe on a boot, its footwear equivalents that relates to the texture and configuration of the surface—"stitch" and "tufting"—are is described "without specific parameters regarding their locations, spacing, or specific patterns." UMF No. 16. Words like "exaggerated", "raised" and "exposed" in the Asserted Classic Ultra Mini Trade Dress only add to the confusion and fail to provide adequate notice to competitors in the footwear business regarding the breadth of the asserted trade dress. UMF No. 16 (noting various variations and interpretations of "exaggerated, raised and exposed circular stitch pattern" and "exposed tufting").

Equally overbroad and generalized are the claimed elements of "[a] raised and rounded vamp" and "[a] thick, flat sole." There are no specific measurements or parameters provided to define what degree of "raised," "rounded," "thickness" or "flatness" are claimed. UMF No. 26. They are also common design elements found in many shoes. UMF No. 16.

Most glaringly, "ankle-high boot"—a fundamental footwear category that describes any boot reaching approximately to the ankle and used by Native Americans over a century ago—is listed an element of the asserted trade dress. UMF No. 13. This, together with the other elements, only answer "the question 'what-are-you' not 'who-are-you.'" *Glassybaby*, 2011 WL 4571876, at *2 (citing *Rudolph Int'l Inc. v. Realys, Inc.,* 482 F.3d 1195, 1198 (9th Cir. 2007)). "Permitting trade dress protection for this item would also unnecessarily grant [Deckers] protection over a broad number and types of [ankle-high boot], which runs contrary to the principles behind extending Lanham Act protection to trade dress." *Glassybaby*, 2011 WL 4571876, at *2 (citing *Wal–Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 213 (2000)).

_The Asserted Tasman Trade Dress._ Like the Asserted Classic Ultra Mini Trade Dress, the Asserted Tasman Trade Dress also consists of overbroad and generalized design elements such as "[a] raised and rounded dome shaped toe" and "[a] thick, flat outsole." UMF No. 24. There are no specific measurements or parameters provided to define what degree of "raised," "rounded," "thickness" or "flatness" are claimed. *Supra* at 18. Both the "center seam" and "embroidered braid" are basic, functional necessities for this type of clog or moccasin slippers.

Defendant's Notice of Motion and Motion for Partial Summary Judgment

UMF No. 22. These are also common design elements found in numerous shoes. *Id.*

The "brushed suede-like exterior" is also overbroad because suede—a type of leather with a soft, fuzzy finish that comes from the underside of animal skin—is a basic, standard material used for countless leather footwear uppers. UMF No. 25. The so-called "brushed suede-like exterior" is simply a made-up descriptor for the appearance of suede material and even Deckers' corporate representative could not name any differences between "suede-like exterior" and "brushed suede-like exterior." *Id.* This, together with the other elements, also only answer "the question 'what-are-you' not 'who-are-you.'"—"[p]ermitting trade dress protection for this item would also unnecessarily grant [plaintiff] protection over a broad number and types of [suede slipper], which runs contrary to the principles behind extending Lanham Act protection to trade dress." *Glassybaby*, 2011 WL 4571876, at *2.

In sum, "Plaintiff resorts to empty generalities in the face of more precise alternatives." *Walker*, 549 F. Supp. 2d at 1176. "These terms fail to provide adequate notice to competitors in the [footwear] business regarding the breadth of plaintiff's exclusivity rights." *Id.*

### 2. The Asserted Classic Ultra Mini and Tasman Trade Dresses Are the Basic Form of a Type of Product.

<u>The Asserted Classic Ultra Mini Trade Dress.</u> A "generic" product design can be defined as one that "refer[s] to the genus of which the particular product is a species." *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 115 (2d Cir. 2001) (quoting *Two Pesos*, 505 U.S. 763, 768-69 (1992)); *Park N' Fly Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194 (1985). In *Walker*, this Court held that "portions of plaintiff's trade dress definition constitute the basic form of tile design"—"a three-dimensional tile design *necessarily* uses 'design relief,' stone tiles will *usually* retain the 'look of stone carving; and *many* manufacturers seek the 'the rustic look of hand-shaped tiles.'" 549 F. Supp. 2d at 1176.

