# Exhibit 5

# EXPERT REPORT OF DAVID FRANKLYN IN THE MATTER OF DECKERS OUTDOOR CORPORATION V. LAST BRAND, INC. dba QUINCE and DOES 1-10

PREPARED BY:
David Franklyn
5602 E Via Buena Vista
Paradise Valley, AZ 85253

November 1, 2024

1

*TABLE OF CONTENTS*

| | Page # |
|---|---|
| *TABLE OF CONTENTS* | *2* |
| *I. ASSIGNMENT AND BACKGROUND* | *2* |
| *II. STUDY AUTHORSHIP AND QUALIFICATIONS* | *3* |
| *III. SUMMARY OF OPINIONS* | *4* |
| *IV. SURVEY OVERVIEW* | *4* |
| *V. METHODOLOGY* | *6* |
| Interviewing Procedures | 6 |
| Relevant Universe of Interest | 7 |
| Quality Control | 15 |
| *VI. EXPERIMENTAL DESIGN* | *18* |
| *VII. RESULTS* | *29* |
| *VIII. CONCLUSION* | *33* |

| | |
|---|---|
| **APPENDIX A:** | **CURRICULUM VITAE OF STUDY'S AUTHOR** |
| **APPENDIX B:** | **QUESTIONNAIRE** |
| **APPENDIX C:** | **STIMULI** |
| **APPENDIX D:** | **SURVEY SCREENSHOTS** |
| **APPENDIX E:** | **SURVEY DATA** |
| **APPENDIX F:** | **MATERIALS CONSIDERED** |

## I.    ASSIGNMENT AND BACKGROUND

I have been retained by counsel for Plaintiff Deckers Outdoor Corporation ("Deckers" or "Plaintiff") to provide an analysis to whether there is a likelihood of confusion between Defendant's LAST BRAND, INC. dba QUINCE and DOES 1-10 (collectively, "Defendants" or "Quince") slippers and the Plaintiff's UGG slippers. In particular, I conducted an analysis on whether there is a likelihood of post-sale confusion that may arise between Quince's Australian Shearling Clog Slippers and Decker's UGG® slippers.

2

## II.    STUDY AUTHORSHIP AND QUALIFICATIONS

I am currently a law professor at Arizona State University, with an appointment in the Sandra Day O'Connor College of Law.  I am also the Executive Director of the McCarthy Institute at ASU Law, which is focused on scholarship and research in intellectual property law, with particular emphasis in the areas of trademark law, branding and consumer perceptions related to brands. I have published extensively on issues relating to intellectual property law and am editor-in-chief and co-author of McCarthy's Desk Encyclopedia of Intellectual Property Law.

Formerly, between 2018 and 2021, I held a joint appointment in both the law school and Ageno School of Business at Golden Gate University in San Francisco. Between 2000 and 2018, I was a law professor and Executive Director of the McCarthy Institute for Intellectual Property and Technology Law at the University of San Francisco and Director of the Center for the Empirical Study of Trademark Law (CEST).

I have consulted and/or qualified as an expert witness on behalf of clients in numerous cases involving consumer perception and behavior issues, including in matters in the United States (federal and state courts), Asia, the European Union, the Middle East, and South America. I have personally designed and executed numerous consumer perception surveys that have been accepted into evidence by state and federal courts.

In addition to my survey research experience, I hold a J.D. from University of Michigan Law School. Additional biographical material, including lists of testimony and publications, is provided in Appendix A.

For my engagement in this matter, I am being compensated at my standard rate of $675 per hour. My compensation is not dependent upon the outcome of this proceeding.

## III.   SUMMARY OF OPINIONS

1.  I ran an *Eveready*-style likelihood of confusion survey which showed images of Defendant's Australian Shearling Clog Slipper product. After controlling for noise, a net of 34.6% of respondents reported confusion between the trade dress of Defendant's product and UGG slippers.

2.  This confusion rate supports a finding of a likelihood of confusion between Defendant's Australian Shearling Clog Slipper product and UGG slippers.

