# Exhibit 6

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| DECKERS OUTDOOR CORPORATION, a Delaware Corporation, | ) Case No. 3:23-cv-04850-AMO<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>) |
| LAST BRAND, INC. dba QUINCE, a Delaware Corporation; and DOES 1-10, inclusive | )<br>)<br>) |
| Defendant. | )<br>)<br>)<br>) |

---

**EXPERT REPORT OF MATTHEW G. EZELL**

---

1.      I am the principal and founder of Ezell Group LLC, a marketing research

company located in Huntington Beach, California.  I have over 21 years of experience working

on litigation and non-litigation trademark and trade dress matters.  Additional information

regarding my qualifications is contained in paragraphs 39-44, below.

**Nature of Retention and Summary of Conclusions**

2.      I was engaged by counsel for Plaintiff Deckers Outdoor Corporation ("Deckers"

or "Plaintiff") to conduct a consumer perception survey to assess whether Defendant Quince's

Australian Shearling Button Boots ("Quince Button Boots") are likely to cause confusion with

Plaintiff's UGG Bailey Button Boot Trade Dress.  I understand, based on my review of the

Complaint filed in this matter, that Plaintiff claims that the Quince Button Boots are likely to

cause confusion among consumers.

1

3.      To test that proposition, I designed and conducted a survey (the "Ezell Button Boots Survey").  The Ezell Button Boots Survey was designed to determine whether relevant consumers are likely to be confused by the mistaken belief that the Quince Button Boots are made by, have the authorization or approval of, or have a business affiliation or business connection with Plaintiff.  The Ezell Button Boots Survey uses the *Eveready* survey methodology, which repeatedly has been recognized as the "gold standard" for likelihood of confusion surveys.[1]

4.      As discussed in further detail below, the Ezell Button Boots Survey found that approximately ***fifty-five percent*** (54.5%) of survey respondents mistakenly believed that the Quince Button Boots are made by, have the authorization or approval of, or have a business affiliation or business connection with Plaintiff.  This level of confusion is well above the threshold typically relied on by courts in finding a likelihood of confusion.[2]

5.      I thus conclude, based on the results of the Ezell Button Boots Survey and my decades of experience, that Defendant's Quince Button Boots are likely to cause consumer confusion with Plaintiff in the post-sale marketplace.

### The Ezell Button Boots Survey Design

6.      The Ezell Button Boots Survey was designed to measure whether relevant consumers living across the United States—that is, females 18 years of age and older who have either purchased boots in the past year or are likely to purchase boots in the next year—were likely to mistakenly believe that the Quince Button Boots are made by, have the authorization or approval of, or have a business affiliation or business connection with Plaintiff.

---

[1] *See* 6 McCarthy on Trademarks and Unfair Competition § 32:174 (5th ed.).
[2] *See* 6 McCarthy on Trademarks and Unfair Competition § 32:188 (5th ed.) ("Survey percentages demonstrating confusion levels over 50% are almost always viewed by courts as persuasive evidence of likely confusion.").

7.      I had primary responsibility for all aspects of the Ezell Button Boots Survey, including developing the survey questions and procedures, supervising the data collection,[3] and analyzing the survey data to form conclusions.  Data gathering for this survey was conducted from October 21 to October 24, 2024. *See* attached Appendix B for the survey data file.

8.      The Ezell Button Boots Survey was designed and conducted according to accepted survey standards and in conformity with the standards detailed in the Federal Judicial Center's *Manual for Complex Litigation, Fourth*[4] and the Federal Judicial Center's *Reference Guide on Survey Research, Federal Reference Manual on Scientific Evidence, Third.*

9.      The survey was administered under double-blind conditions, which means that neither the persons administering the survey nor the survey participants were informed of the purpose or sponsorship of the survey.

10.     The Ezell Button Boots Survey was developed to employ a scientific experimental design consisting of two survey cells: (1) a test or experimental cell designed to measure the degree, if any, to which consumers are likely to be confused by the mistaken belief that Defendant's Quince Button Boots are sold by, have the authorization or approval of, or have a business affiliation or business connection with Plaintiff; and (2) a control cell designed to measure the extent of mismeasurement or "noise" in the test cell results.

