# Exhibit 7

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| DECKERS OUTDOOR CORPORATION, a Delaware Corporation, <br><br> Plaintiff, <br><br> v. <br><br> LAST BRAND, INC. dba QUINCE, a Delaware Corporation; and DOES 1-10, inclusive <br><br> Defendant. | ) Case No. 3:23-cv-04850-AMO <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## **EXPERT REPORT OF MATTHEW G. EZELL**

1.  I am the principal and founder of Ezell Group LLC, a marketing research company located in Huntington Beach, California.  I have over 21 years of experience working on litigation and non-litigation trademark and trade dress matters.  Additional information regarding my qualifications is contained in paragraphs 39-44, below.

### **<u>Nature of Retention and Summary of Conclusions</u>**

2.  I was engaged by counsel for Plaintiff Deckers Outdoor Corporation ("Deckers" or "Plaintiff") to conduct a consumer perception survey to assess whether Defendant Quince's Australian Shearling Mini Boots ("Quince Mini Boots") are likely to cause confusion with Plaintiff's UGG Classic Ultra Mini Trade Dress.  I understand, based on my review of the Complaint filed in this matter, that Plaintiff claims that the Quince Mini Boots are likely to cause confusion among consumers.

1

3.      To test that proposition, I designed and conducted a survey (the "Ezell Mini Boots Survey").  The Ezell Mini Boots Survey was designed to determine whether relevant consumers are likely to be confused by the mistaken belief that the Quince Mini Boots are made by, have the authorization or approval of, or have a business affiliation or business connection with Plaintiff.  The Ezell Mini Boots Survey uses the *Eveready* survey methodology, which repeatedly has been recognized as the "gold standard" for likelihood of confusion surveys.[1]

4.      As discussed in further detail below, the Ezell Mini Boots Survey found that approximately **seventy-seven percent** (76.5%) of survey respondents mistakenly believed that the Quince Mini Boots are made by, have the authorization or approval of, or have a business affiliation or business connection with Plaintiff.  This level of confusion is well above the threshold typically relied on by courts in finding a likelihood of confusion.[2]

5.      I thus conclude, based on the results of the Ezell Mini Boots Survey and my decades of experience, that Defendant's Quince Mini Boots are likely to cause consumer confusion with Plaintiff in the post-sale marketplace.

### The Ezell Mini Boots Survey Design

6.      The Ezell Mini Boots Survey was designed to measure whether relevant consumers living across the United States—that is, females 18 years of age and older who have either purchased boots in the past year or are likely to purchase boots in the next year—were likely to mistakenly believe that the Quince Mini Boots are made by, have the authorization or approval of, or have a business affiliation or business connection with Plaintiff.

---

[1] *See* 6 McCarthy on Trademarks and Unfair Competition § 32:174 (5th ed.).
[2] *See* 6 McCarthy on Trademarks and Unfair Competition § 32:188 (5th ed.) ("Survey percentages demonstrating confusion levels over 50% are almost always viewed by courts as persuasive evidence of likely confusion.").

7.      I had primary responsibility for all aspects of the Ezell Mini Boots Survey, including developing the survey questions and procedures, supervising the data collection,[3] and analyzing the survey data to form conclusions.  Data gathering for this survey was conducted from October 21 to October 25, 2024. *See* attached Appendix B for the survey data file.

8.      The Ezell Mini Boots Survey was designed and conducted according to accepted survey standards and in conformity with the standards detailed in the Federal Judicial Center's *Manual for Complex Litigation, Fourth*[4] and the Federal Judicial Center's *Reference Guide on Survey Research, Federal Reference Manual on Scientific Evidence, Third.*

9.      The survey was administered under double-blind conditions, which means that neither the persons administering the survey nor the survey participants were informed of the purpose or sponsorship of the survey.