Here, a quality sheepskin ankle-high boot will *necessarily* have to be cut at ankle high, have a heel overlay, stitches/tufting (including the butt seams), and a fabric binding along the top of the boot and along the sole. UMF No. 18. A quality sheepskin ankle boot *usually* employ a raised and rounded vamp, a thick, flat sole and a sloped topline for ergonomics purposes. *Id.* And

as "classic" denotes—both in the name of the trade dress and its element "[c]lassic suede boot styling"—*many* other boots have the same timeless look. UMF Nos. 19-20 (14 competitor products and 16 prior products share the appearance).

> <u>*The Asserted Tasman Trade Dress.*</u> The Asserted Tasman Trade Dress is the basic form of moccasin and clog slippers. UMF No. 22. Clog slippers are a more structured version of slip-on slippers, offering a firmer sole and added support. *Id.* Moccasin slippers are inspired by traditional Native American footwear and tend to feature a flat sole, stitched detailing, and a soft leather or suede upper. *Id.* As such, by definition, a clog slipper or moccasin slippers *usually* have a "suede-like" appearance and "flat outsole." *Id.* The raised and rounded dome shaped toe is a completely ergonomic design that is present in countless footwear because the raised vamp facilitates natural walking motion, while its rounded shape accommodates the natural spread of toes during movement. UMF No. 24. To manufacture a durable clog slipper or moccasin slipper, a center seam would be *necessary* to create their three-dimensional shape, as it cannot rely on traditional crimping techniques due to their wool-lined construction. UMF No. 22. The embroidered braid around the opening of the upper is a fundamental functional necessity in both clog and moccasin slippers. UMF No. 23. Without this braid, the raw edges of both the suede upper and sheepskin lining would be directly exposed to wear, leading to fraying and unraveling of materials. *Id.* A shoe of this style made without a topline braid would make it look like a "cheaper" more economical shoe. *Id.* Additionally, the geometric braid pattern is a classic design element seen in *many* Native American moccasin-style footwear. *Id.*

> In sum, the Asserted Classic Ultra Mini Trade Dress is the basic form of a category of boot—an ankle-high sheepskin boot and the Asserted Tasman Trade Dress is the basic form of sheepskin moccasin and clog slippers, neither should be monopolized by Deckers. UMF Nos. 12, 22; *cf. See Landscape*, 113 F.3d 373, 380 (2d Cir. 1997) ("[G]ranting trade dress protection to an ordinary product design would create a monopoly in the goods themselves"); *see Indonesian Imports, Inc. v. Smith*, No. C97–3534 FMS, 1999 WL 183629, at *6 (N.D. Cal. Mar. 30, 1999) (refusing to extend trade dress protection to a "basic crocheted hand bag").

> **3. The Asserted Classic Ultra Mini and Tasman Trade Dresses Are So Common in**

Defendant's Notice of Motion and Motion for Partial Summary Judgment

1    ***the Industry That It Cannot Be Said to Identify a Particular Source.***

2        ***The Asserted Classic Ultra Mini Trade Dress.*** The Asserted Classic Ultra Mini Trade

3    Dress is so common in the industry that it cannot be said to identify a particular source because

4    there are at least 14 competitors in the market that sell a similar ankle-high sheepskin boot. UMF

5    No. 19; *cf. Walker*, 549 F. Supp. 2d at 1176 ("plaintiff's design is common in the industry

6    [where] Plaintiff's own witnesses admit that at least eight competitors market and sell a French

7    provençal tile line.").

8        Indeed, the very reason the Asserted Classic Ultra Mini Trade Dress is called classic is

9    because it has been used for decades (UMF No. 13 (Native American ankle-high boots date back

10   a century ago)) and at least 16 similar products predate Plaintiff's launch of the UGG Classic

11   Ultra Mini (UMF No. 20). *See Walker*, 549 F. Supp. 2d at 1176 ("Indeed, the very reason

12   plaintiff's tiles evoke the 'look of Old World handiwork' is because the tiles copy styles that

13   craftsman have used for centuries.").

14       ***The Asserted Tasman Trade Dress.*** Likewise, the Asserted Tasman Trade Dress is so

15   common in the industry that it cannot be said to identify a particular source because there are at

16   least 9 competitors in the market that sell similar moccasin and clog slippers. UMF No. 27.