## IV.   SURVEY OVERVIEW

I conducted an analysis on whether there is a likelihood of post-sale confusion between Quince's Australian Shearling Clog Slippers and Decker's Ugg slippers.  The design of Quince's Australian Shearling Clog Slippers closely resembles that of Ugg's Tasman Slipper, utilizing what is known as the "Tasman Trade Dress" (including (a) an embroidered braid around the opening of the upper, (b) a raised prominent seam on the front part of the upper running longitudinally down the center of the upper, (c) a raised and rounded dome shaped toe, (d) a brushed suede-like exterior, and (e) a thick, flat outsole).[1]

To assess consumer perceptions relevant to the likelihood of post-sale confusion

---

[1] *See* Second Amended Complaint at p. 12-13 ¶ 48.

4

in this case, I utilized an *Eveready*-style survey. I determined this was the appropriate methodology for a confusion survey in this case for the following reasons. Generally, *Eveready* surveys are advisable where the senior mark is commercially strong enough to be readily accessible in memory with "top of mind" (unaided) awareness.[2] After reviewing Decker's Second Amended Complaint, Decker claims that UGG® has world-wide recognition as a premium brand, and their overwhelming popularity is attributable to Deckers' "continuous commitment to quality and excellence."[3] Additionally, Decker claims that "the Tasman Trade Dress has achieved widespread acceptance and recognition among the consuming public and trade throughout the United States."[4] Further, Plaintiff claims that "the Tasman Trade Dress has achieved a high degree of consumer recognition and secondary meaning, which serves to identify Deckers as the exclusive source of footwear featuring said trade dress."[5]  Additionally, I am aware that courts in the Ninth Circuit have called the *Eveready*-style survey methodology in cases of strong marks "the gold standard for fundamental cognitive and marketing reasons."[6]

In the survey I designed and conducted for this matter, I showed survey respondents (who were past or prospective purchasers of slippers that can be worn both indoors and/or outdoors that were either fur-lined slippers and/or clog slippers) several images of Quince's Australian Shearling Clog Slippers that contain the Tasman Trade Dress. A total of 549 respondents took the survey, with 277 in the test cell and 272 in the control cell. After viewing the images, respondents were asked questions about the source, sponsorship/approval, and affiliation, if any, between the Quince's Australian Shearling Clog Slippers and any other company.

---

[2] Jerre B. Swann, *Likelihood-Of-Confusion Surveys*, in Trademark and Deceptive Advertising Surveys 62 (Shari S. Diamond & Jerre B. Swann eds. 2nd ed. 2022).
[3] *See* Second Amended Complaint at p. 4 ¶ 11.
[4] *See* Second Amended Complaint at p. 14 ¶ 53.
[5] *See* Second Amended Complaint at p. 14 ¶ 53.
[6] *Allstate Ins. Co. v. Kia Motors Am., Inc.*, No. 16-cv-06108-SJO (AGRx), 2017 WL 10311211, at *5 (C.D. Cal. Sept. 20, 2017) (quoting 6 J. Thomas McCarthy, Trademarks & Unfair Competition § 32:173.50 (4th ed.))

5

Within the control cell, everything was identical to the above, with the exception that the stimuli was changed for the control stimuli, which were modified versions of the Quince Slipper images with all elements of the Tasman Trade Dress removed. The control stimuli were modified to remove the embroidered braid around the opening of the upper, remove the raised prominent seam on the front part of the upper running longitudinally down the center of the upper, change the raised and rounded dome shaped toe to a sloped and squared toe, replace the brushed suede-like exterior for a wool-like exterior, and replace the thick, flat outsole for a thin outsole.

## V.    *METHODOLOGY*

---

**Interviewing Procedures**

The sample of survey respondents was recruited using a randomized selection of survey respondents who participate in online survey panels. Surveys conducted online are well-accepted in both academic and market research, and are viewed by courts as standard and reliable methodological approaches to survey research. Indeed, online surveys are now the most common method of conducting market research among consumers. Companies and other entities regularly make decisions of importance based on data they collect through online surveys. Numerous U.S. District Courts have expressly endorsed and accepted into evidence online surveys in trademark cases.