---

[3] Data gathering was carried out under my direction by Dynata, a leading provider of survey panels consisting of millions of individuals and business professionals.

[4] For the proffered poll or survey, "...Relevant factors include whether: the population was properly chosen and defined; the sample chosen was representative of that population; the data gathered were accurately reported; and the data were analyzed in accordance with accepted statistical principles.... In addition, in assessing the validity of a survey, the judge should take into account the following factors: whether the questions asked were clear and not leading; whether the survey was conducted by qualified persons following proper interview procedures; and whether the process was conducted so as to ensure objectivity...." *See Federal Judicial Center, Manual for Complex Litigation, Fourth*, Section 11.493, at 102-104 (2004).

3

11.     The purpose of a control group is to determine the extent to which any potential confusion with Plaintiff that is identified in the test cell should be dismissed or discounted as survey "noise"—*i.e.*, guessing, or otherwise providing answers for reasons unrelated to the specific asserted trademark or trade dress.  A control group measures the extent of that noise so that the level of noise can be deducted from the test cell results indicative of confusion; that allows the researcher to arrive at a net level of confusion that can be attributed specifically to the trademark or trade dress at issue.

12.     For the control group, I showed respondents a fictitious mid-calf boot that does not contain the elements claimed in the Bailey Button Boot Trade Dress (i.e., a boot that does *not* have an overlapping of front and rear panels on the lateral side of the boot shaft, does *not* have curved top edges on the overlapping panels, does *not* have exposed fleece-type lining edging the overlapping panels and top of the boot shaft, and does *not* have or one or more buttons prominently featured on the lateral side of the boot shaft).[5]  This control "shares as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed."[6]

### Sampling and Methodology

13.     In accordance with standard trademark survey practice, I developed the questionnaire for the Ezell Button Boots Survey and arranged for it to be administered over the Internet, using a panel of consumers.

14.     The Ezell Button Boots Survey begins with a screener to identify respondents whose opinions are relevant to the question of whether the Quince Button Boots are likely to

---

[5] A description of the Bailey Button Boot Trade Dress is found beginning on page 10 of the Second Amended Complaint filed in this matter.
[6] Shari Seidman Diamond, "Reference Guide on Survey Research" in the *Reference Manual on Scientific Evidence, Third*, (Federal Judicial Center, 2011), 399.

cause confusion with Plaintiff's UGG Bailey Button Boot in the post-sale marketplace.  Because I understand that Defendant marketed the Quince Button Boots to females, the survey universe was defined as females 18 years of age and older living in the United States who indicated that they either 1) had purchased boots for casual wear in the past year, or 2) were likely to purchase boots for casual wear in the next year (the "Universe Definition").[7]

15.    There were 200 interviews conducted in the test cell and 200 interviews conducted in the control cell, for a total of 400 interviews.

16.    Based on the overall design and execution of the Ezell Button Boots Survey, it is my expert opinion that the survey provides representative and reliable information regarding the opinions of females 18 years of age and older who are consumers of boots for casual wear.

### The Ezell Button Boots Survey Questionnaire

17.    Initially, potential respondents received an invitation to fill out the screening portion of the interview to determine whether they met the Universe Definition.  Subsequently, those respondents who met the Universe Definition were invited to complete the main survey.

18.    Qualifying respondents were told, "Please look at this boot as you normally would if you were considering purchasing a pair." Depending on which cell they were assigned to (*i.e.*, test cell or control cell), qualifying respondents were shown one of the following images. After viewing the image, respondents were then asked whether they could clearly see the boot. Only respondents who answered this question in the affirmative were able to proceed with the survey.

---

[7] Additionally, the survey universe was also restricted to respondents who: (1) did not, nor did anyone else in their household, work for a marketing research company or advertising agency, or a company that makes footwear; (2) agreed to take the survey by themselves without consulting any other persons or sources; (3) were able to clearly see the boot shown in the survey; and (4) successfully passed various quality control checks in the screener (*e.g.*, CAPTCHA).