10.     The Ezell Mini Boots Survey was developed to employ a scientific experimental design consisting of two survey cells: (1) a test or experimental cell designed to measure the degree, if any, to which consumers are likely to be confused by the mistaken belief that Defendant's Quince Mini Boots are sold by, have the authorization or approval of, or have a business affiliation or business connection with Plaintiff; and (2) a control cell designed to measure the extent of mismeasurement or "noise" in the test cell results.

---

[3] Data gathering was carried out under my direction by Dynata, a leading provider of survey panels consisting of millions of individuals and business professionals.

[4] For the proffered poll or survey, "...Relevant factors include whether: the population was properly chosen and defined; the sample chosen was representative of that population; the data gathered were accurately reported; and the data were analyzed in accordance with accepted statistical principles.... In addition, in assessing the validity of a survey, the judge should take into account the following factors: whether the questions asked were clear and not leading; whether the survey was conducted by qualified persons following proper interview procedures; and whether the process was conducted so as to ensure objectivity...." *See Federal Judicial Center, Manual for Complex Litigation, Fourth*, Section 11.493, at 102-104 (2004).

3

11.     The purpose of a control group is to determine the extent to which any potential confusion with Plaintiff that is identified in the test cell should be dismissed or discounted as survey "noise"—*i.e.*, guessing, or otherwise providing answers for reasons unrelated to the specific asserted trademark.  A control group measures the extent of that noise so that the level of noise can be deducted from the test cell results indicative of confusion; that allows the researcher to arrive at a net level of confusion that can be attributed specifically to the mark or trade dress at issue.

12.     For the control group, I showed respondents a fictitious ankle-high boot that does not contain the elements claimed in the Classic Ultra Mini Trade Dress (i.e., a boot that does not have an exaggerated, raised and exposed circular stitch pattern; exposed tufting; a raised and rounded vamp; etc.).[5]  This control "shares as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed."[6]

### Sampling and Methodology

13.     In accordance with standard trademark survey practice, I developed the questionnaire for the Ezell Mini Boots Survey and arranged for it to be administered over the Internet, using a panel of consumers.

14.     The Ezell Mini Boots Survey begins with a screener to identify respondents whose opinions are relevant to the question of whether the Quince Mini Boots are likely to cause confusion with Plaintiff's UGG Classic Ultra Mini in the post-sale marketplace.  Because I understand that Defendant marketed the Quince Mini Boots to females, the survey universe was defined as females 18 years of age and older living in the United States who indicated that they

---

[5] The Classic Ultra Mini Trade Dress is described in full on page 7 of the Complaint filed in this matter.
[6] Shari Seidman Diamond, "Reference Guide on Survey Research" in the *Reference Manual on Scientific Evidence, Third*, (Federal Judicial Center, 2011), 399.

either 1) had purchased boots for casual wear in the past year, or 2) were likely to purchase boots for casual wear in the next year (the "Universe Definition").[7]

15.   There were 200 interviews conducted in the test cell and 200 interviews conducted in the control cell, for a total of 400 interviews.

16.   Based on the overall design and execution of the Ezell Mini Boots Survey, it is my expert opinion that the survey provides representative and reliable information regarding the opinions of females 18 years of age and older who are consumers of boots for casual wear.

**The Ezell Mini Boots Survey Questionnaire**

17.   Initially, potential respondents received an invitation to fill out the screening portion of the interview to determine whether they met the Universe Definition.  Subsequently, those respondents who met the Universe Definition were invited to complete the main survey.

18.   Qualifying respondents were told, "Please look at this boot as you normally would if you were considering purchasing a pair." Depending on which cell they were assigned to (*i.e.*, test cell or control cell), qualifying respondents were shown one of the following images. After viewing the image, respondents were then asked whether they could clearly see the boot. Only respondents who answered this question in the affirmative were able to proceed with the survey.

---

[7] Additionally, the survey universe was also restricted to respondents who: (1) did not, nor did anyone else in their household, work for a marketing research company or advertising agency, or a company that makes footwear; (2) agreed to take the survey by themselves without consulting any other persons or sources; (3) were able to clearly see the boot shown in the survey; and (4) successfully passed various quality control checks in the screener (*e.g.*, CAPTCHA).