17       In sum, the Asserted Classic Ultra Mini Trade Dress possesses designs that "are common

18   characteristics of the entire genre of" an ankle-high sheepskin boot and the Asserted Tasman

19   Trade Dress possesses designs that "are common characteristics of the entire genre of" moccasins

20   and clog slippers; thus, they are both generic. *Mana Prods. Inc. v. Columbia Cosmetics*

21   *Manufacturing Inc.*, 65 F.3d 1063, 1070 (2d Cir. 1995) (holding that makeup compacts possess a

22   "size and shape…are common characteristics of the entire genre of makeup compacts" and are

23   consequently generic, and that black was a generic color for makeup compacts because it was

24   widely used in the industry); *Kendall-Jackson*, 150 F.3d at 1049 (holding that grape-leaf designs

25   had become generic because grape leaves are commonly used to decorate wine bottles and

26   because the grape leaf alone "has lost the power to differentiate brands.").

27   **C.    The Asserted Tasman Trade Dress Lacks Secondary Meaning.**

28       Quince has asked the Court to exclude improper secondary considerations opinions

Defendant's Notice of Motion and Motion for Partial Summary Judgment

1   offered by Deckers' footwear expert and undisclosed affirmative opinions by Deckers' survey

2   expert who did not conduct a secondary meaning survey. If the Court grants Quince's *Daubert*

3   motions relating to those two experts, Quince's expert's survey evidence would remain as

4   unrebutted evidence of lack of secondary meaning. *See* Exs. 20-21 (Wallace Rebuttal Reports).

5   Therefore, the Court should grant summary judgment of non-infringement of the Asserted

6   Tasman Trade Dress.

7       **D.    The State Law Claims Based on Asserted Classic Ultra Mini and Tasman
             Trade Dress Should Be Dismissed.**

8

9       Infringement claims based on the Lanham Act and state common law are "subject to the

10   same test." *Jada Toys, inc. v. Mattel, Inc.*, 518 F.3d 628, 632 (9th Cir. 2008). California common

11   law also does not protect generic trade dresses. *Magic Kitchen LLC v. Good Things Int'l., Ltd.*,

12   153 Cal. App. 4th 1144, 1155 (2007). If an underlying trade dress infringement claim is

13   dismissed, the unfair competition claim must also be dismissed. *See Salt Optics, Inc. v. Jand,*

14   *Inc.*, No. SACV 10-0828 DOC, 2010 WL 4961702, at *8 (C.D. Cal. Nov. 19, 2010) (unfair

15   competition claim that "ar[ose] solely from [defendant's] allegedly unauthorized appropriation of

16   Plaintiff's trade dress and, as such, must be dismissed for the same reasons that Plaintiff's trade

17   dress claim must be dismissed"); *Acad. of Motion Picture Arts & Scis. v. Creative House*

18   *Promotions, Inc.*, 944 F.2d 1446, 1457 (9th Cir. 1991) ("[a]n action for unfair competition under

19   Cal. Bus. & Prof. Code §§ 17200 *et seq.* is 'substantially congruent' to a trademark infringement

20   claim under the Lanham Act."). The Court should thus summarily adjudicate the state law claims

21   in Quince's favor for the same reasons discussed above.

22       **E.    The '161 Patent Is Invalid.**

23       The '161 Patent is invalid for being (1) functional and (2) indefinite and non-enabling.

24       *First*, the '161 Patent is primarily functional. Quince's footwear expert explains that

25   functional concerns dictated the claimed design. UMF No. 29; Ex. 15 ¶¶ 63, 65-106. An obvious

26   combination of functional elements is not entitled to design patent protection. *Pioneer Photo*

27   *Albums, Inc. v. Holson Co.*, 654 F. Supp. 87, 89 (C.D. Cal. 1987) ("[T]he Holson design combines

28   functional elements in a way which, although obvious, had not been done before. Nonetheless, the

Defendant's Notice of Motion and Motion for Partial Summary Judgment

1   elements of the design are wholly functional and, therefore, not entitled to patent protection.").

2        To the extent the Court finds that the entire claimed design is not primarily functional, the

3   Court still has "a duty to conduct claim construction in design patent cases." *Egyptian Goddess,*

4   *Inc. v. Swisa, Inc.*, 543 F.3d 665, 679 (Fed. Cir. 2008); *Lanard Toys Ltd. v. Dolgencorp LLC*, 958

5   F.3d 1337, 1342 (Fed. Cir. 2020) ("[W]here a design contains both functional and non-functional

6   elements, the scope of the claim must be construed in order to identify the non-functional aspects

7   of the design as shown in the patent."); *O2 Micro*, 521 F.3d at 1360.