I have designed, fielded, and reported on numerous online surveys that have been accepted by state and federal courts.

The sample of panelists used in the survey was provided by Prodege, a leading supplier of online samples for surveys. Prodege is highly regarded as a reputable

source of consumers for online surveys within the field of market research.  Prodege utilizes appropriate industry procedures for ensuring the integrity and quality of its panels.  Prodege ensures data integrity through their continued review of their panelists' behavior on a variety of metrics.

The online survey questionnaires were constructed, programmed, and fielded under my direction. My staff and I thoroughly tested the programmed surveys prior to any potential consumers receiving the invitations to participate in the surveys. Data was collected through the Qualtrics survey platform. The datasets showing each respondent's answers to all questions is provided in electronic form in Appendix E.

These studies were administered under "double-blind" conditions. Consumers were uninformed as to the purpose and sponsorship of the study. The survey is also, by definition, "blind" in that there is no person administering the surveys that can do anything to influence the results (unlike, for instance, a survey where someone asks a respondent questions in person or over the phone).

Interviewing was conducted October 27, 2024 through October 30, 2024.

**Relevant Universe of Interest**

The interested universe of this study was individuals who have purchased in the last 18 months, or intend to purchase in the next 12 months, slippers that can be worn both indoors and/or outdoors and that were either fur-lined slippers and/or clog slippers. Additionally, respondents must indicate that they have or would spend above $40 on a pair of slippers.

Census-based quotas were used for geographic regions. In order to create a representative sample of the market for this product, additional quotas were set to

7

ensure that 90% of respondents were between the ages of 18-64 and 80% of respondents were female. Within the 18-64 age range, additional census-based quotas were used to ensure representative distribution of age groups within that range. These quotas were chosen based on information from counsel that the primary market for this product is women between the ages of 18-64. As is appropriate for a post-sale confusion survey, a limited number of male and 65+ respondents were included.[7] Full demographic information showing the age, gender, and state of residence of each respondent can be found in the dataset in Appendix E.

The survey began with a screener to ensure that respondents were members of the relevant universe and fit within the set quotas. Consumers were first asked about their age.

---

[7] In post-sale confusion surveys, it has been held that the proper universe includes both likely purchasers of the plaintiff's and the defendant's goods. *See Vans, Inc. v. Walmart, Inc.*, No. SACV2101876DOCKESX, 2023 WL 6927344, at *3 (C.D. Cal. Oct. 11, 2023) (Court finding a post-sale confusion survey with a survey universe containing both likely purchasers of both the plaintiff and defendant's products permissible); *See also Gen. Motors Co. v. Urb. Gorilla, LLC,* No. 2:06-CV-00133 BSJ, 2010 WL 5395065, at *17 (D. Utah Dec. 27, 2010); *See also* William G. Barber & Guilio E. Yaguinto, *The Universe,* in Trademark and Deceptive Advertising Surveys 31, 35-36, 53 (Shari S. Diamond & Jerre B. Swann eds. 2nd ed. 2022).



Respondents who selected "Under 18" or "Prefer not to answer" were terminated (*i.e.*, not allowed to proceed further in) from the survey.

Next, respondents were asked their gender. Options for "Female" and "Male" were randomized.



9

Those who selected "Prefer not to answer" were terminated.

Respondents were then asked in which state they currently live and were provided with a drop-down menu of options including all 50 states, Washington D.C., Puerto Rico, and an option of "I do not live in the US".

In which state do you currently live?

→

Respondents who selected "I do not live in the US" were terminated.

Respondents were then asked whether they or anyone in their household work in a subset of industries. Options other than "None of the above" were randomized.

10

Do you or does anyone in your household work in the following industries? Select all that apply.