Test Cell Stimulus Image (Quince Button Boots)



Control Cell Stimulus Image (Fictitious Mid-Calf Boot)



19.    The test cell image shows one of the Quince Button Boots as a consumer may encounter it in the post-sale marketplace.  The control cell image was a fictitious mid-calf boot that did not contain the elements of the UGG Bailey Button Boot Trade Dress.

20.    Survey respondents were then asked, "Who do you believe makes or puts out these boots?" If respondents provided an answer, they were asked the basis for their belief with the question, "Why do you say that?"

21.    Next, survey respondents were asked, "What other brand(s), if any, are made or put out by whoever you believe makes or puts out these boots?"  Respondents who provided a response were again asked the basis for their belief with the question, "Why do you say that?"

7

22.     Next, survey respondents were asked whether they believed that whoever makes or puts out the boot shown has the authorization or approval of any other company(s) or brand(s), and if so, what company(s) or brand(s). Respondents who provided a response were again asked the basis for their belief with the question, "Why do you say that?"

23.     Finally, survey respondents were asked whether they believed that whoever makes or puts out the boot shown has a business affiliation or business connection with any other company(s) or brand(s), and, if so, with what company(s) or brand(s). Respondents who provided a response were again asked the basis for their belief with the question, "Why do you say that?"

24.     These questions are patterned after the well-accepted Eveready methodology used in the industry and relied on by courts as an effective way to assess whether there is a likelihood of confusion. The full screener and questionnaire can be found in Appendix A, pages 1-5.

**Ezell Button Boots Survey Results – Test Cell**

25.    In the test cell, in response to Q1-Q2, approximately sixty-nine percent (68.5%) of the survey respondents reported the mistaken belief that the Quince Button Boots are made or put out by UGG.  *See* Table 1 below. For a listing of responses by category, see Appendix A, pages 8-25.

| **TABLE 1** | | |
|---|---|---|
| TEST CELL – QUINCE BUTTON BOOTS | | |
| Q1     Who do you believe makes or puts out these boots? | | |
| Q2     Why do you say that? | | |
| Response Category | Number | Percent |
| 1.  UGG | 137 | 68.5 |
| 2.  UGG plus other | 1 | 0.5 |
| 3.  Other named source(s) (e.g., Bearpaw, Clarks, Walmart, etc.) | 31 | 15.5 |
| Note: No source in this category accounted for more than 6.0% of the total | | |
| 4.  Unspecified source(s) | 3 | 1.5 |
| 5.  Don't know | 28 | 14.0 |
| Total | 200 | 100.0 |

9

26.     In the test cell, in response to Q3-Q4, an additional ten percent (10.0%) of survey respondents reported the mistaken belief that UGG is another brand made or put out by the maker of the Quince Button Boots.  Of these, one percent (1.0%) already gave an UGG response to the prior question and nine percent (9.0%) were additional respondents not already counted. *See* Table 2 below. For a listing of responses by category, see Appendix A, pages 27-42.

| **TABLE 2**<br>TEST CELL – QUINCE BUTTON BOOTS | | |
|---|---|---|
| Q3   What other brand(s), if any, are made or put out by whoever you believe makes or puts out these boots? | | |
| Q4   Why do you say that? | | |
| <u>Response Category</u> | <u>Number</u> | <u>Percent</u> |
| 1.  UGG | | |
|    Respondents counted in prior question(s) | 2 | 1.0 |
|    New respondents not counted in prior question(s) | 18 | 9.0 |
| 2.  UGG plus other | 0 | 0.0 |
| 3.  Other named source(s) (e.g., Bearpaw, Clarks, Walmart, etc.) | 53 | 26.5 |
|    Note: No source in this category accounted for more than 9.5% of the total | | |
| 4.  Unspecified source(s) | 3 | 1.5 |
| 5.  Don't know | 124 | 62.0 |
| Total | 200 | 100.0 |