Test Cell Stimulus Image (Quince Mini Boots)



Control Cell Stimulus Image (Fictitious Ankle-High Boot)



19. The test cell image shows one of the Quince Mini Boots as a consumer may encounter it in the post-sale marketplace. The control cell image was a fictitious ankle-high boot that did not contain the elements of the UGG Classic Ultra Mini Trade Dress.

20. Survey respondents were then asked, "Who do you believe makes or puts out these boots?" If respondents provided an answer, they were asked the basis for their belief with the question, "Why do you say that?"

21. Next, survey respondents were asked, "What other brand(s), if any, are made or put out by whoever you believe makes or puts out these boots?" Respondents who provided a response were again asked the basis for their belief with the question, "Why do you say that?"

22. Next, survey respondents were asked whether they believed that whoever makes or puts out the boot shown has the authorization or approval of any other company(s) or brand(s),

7

and if so, what company(s) or brand(s). Respondents who provided a response were again asked the basis for their belief with the question, "Why do you say that?"

24. Finally, survey respondents were asked whether they believed that whoever makes or puts out the boot shown has a business affiliation or business connection with any other company(s) or brand(s), and, if so, with what company(s) or brand(s). Respondents who provided a response were again asked the basis for their belief with the question, "Why do you say that?"

24. These questions are patterned after the well-accepted Eveready methodology used in the industry and relied on by courts as an effective way to assess whether there is a likelihood of confusion. The full screener and questionnaire can be found in Appendix A, pages 1-5.

8

**Ezell Mini Boots Survey Results – Test Cell**

25.    In the test cell, in response to Q1-Q2, seventy-six percent (76.0%) of the survey

respondents reported the mistaken belief that the Quince Mini Boots are made or put out by

UGG.  *See* Table 1 below. For a listing of responses by category, see Appendix A, pages 8-25.

| TABLE 1 | | |
|---|---|---|
| TEST CELL – QUINCE MINI BOOTS | | |
| Q1    Who do you believe makes or puts out these boots? | | |
| Q2    Why do you say that? | | |
| Response Category | Number | Percent |
| 1.  UGG | 152 | 76.0 |
| 2.  UGG plus other | 1 | 0.5 |
| 3.  Other named source(s) (e.g., Bearpaw, Clarks, Walmart, etc.)<br>     Note: No source in this category accounted for more than<br>     3.0% of the total | 13 | 6.5 |
| 4.  Unspecified source(s) | 1 | 0.5 |
| 5.  Don't know | 33 | 16.5 |
| Total | 200 | 100.0 |

9

26.    In the test cell, in response to Q3-Q4, an additional eight and one-half percent (8.5%) of survey respondents reported the mistaken belief that UGG is another brand sold by the maker of the Quince Mini Boots.  Of these, one-half percent (0.5%) already gave an UGG response to the prior question and eight percent (8.0%) were additional respondents not already counted. *See* Table 2 below. For a listing of responses by category, see Appendix A, pages 27-43.

| **TABLE 2** TEST CELL – QUINCE MINI BOOTS | | |
|---|---|---|
| Q3    What other brand(s), if any, are made or put out by whoever you believe makes or puts out these boots? | | |
| Q4    Why do you say that? | | |
| Response Category | Number | Percent |
| 1.  UGG | | |
|     Respondents counted in prior question(s) | 1 | 0.5 |
|     New respondents not counted in prior question(s) | 16 | 8.0 |
| 2.  UGG plus other | 1 | 0.5 |
| 3.  Other named source(s) (e.g., Bearpaw, Clarks, Walmart, etc.) | 62 | 31.0 |
|     Note: No source in this category accounted for more than 9.0% of the total | | |
| 4.  Unspecified source(s) | 2 | 1.0 |
| 5.  Don't know | 118 | 59.0 |
| Total | 200 | 100.0 |