8        At least the following aspects of the claimed design are dictated by function and should be

9   excluded from the claim scope: (1) the horizontal butt seam; (2) the vertical butt seams; (3) the

10  thermoplastic imprints at the heel counter; (4) the pull tab; (5) the sloped top opening of the boot;

11  and (6) the binding around the boot collar. Ex. 15, ¶¶ 64-106. In a recent decision, a court limited

12  the scope of another Deckers footwear patent. *Deckers Outdoor Corp. v. Wal-Mart Stores, Inc.*,

13  No. 2:20-CV-09521-FLA (EX), ECF No. 160 (C.D. Cal. Apr. 9, 2024) ("Given the many

14  functional elements of the claimed design, the court finds the scope of the D'941 Patent is narrow"

15  and that the "[p]atent does not protect the general design concept of a footwear with a wide and

16  thick vamp, an elastic band connected to the rear of the vamp, and a thick midsole that is curved

17  upward at the toe section as described above."). This Court should do so, too.

18        *Second*, the '161 Patent is indefinite and non-enabling. It uses two types of solid lines to

19  depict features on the footwear upper, a solid line with a short dash at the end (highlighted in

20  yellow in representative figures below) and a solid line without (highlighted in green):



Defendant's Notice of Motion and Motion for Partial Summary Judgment

FIG. 3

FIG. 4

FIG. 5

Ex. 15, ¶ 108. Both sides' experts agree that generally these types of lines on a footwear upper could represent either pleats/seams or contours. *Id.*, ¶¶109-10; Ex. 17 (da Baere Rebuttal) at 38. But because the inventor specifically used two different types of solid lines to depict these features at similar locations of the footwear, they cannot all represent pleats/seams or all represent contours. *See*, *e.g.*, Ex. 15, ¶ 111. This inconsistent treatment makes it impossible for a designer of ordinary skill in the art, viewing the figures from the perspective of an ordinary observer, to understand whether these lines represent pleats/seams or contours or which lines represent pleats/seams and which represent contours. *Id.*, ¶ 112.

Moreover, a "visual disclosure may be inadequate—and its associated claim indefinite—if it includes multiple, internally inconsistent drawings." *Maatita*, 900 F.3d at 1375-76 (citing *Times Three Clothier, LLC v. Spanx, Inc.*, Case Nos. 13-cv-2157, 13-cv-7260, 2014 WL 1688130, at *7–9 (S.D.N.Y. Apr. 29, 2014) (holding design patents directed to ornamental designs for an undergarment invalid for indefiniteness because the drawings were inconsistent as to material aspects of the claimed design). Here, the '161 Patent includes internally inconsistent figures.

Defendant's Notice of Motion and Motion for Partial Summary Judgment

1  Figures 1-4 of the '161 Patent show a horizontal seam across the top of the footwear to be a

2  smooth, gradual bend with no visible portion protruding or jutting outward from the seam:



13  Ex. 15, ¶ 114. But Figure 6 shows a small but definitive knob that protrudes outwardly from the

14  seam when viewed from the top:



21  Ex. 15 (Comeau Report) ¶ 114. The inventor did ███████████████████. Ex. 18 (Frain Tr.)

22  at 66:9-70:13. Deckers' expert's █████████████████████████████████████████

23  ████████████████████████████████████████████████████—cannot

24  raise a genuine dispute of material fact. Ex. 17 (da Baere Rebuttal), at 39-40. The shaft and instep

25  are connected by the horizontal seam. Either the seam is invisible from the top, or the smoothly

26  bent shape of the seam is visible—not this knob. Because a designer of ordinary skill in the art

27  would not understand exactly what is claimed or how to make this design (Ex. 15 (Comeau

28  Report) ¶ 115), the '161 Patent is invalid.

Defendant's Notice of Motion and Motion for Partial Summary Judgment

1  **VI.    CONCLUSION**

2      For the foregoing reasons, Quince respectfully requests the Court grant its motion.

3

4  DATED: March 10, 2025

Xinlin Li Morrow (SBN 281707)
5  Ryan McMenamin (*pro hac vice*)
Lawrence Yichu Yuan (*pro hac vice*)
6  **Morrow Ni LLP**
xinlin@moni.law
7  ryan@moni.law
lawrence@moni.law
8  3333 Michelson Drive Suite 300
Irvine, CA 92612
9  Telephone: (213) 282-8166

10  *Attorneys for Defendant Last Brand,*
*Inc. d/b/a Quince*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendant's Notice of Motion and Motion for Partial Summary Judgment