☐ Manufacturing, distribution, or marketing of kitchen appliances

☐ Manufacturing, distribution, or marketing of construction tools

☐ Manufacturing, distribution, or marketing of footwear and/or apparel

☐ Manufacturing, distribution, or marketing of health supplements

☐ Personal training/physical therapy

☐ Manufacturing, distribution, or marketing of home goods

☐ None of the above

→

Respondents who answered either "Manufacturing, distribution, or marketing of home goods" and/or "Manufacturing, distribution, or marketing of footwear and/or apparel" were terminated.[8]

Next, respondents were asked which from a subset of products they had purchased in the past 18 months. Options other than "Other" and "None of the above" were randomized.

---

[8] This termination logic was meant to capture individuals with special industry knowledge. Defendant Quince sells various types of goods, including home goods, apparel and footwear. Therefore, respondents who indicated that they may work in either the apparel/ footwear industry as well as the home goods industry were removed from the pool.

11

Respondents were also asked which from a subset of products they intended to purchase in the next 12 months. Options other than "Other" and "None of the above" were randomized.

12

Which of the following goods do you plan on purchasing in the next 12 months? Select all that apply.

☐ A smartphone and/or tablet capable of cellular connectivity

☐ Slippers that can be worn both indoors and/or outdoors

☐ A board game

☐ A blender

☐ A slithy tove

☐ Daily multi-vitamins

☐ A hat

☐ A fiction novel

☐ Patio furniture

☐ An electric guitar

☐ None of the above

☐ Don't know/prefer not to say

→

Only respondents who answered "Slippers that can be worn both indoors and/or outdoors" to one or both questions were allowed to continue. Additionally, respondents who selected the fictional product "a slithy tove" in response to either question were terminated.

Next, respondents who had indicated they had purchased slippers that can be worn both indoors and/or outdoors in the last 18 months or intended to purchase slippers that can be worn both indoors and/or outdoors in the next 12 months were asked what type of slippers that can be worn both indoors and/or outdoors did they

13

purchase or intend to purchase. Options other than "Other" and "None of the Above" were randomized.

In a previous question, you indicated that in the last 18 months or in the next 12 months, you have purchased or intend to purchase slippers that can be worn both indoors and/or outdoors. Which of the following types of slippers that can be worn both indoors and/or outdoors did you purchase or do you intend to purchase? Select all that apply.

- ☐ Leather loafers
- ☐ Silk slippers
- ☐ Orthopedic slippers
- ☐ Moccasin-style slippers
- ☐ Hand-knitted slippers
- ☐ Athletic slides
- ☐ Fur-lined slippers
- ☐ Clog slippers
- ☐ Other
- ☐ None of the above

→

Only respondents who selected either "Fur-lined slippers" and/or "clog slippers" were allowed to continue.

Next, respondents were asked approximately how much are the slippers you purchased or intend to purchase.

14

In a previous question, you indicated that in the last 18 months or in the next 12 months, you have purchased or intend to purchase slippers that can be worn both indoors and/or outdoors. Approximately how much are the slippers you purchased or intend to purchase? Select all that apply.

- ☐ Under $40
- ☐ $40 – $80
- ☐ $81 – $120
- ☐ More than $120
- ☐ Don't know/ Not sure

→

Respondents who answered "Under $40" only were terminated from the survey.

## Quality Control

Several quality control metrics were employed to ensure the validity of responses. First, respondents were presented with one fictional product amidst the initial subset of products they were asked about past and future purchases. Those who selected this fictional product, "a slithy tove," in response were terminated from the survey. This ensures that respondents were actively paying attention to the survey questions and their responses.

Second, consumers were also asked whether they typically wear eyeglasses or contact lenses when they read or shop.

15



If they answered "yes" to the question, they were asked if they would be wearing their eyeglasses or contact lenses during the survey. Respondents who said "no" to this question were terminated.



Third, consumers were also provided with a detailed list of instructions and were asked to agree to these instructions in order to participate in the survey.