10

27.      In the test cell, in response to Q5-Q7, fourteen percent (14.0%) of survey respondents reported the mistaken belief that the maker of the Quince Button Boots has the authorization or approval of UGG.  Of these, thirteen percent (13.0%) already gave an UGG response to prior question(s) and one percent (1.0%) were new respondents not already counted. *See* Table 3 below. For a listing of responses by category, see Appendix A, pages 44-55.

| TABLE 3 | | |
|---|---|---|
| TEST CELL – QUINCE BUTTON BOOTS | | |
| Q5    Do you believe that whoever makes or puts out these boots…? | | |
|     a.   HAS the authorization or approval of any other company(s) or brand(s) | | |
|     b.   Does NOT have the authorization or approval of any other company(s) or brand(s) | | |
|     c.   Don't know or no opinion | | |
| Q6    What company(s) or brand(s)? | | |
| Q7    Why do you say that? | | |
| Response Category | Number | Percent |
|    Has the authorization or approval of… | | |
|     1.  UGG | | |
|       Respondents counted in prior question(s) | 26 | 13.0 |
|       New respondents not counted in prior question(s) | 2 | 1.0 |
|     2.  UGG plus other | 0 | 0.0 |
|     3.  Other named source(s) (e.g., Bearpaw, Clarks, Walmart, etc.) | 15 | 7.5 |
|       Note: No source in this category accounted for more than 2.0% of the total | | |
|     4.  Unspecified source(s) | 2 | 1.0 |
|     5.  Don't know | 38 | 19.0 |
|    Does not have the authorization or approval of any other company(s) or brand(s) | 26 | 13.0 |
|    Don't know or no opinion | 91 | 45.5 |
| Total | 200 | 100.0 |

28.     In the test cell, in response to Q8-Q10, seven percent (7.0%) reported the mistaken belief that the maker of the Quince Button Boots has a business affiliation or business connection with UGG.  Of these, six percent (6.0%) already gave an UGG response to prior question(s) and one percent (1.0%) were new respondents not already counted.  *See* Table 4 below. For a listing of responses by category, see Appendix A, pages 57-67.

| | | |
|---|---|---|
| **TABLE 4** | | |
| TEST CELL – QUINCE BUTTON BOOTS | | |
| Q8     Do you believe that whoever makes or puts out these boots…? | | |
| a.   HAS a business affiliation or business connection with any other company(s) or brand(s) | | |
| b.   Does NOT have a business affiliation or business connection with any other company(s) or brand(s) | | |
| c.   Don't know or no opinion | | |
| Q9     What company(s) or brand(s)? | | |
| Q10    Why do you say that? | | |
| Response Category | Number | Percent |
| Has the authorization or approval of… | | |
| 1.  UGG | | |
| Respondents counted in prior question(s) | 12 | 6.0 |
| New respondents not counted in prior question(s) | 2 | 1.0 |
| 2.  UGG plus other | 1 | 0.5 |
| 3.  Other named source(s) (e.g., Bearpaw, Clarks, Walmart, etc.) | 19 | 9.5 |
| Note: No source in this category accounted for more than 2.0% of the total | | |
| 4.  Unspecified source(s) | 1 | 0.5 |
| 5.  Don't know | 35 | 17.5 |
| Does not have a business affiliation or business connection with any other company(s) or brand(s) | 43 | 21.5 |
| Don't know or no opinion | 87 | 43.5 |
| Total | 200 | 100.0 |

12

29.     Thus, across all questions in the test cell and without double-counting, approximately eighty percent (68.5 + 9.0 + 1.0 + 1.0 = 79.5%) of respondents reported the mistaken belief that the Quince Button Boots are made or put out by, have the authorization or approval of, or have a business affiliation or business connection with UGG. *See* Table 5 below.

| TABLE 5 TEST CELL AGGREGATE UGG RESPONSES Q1-Q10 | | |
| --- | --- | --- |
| Response | Number | Percent (n=200) |
| UGG | 159 | 79.5 |