10

27.    In the test cell, in response to Q5-Q7, sixteen percent (16.0%) of survey respondents reported the mistaken belief that the maker of the Quince Mini Boots has the authorization or approval of UGG.  Of these, fourteen and one-half percent (14.5%) already gave an UGG response to prior question(s) and one and one-half percent (1.5%) were new respondents not already counted.  *See* Table 3 below. For a listing of responses by category, see Appendix A, pages 45-55.

| **TABLE 3** | | |
|---|---|---|
| **TEST CELL – QUINCE MINI BOOTS** | | |
| Q5    Do you believe that whoever makes or puts out these boots…? | | |
|     a.  HAS the authorization or approval of any other company(s) or brand(s) | | |
|     b.  Does NOT have the authorization or approval of any other company(s) or brand(s) | | |
|     c.  Don't know or no opinion | | |
| Q6    What company(s) or brand(s)? | | |
| Q7    Why do you say that? | | |
| <u>Response Category</u> | <u>Number</u> | <u>Percent</u> |
|     Has the authorization or approval of… | | |
|     1.  UGG | | |
|        Respondents counted in prior question(s) | 29 | 14.5 |
|        New respondents not counted in prior question(s) | 3 | 1.5 |
|     2.  UGG plus other | 0 | 0.0 |
|     3.  Other named source(s) (e.g., Bearpaw, Clarks, Walmart, etc.) | 12 | 6.0 |
|        Note: No source in this category accounted for more than 2.0% of the total | | |
|     4.  Unspecified source(s) | 2 | 1.0 |
|     5.  Don't know | 24 | 12.0 |
|     Does not have the authorization or approval of any other company(s) or brand(s) | 25 | 12.5 |
|     Don't know or no opinion | 105 | 52.5 |
| Total | 200 | 100.0 |

11

28.    In the test cell, in response to Q8-Q10, eleven percent (11.0%) reported the mistaken belief that the maker of the Quince Mini Boots has a business affiliation or business connection with UGG. All of these respondents already gave an UGG response to prior question(s). *See* Table 4 below. For a listing of responses by category, see Appendix A, pages 57-67.

| | | |
|---|---|---|
| **TABLE 4** | | |
| **TEST CELL – QUINCE MINI BOOTS** | | |
| Q8    Do you believe that whoever makes or puts out these boots…? | | |
|    a.  HAS a business affiliation or business connection with any other company(s) or brand(s) | | |
|    b.  Does NOT have a business affiliation or business connection with any other company(s) or brand(s) | | |
|    c.  Don't know or no opinion | | |
| Q9    What company(s) or brand(s)? | | |
| Q10   Why do you say that? | | |
| Response Category | Number | Percent |
|    Has the authorization or approval of… | | |
|    1.  UGG | | |
|      Respondents counted in prior question(s) | 22 | 11.0 |
|      New respondents not counted in prior question(s) | 0 | 0.0 |
|    2.  UGG plus other | 3 | 1.5 |
|    3.  Other named source(s) (e.g., Bearpaw, Clarks, Walmart, etc.) | 17 | 8.5 |
|      Note: No source in this category accounted for more than 2.0% of the total | | |
|    4.  Unspecified source(s) | 0 | 0.0 |
|    5.  Don't know | 17 | 8.5 |
|    Does not have a business affiliation or business connection with any other company(s) or brand(s) | 36 | 18.0 |
|    Don't know or no opinion | 105 | 52.5 |
| Total | 200 | 100.0 |

12

29.    Thus, across all questions in the test cell and without double-counting, eighty-five and one-half percent (76.0 + 8.0 + 1.5 + 0.0 = 85.5%) of respondents reported the mistaken belief that the Quince Mini Boots are made or put out by, have the authorization or approval of, or have a business affiliation or business connection with UGG.  *See* Table 5 below.

| TABLE 5 |||
| --- | --- | --- |
| TEST CELL |||
| AGGREGATE UGG RESPONSES Q1-Q10 |||
| Response | Number | Percent |
|  |  | (n=200) |
| UGG | 171 | 85.5 |