16

You have qualified to take this survey. Before continuing, please
carefully read these instructions:
* Please take the survey in one session without interruption.
* Please keep your browser maximized for the entire survey.
* While taking the survey, please do not consult any other
websites or other electronic or written materials.
* Please answer all questions on your own without consulting any
other person.
* Please do not guess. If you don't know for any question, please
indicate so.

○ I understand and agree to the above instructions

○ I do not understand or do not agree to the above instructions

→

Consumers who indicated that they did not understand or agree to the instructions were terminated from the survey.

Fourth, the survey implemented screening features provided by the Qualtrics software to prevent fraudulent or duplicative responses. To prevent bots from taking the survey, each respondent was assigned a ReCaptcha score ("Q_RecaptchaScore") and a fraud score ("Q_RelevantIDFraudScore"), each of which is a measure of how much the respondent's behavior appears to be that of a robot or otherwise fraudulent. To prevent any individual from taking the survey more than once, each respondent was assigned a score for three different related measures ("Q_BallotBoxStuffing", "Q_RelevantIDDuplicate", and "Q_RelevantIDDuplicateScore"). Respondents whose scores did not meet the standardized thresholds for any of these quality control measures were terminated.[9]

---

[9] *See*:
https://www.qualtrics.com/support/survey-platform/survey-module/survey-checker/fraud-detection

17

The dataset was also reviewed in detail and "cleaned" prior to analysis. All respondents were confirmed to have geographic coordinates in the United States. Respondents who entered gibberish or nonsensical answers into open-ended responses were removed. A total of two respondents were removed for this reason, representing 1.3% of the initial respondents. Furthermore, my analysis showed that the minimum amount of time in which a respondent could take the survey while fully examining the images and reading the questions was 1 minute and 15 seconds (75 seconds). As no respondents took the survey in less than 75 seconds, no responses were removed for that reason. The full dataset is available in Appendix E, and those excluded from analysis are included as a separate tab within the dataset.

## VI.    EXPERIMENTAL DESIGN

After passing screening criteria and qualifying for the survey, respondents were asked to review images.

This survey utilized a test and control design. Respondents who were in the test cell saw images of Quince's Australian Shearling Clog Slippers from various angles. Respondents who were in the control cell saw similar images which had been digitally modified to remove all elements of Plaintiff's Tasman Trade Dress.[10]

Screenshots of both the test cell and control cell stimuli are shown below.

---

[10] *Supra* p. 4-5.

18

<u>Test Stimuli</u>





Control Stimuli





While these and subsequent images are reduced in size to fit on these pages, the images appeared larger to consumers responding to the survey. Larger versions of the stimuli images can also be found in Appendix C.

20

Respondents were asked to confirm whether they could clearly see the images.





Were you able to see the images clearly?

○ Yes

○ No

Those indicating they could not see the images were terminated and not allowed to proceed further in the survey. Full screenshots of this survey page, along with screenshots of every page in the survey, are provided within Appendix D of this report.

Next, respondents were asked a series of questions to assess confusion, beginning with questions assessing source confusion. Respondents were asked what company they think makes or puts out the slippers shown in the stimuli.

22

Below are the same images.

Use the zoom-in feature on the device you are using if you would like to enlarge an image.



23



This question, as well as subsequent questions, was accompanied by the stimuli images corresponding to the respondent's assigned cell and the text saying "Use the zoom-in feature on the device you are using if you would like to enlarge an image". For the purposes of clarity and readability in this report, all following screenshots will be cropped to show only the question and not the images that appeared above them. Full screenshots of the questions and images as they appear to the respondent can be found in Appendix D.

Respondents also had the option to check "Don't know/not sure". Before proceeding in the survey, respondents were required to either type an answer into the box or check the box next to "Don't know/not sure", and they were not allowed to do

24

both. A similar "Don't know/not sure" box, with the same accompanying response requirements, appeared alongside every open text box response option in the survey.

Respondents were then asked to explain their answer to the previous question.