### Ezell Button Boots Survey Results – Control Cell

30.     In the control cell, in response to Q1-Q2, approximately nineteen percent (18.5%) of survey respondents reported the mistaken belief that the fictitious mid-calf boots are made or put out by Plaintiff. *See* Table 6 below. For a listing of responses by category, see Appendix A, pages 71-85.

| TABLE 6 CONTROL CELL – FICTITIOUS MID-CALF BOOTS | | |
| --- | --- | --- |
| Q1     Who do you believe makes or puts out these boots? Q2     Why do you say that? | | |
| Response Category | Number | Percent |
| 1.  UGG | 37 | 18.5 |
| 2.  UGG plus other | 1 | 0.5 |
| 3.  Other named source(s) (e.g., Bearpaw, Clarks, Walmart, etc.) Note: No source in this category accounted for more than 5.0% of the total | 50 | 25.0 |
| 4.  Unspecified source(s) | 3 | 1.5 |
| 5.  Don't know | 109 | 54.5 |
| Total | 200 | 100.0 |

13

31.    In the control cell, in response to Q3-Q4, six and one-half percent (6.5%) of survey respondents reported the mistaken belief that UGG is another brand sold by the maker of the fictitious mid-calf boots.  Of these, none (0.0%) already gave an UGG response to the prior question and six and one-half percent (6.5%) were additional respondents not already counted. *See* Table 7 below. For a listing of responses by category, see Appendix A, pages 87-102.

| TABLE 7 | | |
|---|---|---|
| CONTROL CELL – FICTITIOUS MID-CALF BOOTS | | |
| Q3    What other brand(s), if any, are made or put out by whoever you believe makes or puts out these boots? | | |
| Q4    Why do you say that? | | |
| Response Category | Number | Percent |
| 1.  UGG | | |
|    Respondents counted in prior question(s) | 0 | 0.0 |
|    New respondents not counted in prior question(s) | 13 | 6.5 |
| 2.  UGG plus other | 1 | 0.5 |
| 3.  Other named source(s) (e.g., Bearpaw, Clarks, Walmart, etc.) | 53 | 26.5 |
|    Note: No source in this category accounted for more than 4.0% of the total | | |
| 4.  Unspecified source(s) | 2 | 1.0 |
| 5.  Don't know | 131 | 65.5 |
| Total | 200 | 100.0 |

32.     In the control cell, in response to Q5-Q7, ten percent (10.0%) of survey respondents reported the mistaken belief that the maker of the fictitious mid-calf boots has the authorization or approval of UGG. Of these, all ten percent (10.0%) already gave an UGG response to a prior question.  *See* Table 8 below. For a listing of responses by category, see Appendix A, pages 104-115.

| TABLE 8 |||
|:---|:---:|:---:|
| **CONTROL CELL – FICTITIOUS MID-CALF BOOTS** |||
| Q5    Do you believe that whoever makes or puts out these boots…? |||
|     a.  HAS the authorization or approval of any other company(s) or brand(s) |||
|     b.  Does NOT have the authorization or approval of any other company(s) or brand(s) |||
|     c.  Don't know or no opinion |||
| Q6    What company(s) or brand(s)? |||
| Q7    Why do you say that? |||
| <u>Response Category</u> | <u>Number</u> | <u>Percent</u> |
|   Has the authorization or approval of… | | |
|    1.  UGG | | |
|     Respondents counted in prior question(s) | 10 | 5.0 |
|     New respondents not counted in prior question(s) | 0 | 0 |
|    2.  UGG plus other | 3 | 1.5 |
|    3.  Other named source(s) (e.g., Bearpaw, Clarks, Walmart, etc.) | 21 | 10.5 |
|     Note: No source in this category accounted for more than 2.0% of the total | | |
|    4.  Unspecified source(s) | 0 | 0.0 |
|    5.  Don't know | 71 | 35.5 |
|   Does not have the authorization or approval of any other company(s) or brand(s) | 10 | 5.0 |
|   Don't know or no opinion | 85 | 42.5 |
| Total | 200 | 100.0 |