**Ezell Mini Boots Survey Results – Control Cell**

30.    In the control cell, in response to Q1-Q2, three and one-half percent (3.5%) of survey respondents reported the mistaken belief that the fictitious ankle-high boots are made or put out by Plaintiff.  *See* Table 6 below. For a listing of responses by category, see Appendix A, pages 71-85.

| TABLE 6 |||
| --- | --- | --- |
| CONTROL CELL – FICTITIOUS ANKLE-HIGH BOOTS |||
| Q1     Who do you believe makes or puts out these boots? |||
| Q2     Why do you say that? |||
| Response Category | Number | Percent |
| 1.  UGG | 7 | 3.5 |
| 2.  UGG plus other | 0 | 0.0 |
| 3.  Other named source(s) (e.g., Bearpaw, Clarks, Walmart, etc.) | 56 | 28.0 |
|     Note: No source in this category accounted for more than 5.0% of the total |  |  |
| 4.  Unspecified source(s) | 6 | 3.0 |
| 5.  Don't know | 131 | 65.5 |
| Total | 200 | 100.0 |

31.     In the control cell, in response to Q3-Q4, five percent (5.0%) of survey respondents reported the mistaken belief that UGG is another brand sold by the maker of the fictitious ankle-high boots.  Of these, none (0.0%) already gave an UGG response to the prior question and five percent (5.0%) were additional respondents not already counted.  *See* Table 7 below. For a listing of responses by category, see Appendix A, pages 87-102.

| **TABLE 7**<br>CONTROL CELL – FICTITIOUS ANKLE-HIGH BOOTS | | |
|---|---|---|
| Q3     What other brand(s), if any, are made or put out by whoever you believe makes or puts out these boots? | | |
| Q4     Why do you say that? | | |
| <u>Response Category</u> | <u>Number</u> | <u>Percent</u> |
|    1.  UGG | | |
|       Respondents counted in prior question(s) | 0 | 0.0 |
|       New respondents not counted in prior question(s) | 10 | 5.0 |
|    2.  UGG plus other | 0 | 0.0 |
|    3.  Other named source(s) (e.g., Bearpaw, Clarks, Walmart, etc.) | 54 | 27.0 |
|       Note: No source in this category accounted for more than 4.0% of the total | | |
|    4.  Unspecified source(s) | 3 | 1.5 |
|    5.  Don't know | 133 | 66.5 |
| Total | 200 | 100.0 |

14

32.    In the control cell, in response to Q5-Q7, two percent (2.0%) of survey respondents reported the mistaken belief that the maker of the fictitious ankle-high boots has the authorization or approval of UGG. Of these, all two percent (2.0%) already gave an UGG response to a prior question. *See* Table 8 below. For a listing of responses by category, see Appendix A, pages 104-115.

| **TABLE 8** | | |
|---|---|---|
| **CONTROL CELL – FICTITIOUS ANKLE-HIGH BOOTS** | | |
| Q5    Do you believe that whoever makes or puts out these boots…? | | |
| a.   HAS the authorization or approval of any other company(s) or brand(s) | | |
| b.   Does NOT have the authorization or approval of any other company(s) or brand(s) | | |
| c.   Don't know or no opinion | | |
| Q6    What company(s) or brand(s)? | | |
| Q7    Why do you say that? | | |
| Response Category | Number | Percent |
| Has the authorization or approval of… | | |
| 1.  UGG | | |
| Respondents counted in prior question(s) | 4 | 2.0 |
| New respondents not counted in prior question(s) | 0 | 0.0 |
| 2.  UGG plus other | 1 | 0.5 |
| 3.  Other named source(s) (e.g., Bearpaw, Clarks, Walmart, etc.) | 24 | 12.0 |
| Note: No source in this category accounted for more than 2.0% of the total | | |
| 4.  Unspecified source(s) | 3 | 1.5 |
| 5.  Don't know | 55 | 27.5 |
| Does not have the authorization or approval of any other company(s) or brand(s) | 20 | 10.0 |
| Don't know or no opinion | 93 | 46.5 |
| Total | 200 | 100.0 |