Next, respondents were asked if they believed that the slippers in the images were sponsored or approved by another company. As before, the question was accompanied by the stimuli images corresponding to the respondent's assigned cell. The first and second answer options were randomized.

25



Respondents who indicated that they believed that the slippers were sponsored or approved by another company were asked to identify which company they believed sponsored or approved the slippers.



26

Respondents were then asked to explain their answer to the previous question.



Finally, respondents were asked whether they believed the company that sells the slippers is affiliated with another company. The first and second answer options were randomized.

27



Respondents who answered "is affiliated with another company" were asked which company they believed was affiliated.



Respondents were then asked to explain their answer to the previous question.

28



Why do you say that?

☐ Don't know/ not sure

The questionnaire instrument is included in Appendix B to this report. Full images of stimuli and screenshots are included in Appendices C and D to this report, respectively.

## VII.    RESULTS

As more fully explained in the Methodology and Experimental Design sections, this survey consisted of showing images of Defendant Quince's Australian Shearling Clog Slippers to a relevant universe of consumers to assess potential confusion with Plaintiff UGG's slippers. To account for "noise" within the data, a control group was shown modified images of the Quince Slipper with all elements of the Tasman Trade Dress removed.[11]

---

[11] *Supra* p. 4-5; Appropriate controls offer an effective way to overcome most threats of systematic and random noise that interferes with the signal (e.g., actual percentage of consumers who are misled) that the consumer's answer to the question would provide in the absence of noise. Shari Seidman Diamond, *Control Foundations: Rationales and Approaches*, in Trademark and Deceptive Advertising Surveys, 241-242 (Shari S. Diamond & Jerre B. Swann eds. 2nd ed. 2022).

29

A total of 549 respondents completed the survey, with 277 respondents in the test cell and 272 respondents in the control cell. All individual responses are available in the dataset in Appendix E.

After viewing the test images of Quince's Australian Shearling Clog Slippers, consumers were asked questions regarding source, sponsorship, and affiliation confusion. The results for each type of confusion are detailed below and then de-duped to determine an overall confusion rate.[12]

As is standard for an *Eveready*-format confusion survey, a respondent was counted as confused in this survey if they indicated the Plaintiff "UGG," "Tasman," or some variation of Plaintiff's marks.[13] [14]

**Table 1: Results for Eveready Confusion Survey**

|  | Test (N=277) | Control (N=272) | Net |
|---|---|---|---|
| **Source** | 53.1% | 18.0% | 35.1% |
| **Sponsorship** | 10.5% | 6.3% | 4.2% |
| **Affiliation** | 5.8% | 3.3% | 2.5% |
| **Aggregated Total** | 57.0% | 24.4% | 34.6% |

[12] As a matter of practice, my aggregated total confusion tabulation uses a "de-duping" process where respondents who indicated multiple types of confusion are only counted once.

[13] Additionally, 3 respondents indicated "Koolaburra," which is a subsidiary of the UGG brand and were thus counted as confused as to the source, sponsorship, and/or affiliation.

[14] For quality control purposes, each response was coded by two different people, each of whom was blind to the other's coding. The two sets of codes were then compared to ensure that the coding was consistent. For this survey, both people coded the same values for all responses.

**Source Confusion**

Of the respondents who saw the images of Quince's slippers, 53.1% of respondents indicated that they believed the slippers were made or put out by UGG.

As more thoroughly discussed in the Survey Overview section of my report, the control cell utilized identical stimuli with the exception of UGG's asserted Tasman Trade Dress elements were removed. The purpose of a control cell is to account for "noise" within the data. Of the control respondents who saw the control stimuli, 18.0% indicated they believed that the slippers were made or put out by UGG.