15

33.     In the control cell, in response to Q8-Q10, three percent (3.0%) reported the mistaken belief that the maker of the fictitious mid-calf boots has a business affiliation or business connection with UGG. Of these, all three percent (3.0%) already gave an UGG response to prior question(s). *See* Table 9 below. For a listing of responses by category, see Appendix A, pages 117-128.

| **TABLE 9**<br>CONTROL CELL – FICTITIOUS MID-CALF BOOTS | | |
|---|---|---|
| **Q8**    Do you believe that whoever makes or puts out these boots…? | | |
|     a.   HAS a business affiliation or business connection with any other company(s) or brand(s) | | |
|     b.   Does NOT have a business affiliation or business connection with any other company(s) or brand(s) | | |
|     c.   Don't know or no opinion | | |
| **Q9**    What company(s) or brand(s)? | | |
| **Q10**   Why do you say that? | | |
| <u>Response Category</u> | <u>Number</u> | <u>Percent</u> |
|     Has the authorization or approval of… | | |
|     1.  UGG | | |
|       Respondents counted in prior question(s) | 6 | 3.0 |
|       New respondents not counted in prior questions | 0 | 0.0 |
|     2.  UGG plus other | 2 | 1.0 |
|     3.  Other named source(s) (e.g., Bearpaw, Clarks, Walmart, etc.) | 26 | 13.0 |
|       Note: No source in this category accounted for more than 2.0% of the total | | |
|     4.  Unspecified source(s) | 3 | 1.5 |
|     5.  Don't know | 56 | 28.0 |
|     Does not have a business affiliation or business connection with any other company(s) or brand(s) | 25 | 12.5 |
|     Don't know or no opinion | 82 | 41.0 |
| Total | 200 | 100.0 |

16

34. Thus, across all questions in the control cell and without double-counting, twenty-five percent (18.5 + 6.5 + 0.0 + 0.0 = 25.0%) of respondents reported the mistaken belief that the fictitious boot they were shown (i.e., a mid-calf boot of the same material and color that does *not* contain the elements of the UGG Bailey Button Boot trade dress) is made or put out by, has the authorization or approval of, or has a business affiliation or business connection with UGG. *See* Table 10 below.

**TABLE 10**
CONTROL CELL
AGGREGATE UGG RESPONSES Q1-Q10

| Response | Number | Percent (n=200) |
|---|---|---|
| UGG | 50 | 25.0 |

35. The results of the likelihood of confusion survey in its entirety evidence that, on a net basis after adjusting the survey data for any mismeasurement error based upon the control cell, approximately fifty-five percent (79.5 – 25.0 = 54.5%) of the relevant universe of consumers of boots for casual wear are likely to be confused by the mistaken belief that the Quince Button Boots are made or put out by, have the authorization or approval of, or have a business affiliation or business connection with UGG. *See* Table 11 below.

**TABLE 11**
TEST CELL AND CONTROL CELL
NET LIKELIHOOD OF CONFUSION

| Response Category | Test Cell Percent (n=200) | Control Cell Percent (n=200) | Net Percent (Test minus Control) |
|---|---|---|---|
| 1. UGG | 79.5 | 25.0 | 54.5 |

**Conclusion**

36.    It is my considered opinion—based upon my education, background, professional experience, and my review and analysis of the survey results—that the Ezell Button Boots Survey results clearly support a finding of likelihood of confusion.  After adjusting the survey data for any mismeasurement error based upon the control cell, approximately ***fifty-five percent*** (54.5%) of the relevant universe of consumers of boots for casual wear are likely to be confused by the mistaken belief that the Quince Button Boots are made or put out by, have the authorization or approval of, or have a business affiliation or business connection with UGG.

37.    Furthermore, the survey results show that the causal nexus for likelihood of confusion is the presence of elements of the UGG Bailey Button Boot Trade Dress on the Quince Button Boots, and not due to any alternative explanation. Because the control cell, which showed a fictitious mid-calf boot and asked the same questions resulted in twenty-five percent (25.0%) likelihood of confusion, the net measured likelihood of confusion of approximately fifty-five percent (54.5%) is attributable to the presence of the UGG Bailey Button Boot Trade Dress elements on the Quince Button Boot.