33.     In the control cell, in response to Q8-Q10, two percent (2.0%) of survey respondents reported the mistaken belief that the maker of the fictitious ankle-high boots has a business affiliation or business connection with UGG. Of these, one and one-half percent (1.5%) already gave an UGG response to prior question(s) and one-half percent (0.5%) are new respondents not already counted. *See* Table 9 below. For a listing of responses by category, see Appendix A, pages 117-127.

**TABLE 9**
**CONTROL CELL – FICTITIOUS ANKLE-HIGH BOOTS**

Q8     Do you believe that whoever makes or puts out these boots…?
  a.   HAS a business affiliation or business connection with any other company(s) or brand(s)
  b.   Does NOT have a business affiliation or business connection with any other company(s) or brand(s)
  c.   Don't know or no opinion

Q9     What company(s) or brand(s)?
Q10    Why do you say that?

| Response Category | Number | Percent |
|---|---|---|
| Has the authorization or approval of… | | |
| 1.  UGG | | |
|     Respondents counted in prior question(s) | 3 | 1.5 |
|     New respondents not counted in prior questions | 1 | 0.5 |
| 2.  UGG plus other | 1 | 0.5 |
| 3.  Other named source(s) (e.g., Bearpaw, Clarks, Walmart, etc.) | 25 | 12.5 |
|     Note: No source in this category accounted for more than 2.0% of the total | | |
| 4.  Unspecified source(s) | 1 | 0.5 |
| 5.  Don't know | 42 | 21.0 |
| Does not have a business affiliation or business connection with any other company(s) or brand(s) | 35 | 17.5 |
| Don't know or no opinion | 92 | 46.0 |
| Total | 200 | 100.0 |

16

34.     Thus, across all questions in the control cell and without double-counting, nine percent (3.5 + 5.0 + 0.0 + 0.5 = 9.0%) of respondents reported the mistaken belief that the control boot they were shown (i.e., an ankle-high boot of the same material and color that does *not* contain the elements of the UGG Classic Ultra Mini trade dress) is made or put out by, has the authorization or approval of, or has a business affiliation or business connection with UGG. *See* Table 10 below.

| **TABLE 10**<br>CONTROL CELL<br>AGGREGATE UGG RESPONSES Q1-Q10 | | |
|---|---|---|
| Response | Number | Percent<br>(n=200) |
| UGG | 18 | 9.0 |

35.     The results of the likelihood of confusion survey in its entirety evidence that, on a net basis after adjusting the survey data for any mismeasurement error based upon the control cell, approximately seventy-seven percent (85.5 – 9.0 = 76.5%) of the relevant universe of consumers of boots for casual wear are likely to be confused by the mistaken belief that the Quince Mini Boots are made or put out by, have the authorization or approval of, or have a business affiliation or business connection with UGG. *See* Table 11 below.

| **TABLE 11**<br>TEST CELL AND CONTROL CELL<br>NET LIKELIHOOD OF CONFUSION | | | |
|---|---|---|---|
| Response Category | Test Cell<br>Percent<br>(n=200) | Control Cell<br>Percent<br>(n=200) | Net<br>Percent<br>(Test minus<br>Control) |
| 1.  UGG | 85.5 | 9.0 | 76.5 |

**Conclusion**

36.     It is my considered opinion—based upon my education, background, professional experience, and my review and analysis of the survey results—that the Ezell Mini Boots Survey results clearly support a finding of likelihood of confusion.  After adjusting the survey data for any mismeasurement error based upon the control cell, approximately ***seventy-seven percent*** (76.5%) of the relevant universe of consumers of boots for casual wear are likely to be confused by the mistaken belief that the Quince Mini Boots are made or put out by, have the authorization or approval of, or have a business affiliation or business connection with UGG.