After controlling for noise, the net level of source confusion between the Quince slipper and UGG is **35.1%** (53.1% - 18.0%).[15]

All respondents were asked to provide a rationale (i.e., "Why do you say that?") for their answer to the source confusion question. A significant portion of respondents in the test cell indicated "look" or appearance as their reason for indicating UGG as a source. Below are a few verbatim responses:

- "They resemble uggs with the suede and lining"
- "The lined suede uppers look like some of their other styles"
- "It looks like a pair of Uggs."
- A respondent indicating precisely UGG Tasman slippers stated "That's what they look like."
- "Looks like their moosehide type slipper and has thick sole"
- "I have a pair of these specific shoes in my closet"
- "1 of Uggs slippers they're known for is the tasman slippers"
- "The stitch design and the quality look and solid sole with inside fur."

---

[15] The margin of error for the test and control percentages for source confusion are 5.9% and 4.6%, respectively.

31

- "This shoe structure reminds me of the design of uggs."

In my review, there is high risk of source confusion between the defendant Quince's Australian Shearling Clog Slippers and plaintiff UGG.

### Sponsorship or Approval Confusion

Of the test cell respondents who saw the test images of Quince's Australian Shearling Clog Slippers, 10.5% indicated they believed that the Quince slipper is sponsored or approved by UGG.

Within the control cell, 6.3% of respondents believed that the control stimuli was sponsored or approved by UGG.

After controlling for noise, the net level of sponsorship or approval confusion between Quince and UGG is **4.2%** (10.5% - 6.3%).[16]

### Affiliation Confusion

Of the test cell respondents who saw the images of Quince's Australian Shearling Clog Slippers, 5.8% indicated they believed that the Quince slippers are affiliated or connected with UGG.

Within the control cell, 3.3% believed that the control stimuli were affiliated or connected with UGG.

After controlling for noise, the net level of business affiliation confusion between

---

[16] The margin of error for the test and control percentages for sponsorship or approval confusion are 3.6% and 2.9%, respectively.

32

the Quince slipper and UGG is **2.5%** (5.8% - 3.3%).[17]

### Overall Confusion

Responses for source, sponsorship/approval, and affiliation confusion were aggregated and de-deduped in order to come up with an overall confusion rate. In the de-duping process, a respondent is counted as confused if they indicated confusion for at least one of the three types of confusion. Any respondent who indicated more than one type of confusion is counted only once.

After de-duping, 57.0% of respondents in the test cell indicated confusion as to the source, sponsorship, and/or affiliation of the product. Within the control cell, 24.4% of respondents indicated confusion as to the source, sponsorship, and/or affiliation of the product.

After controlling for noise, the net level of overall confusion between the Quince slipper and UGG is **<u>34.6%</u>** (57.0% - 24.4%).[18]

## VIII.    CONCLUSION

Based on the survey conducted and described in this report, it is clear that a significant percentage of the relevant consumers are confused by the use of the Tasman Trade Dress on Quince's Australian Shearling Clog Slippers. Consumers viewing Defendant Quince's slippers are likely to believe there is a connection between those slippers and UGG.

---

[17] The margin of error for the test and control percentages for affiliation confusion are 2.7% and 2.1%, respectively.

[18] The margin of error for the test and control percentages for overall confusion are 5.8% and 5.0%, respectively.

33

After reviewing the slippers, a net aggregate of **34.6%** of respondents reported confusion between Defendant Quince's Australian Shearling Clog Slippers and Plaintiff UGG. This is well above standards set by courts to indicate a likelihood of confusion.[19] The results of this survey indicate that there is a significant likelihood of confusion among relevant consumers.

If called in this case to testify as an expert at trial, I expect to prepare exhibits to aid my testimony. I also reserve the right to supplement and/or amend my opinions if additional information or evidence is provided to me.

Respectfully submitted this 1st day of November, 2024,

David J. Franklyn

---

David J. Franklyn

---

[19] § 32:188. Likelihood of confusion—Percentage figures in the cases—Evidence of a likelihood of confusion, 5 McCarthy on Trademarks and Unfair Competition § 32:188 (5th ed.) ("Generally, figures in the range of 25% to 50% have been viewed as solid support for a finding of a likelihood of confusion.")