38.    The causal nexus of the measured confusion is perhaps made most clear by the fact that the vast majority of respondents in the test cell who exhibited confusion reported that the basis for their confusion was due to the similarity in "look" "style," or "design" between the Quince Button Boots and Plaintiff's UGG products. Below is a small sampling of excerpted responses from the respondents who were counted as confused (emphasis added).

| RESPID | RESPONSE | |
|---|---|---|
| 1003 | Q1 | UGG. |
| | Q2 | Because <u>it looks like an UGG boot</u>. |
| | | |
| 1017 | Q1 | UGGs. |
| | Q2 | <u>Looks like that brand</u>. |

| RESPID | RESPONSE | |
|---|---|---|
| 1028 | Q1 | UGGs. |
| | Q2 | They <u>look like UGG boots</u>. |
| 1040 | Q1 | UGGs. |
| | Q2 | <u>Those are UGGs</u>. |
| 1106 | Q1 | UGG. |
| | Q2 | <u>That's an UGG "look"</u>. |
| 1109 | Q1 | UGG. |
| | Q2 | The fur and <u>the button on the side</u>. |
| 1124 | Q1 | UGG. |
| | Q2 | <u>The style of it is their signature style</u>. |
| 1129 | Q1 | UGGs. |
| | Q2 | <u>They look like the classic UGG boots</u>. |
| 1136 | Q5 | HAS the authorization or approval of... |
| | Q6 | UGGs. |
| | Q7 | <u>They look just like their classic boot designs</u>. |
| 1141 | Q5 | HAS the authorization or approval of... |
| | Q6 | UGG. |
| | Q7 | <u>They are exactly like UGG boots</u>. |
| 1171 | Q5 | HAS the authorization or approval of... |
| | Q6 | UGG. |
| | Q7 | Because <u>if they didn't have the approval it would be copying or stealing the design</u>. |
| 1188 | Q3 | UGG. |
| | Q4 | <u>This is their staple design for their boots</u>. |

## Qualifications and Compensation

39.     As noted above, I have over 21 years of experience working on litigation and non-litigation trademark and trade dress matters.  During the past 15 years I have participated in the design and execution of a variety of surveys relating to intellectual property matters, including trademark, false advertising, and other related matters.

40.     I have been retained on behalf of clients in the consumer product, industrial product, and service sectors of the economy to provide marketing consulting and research

19

services.  Throughout the past eight years, I have been retained in a number of litigation-related consultancies involving intellectual property matters, including matters before federal and state courts and the Trademark Trial and Appeal Board of the U.S. Patent and Trademark Office.

41.     I am familiar with the tests for trustworthiness of properly conducted surveys or polls and the accepted principles of survey research, detailed in the *Manual for Complex Litigation, Fourth and Reference Manual on Scientific Evidence, Third*.  I am a member of the American Association of Public Opinion Research (AAPOR) and the International Trademark Association (INTA).

42.     Attached as Appendix C is a copy of publications that I have authored or co-authored in the last ten years.

43.     Attached as Appendix D is a list of all trial and deposition testimony I have given in the last four years.

44.     Attached as Appendix E is a copy of my curriculum vitae, describing my qualifications and professional background.

<u>**Materials Considered**</u>

45.     In addition to materials mentioned in this report, I considered the following materials in this matter: Plaintiff's Second Amended Complaint; and portions of the Quince.com website depicting the Quince Australian Shearling Button Boot (QUINCE0000016).

<u>**Compensation**</u>

46.     My fees for this engagement consist solely of billable time and expenses. Standard time is billed at the rate of $600.00 per hour.  Deposition and trial time are billed at the rate of $750.00 per hour. Research Assistant time is billed at the rate of $300.00 per hour.

20

47.    29.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 15th day of November, 2024, in Huntington Beach, California.


_____

Matthew G. Ezell