37.     Furthermore, the survey results show that the causal nexus for likelihood of confusion is the presence of elements of the UGG Classic Ultra Mini Trade Dress on the Quince Mini Boots, and not due to any alternative explanation. Because the control cell, which showed a fictitious ankle-high boot and asked the same questions resulted in eight percent (8.0%) likelihood of confusion, the net measured likelihood of confusion of approximately seventy-seven percent (76.5%) is attributable to the presence of the UGG Classic Ultra Mini Trade Dress elements on the Quince Mini Boot.

38.     The causal nexus of the measured confusion is perhaps made most clear by the fact that the vast majority of respondents in the test cell who exhibited confusion reported that the basis for their confusion was due to the similarity in "look," "style," or "design" between the Quince Mini Boots and Plaintiff's UGG products. Below is a small sampling of excerpted responses from the respondents who were counted as confused (emphasis added).

**RESPID**      **RESPONSE**
1002            Q1      UGG.
                Q2      It looks like an UGG boot.

1014            Q1      UGG.
                Q2      They look like the classic UGG style.

18

| RESPID | RESPONSE | |
|---|---|---|
| 1019 | Q1 | UGG. |
| | Q2 | It looks like their most popular boot style. |
| 1035 | Q3 | UGG. |
| | Q4 | They look like UGGs. |
| 1056 | Q1 | UGG. |
| | Q2 | They are famous for this style. |
| 1058 | Q1 | UGG. |
| | Q2 | I recognize UGG style. |
| 1123 | Q1 | UGG. |
| | Q2 | Looks like their famous boots. |
| 1127 | Q1 | UGG. |
| | Q2 | It matches the typical UGG style. |
| 1143 | Q1 | UGGs. |
| | Q2 | The shape and design are like UGGs. |
| 1160 | Q5 | HAS the authorization or approval of... |
| | Q6 | UGG. |
| | Q7 | The style is unique. |
| 1164 | Q1 | UGGs. |
| | Q2 | It looks like a classic UGG boot. |
| 1177 | Q1 | UGGs. |
| | Q2 | It's their iconic product. |

## Qualifications and Compensation

39.     As noted above, I have over 21 years of experience working on litigation and non-litigation trademark and trade dress matters.  During the past 15 years I have participated in the design and execution of a variety of surveys relating to intellectual property matters, including trademark, false advertising, and other related matters.

40.     I have been retained on behalf of clients in the consumer product, industrial product, and service sectors of the economy to provide marketing consulting and research services.  Throughout the past eight years, I have been retained in a number of litigation-related

19

consultancies involving intellectual property matters, including matters before federal and state courts and the Trademark Trial and Appeal Board of the U.S. Patent and Trademark Office.

41.     I am familiar with the tests for trustworthiness of properly conducted surveys or polls and the accepted principles of survey research, detailed in the *Manual for Complex Litigation, Fourth and Reference Manual on Scientific Evidence, Third*.  I am a member of the American Association of Public Opinion Research (AAPOR) and the International Trademark Association (INTA).

42.     Attached as Appendix C is a copy of publications that I have authored or co-authored in the last ten years.

43.     Attached as Appendix D is a list of all trial and deposition testimony I have given in the last four years.

44.     Attached as Appendix E is a copy of my curriculum vitae, describing my qualifications and professional background.

### Materials Considered

45.     In addition to materials mentioned in this report, I considered the following materials in this matter: Plaintiff's Second Amended Complaint; and portions of the Quince.com website depicting the Quince Australian Shearling Mini Boot (QUINCE0000021).

### Compensation

46.     My fees for this engagement consist solely of billable time and expenses. Standard time is billed at the rate of $600.00 per hour.  Deposition and trial time are billed at the rate of $750.00 per hour. Research Assistant time is billed at the rate of $300.00 per hour.

47.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 15th day of November, 2024, in Huntington Beach, California.

_____

Matthew G. Ezell

21