# Exhibit 20

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DECKERS OUTDOOR                                    CASE NO.: *3-23-04850-AMO*

CORPORATION, a Delaware Corporation,

Plaintiff,

v.

LAST BRAND, INC. D/B/A QUINCE,

Defendant.

## REBUTTAL OF MATTHEW G. EZELL REPORTS

### Prepared by Rob Wallace

January 7, 2025

## I.      Introduction

1.      I was engaged by counsel for Defendant, Last Brand, Inc. d/b/a Quince to review the four surveys and four reports that Matthew G. Ezell submitted in this matter and provide my expert opinion on the secondary meaning and likelihood of confusion surveys conducted to determine if their methodologies are reliable and if their results are accurate reflections of the

1

Deckers UGG Bailey Button and UGG Classic Ultra Mini's alleged trade dresses having achieved distinctiveness or secondary meaning or if there is a relevant likelihood of confusion between these two products and the Quince products in question.

2.      It is important to note that Mr. Ezell did not conduct a survey nor submit a report on the alleged secondary meaning of the UGG Tasman Slipper nor its likelihood of confusion with the Quince slipper product in question.  David Franklyn conducted a survey and provided a report on the UGG Tasman Slipper and the Quince slipper product in question, which I have rebutted in a separate report.

3.      I was also asked to provide my own expert opinion on the UGG Bailey Button boot, UGG Tasman Slipper, UGG Classic Ultra Mini's (hereinafter "UGG shoes") alleged secondary meaning and the likelihood that the relevant public confuses their source with that of the Quince products in question.  Among other things, I was asked to conduct an empirical, court-compliant survey designed to determine the relevant consuming public's perception of the issues at hand in this case. The survey conducted for this case determined if the alleged trade dresses of the three UGG shoes in question have acquired secondary meaning and if there is a relevant likelihood of confusion with the Quince products in question.  This survey tested the alleged trade dresses of the shoes alone and in the context of the retail environment through which they are sold.

4.    My opinions consider the information provided to me, as cited, publicly available information, as cited, the results of the survey findings, as cited, my over 45 years of brand identity and brand communications expertise for a large number of consumer brands, as cited in Appendix 3 of this report, and my 24 years of work as an expert witness, as summarized in Appendix 4 of this report. This report constitutes my findings as outlined below.

2

5.      I reserve the right to supplement my opinions based on any additional information that would affect the outcome of my work or provide greater insight into the matters examined.

## II.      Summary of Qualifications

6.      I was the Managing Partner for more than 30 years of one of the branding industry's most respected brand identity strategy and design firms, Wallace Church & Co. I am currently the Managing Partner of Best of Breed Branding Consortium, an omni-channel branding consultancy that also focuses on all the branding issues involved in this case.

7.      Based on this experience, I have highly specialized knowledge of how marketers create, design and establish brands, how consumers interpret brand trade dress and brand messaging, how they develop awareness and perceptions of brands, and all the other marketing/branding issues in this case.

8.      As outlined in my Curriculum Vitae, in Appendix 3 of this report, I have been actively involved in hundreds of product design, brand naming, brand identity, and brand messaging assignments for dozens of leading consumer product and service companies. For example, my firm and I have developed brand messaging for such companies as Coca-Cola, Procter & Gamble, PepsiCo, Pfizer, Nestle, Johnson & Johnson, Target, The Home Depot, shoe and apparel companies such as Russell Athletic and more than 100 additional national and global brand owners.  As part of my experience as a brand identity strategist, I participated in developing, fielding and/or analyzing well over one thousand consumer surveys and research projects.

9.      As an expert witness, I have designed fielded and analyzed well more than 75 surveys to determine secondary meaning and or likelihood of confusion and other intellectual property infringement issues. As a result, I have the experience to qualify and quantify my opinions regarding secondary meaning and likelihood of confusion.

3

10.     I served on the Board of Directors of The Design Management Institute, the largest global organization in the brand design and strategy industry, for 10 years. There I founded and co-chaired the Design Value Project, which focused on determining the return on investment of brand messaging and brand identity. As such I have been referred to as "the thought leader in quantifying brand design's value." I have delivered keynote presentations on this topic at more than 50 branding industry symposia across the US, Canada, Europe, Latin America and Asia. I have lectured at the graduate level at The Columbia School of Business, The SVA Masters in Branding Program, Georgetown University, University of Texas, Seton Hall, and other educational institutions. My full Curriculum Vitae is attached in Appendix 3 of this report.

## III.    Previous Testimony and Expert Opinions

11.     My testimony and opinions have been accepted by and admitted in proceedings both before many U.S. District Courts and before the USPTO Trademark Trial and Appeal Board (also known as the "TTAB"). I have served as an expert witness on more than 90 cases concerning intellectual property infringement, trademark and trade dress infringement, false or deceptive advertising and brand messaging, and other marketing/branding industry issues. In such capacity I have designed and conducted court-compliant surveys for more than 70 of these cases. I have been deposed more than 40 times and testified in court as an expert witness more than a dozen times. My substantial experience in branding, marketing and survey development provides me with the background necessary to prepare and analyze the survey described in this report. A listing of my legal expert witness cases completed in the last 4 years is attached as Appendix 4 of this report.

## IV.    Compensation

4

12.     I am being compensated in connection with my engagement in this proceeding at the rate of $400 per hour for report writing and $500 per hour for deposition and trial testimony. I have received no additional compensation for my work in this proceeding. My compensation is in no way dependent upon the outcome of this proceeding.

## V.     Summary of Opinions: Flaws in the Ezell Surveys

13.     There are several critical failures in the Mr. Ezell's four surveys that invalidate them from being reliant and relevant to the issue at hand.  Mr. Excel's interpretation of these survey findings expressed in his report are, therefore, un-supported and irrelevant. Among the Ezell surveys' critical failures are that they did not consider the nine elements of the alleged trade dress definition for the UGG Classic Ultra Mini and the five elements of the alleged trade dress for the UGG Bailey Button at issue. They also used ineffective controls that did not properly extract survey noise.  They did not analyze the products in the context of their retail environment where consumers traditionally engage them at the point of sale.  And importantly, the primary likelihood of confusion question was improper and may well have led to inaccurate responses.  These critical flaws will be detailed below.

## VI.     Summary of Opinions: All four Ezell surveys used ineffective controls

14.     A proper survey control stimuli must "share as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed."[1]  The control stimuli used by the two Ezell Button Boot and two Mini Boot surveys were ineffective and not reliable in that they did not meet this criteria.

15.     Inexplicably, Mr. Ezell used two different control stimuli for his Button Boot secondary meaning and likelihood of confusion ("LOC") surveys, as pictured below:

---

[1] Shari Seidman Diamond, "Reference Guide on Survey Research" in the *Reference Manual on Scientific Evidence, Third*, (Federal Judicial Center, 2011), 399.

5

| | |
|---|---|
| <br>UGG Button Boot used in Ezell secondary meaning survey<br><br><br>Ezell Improper secondary meaning control | <br>Proper control used in my survey |
| <br>Quince Button Boot used in Ezell LOC survey<br><br><br>Ezell Improper LOC control | <br>Proper control used in my survey |

6

16.     Likewise, and equally inexplicably, Mr. Ezell used two different control stimuli

for his Mini Boot secondary meaning and likelihood of confusion surveys as pictured below:

| | |
|---|---|
| <br>UGG Ultra Mini Boot used in Ezell secondary meaning survey | <br>Proper control used in my survey |
| <br> Ezell Improper secondary meaning<br><br>control | |

| | |
|---|---|
| <br>Quince Boot used in Ezell LOC survey | <br>Proper control used in my survey<br><br>17. |
| <br> Ezell Improper LOC control | |

7

18.     In my expert opinion, all four of Mr. Ezell's control stimuli clearly do not meet the essential criteria of sharing the characteristics of the primary stimuli except for the alleged trade dresses in question.

19.     All four of Mr. Ezell's ineffective controls share few, if any, of the attributes of the primary stimuli in question, as proper controls are required to do.  The styles of the Ezell controls are entirely different from that of the UGGS Button Boot and Mini Boot products in question. The Ezell Button Boot secondary meaning control appears to be a leather work boot and the other three Ezell controls appear to be suede dress shoes with a well-defined heel block and a thin front in the sole typical of dress shoes, in contrast with the casual look of the primary stimuli boots.

20.     For example, the Ezell Button Boot secondary meaning control has a traditional shoelace tie closure and the Ezell Button Boot likelihood of confusion control has a zipper closure, while the primary stimuli in question have a button closure, as does the proper control used in my survey.  The Ezell control shoes are generally smooth in the footwear upper and do not have creases/seams between the top of foot and ankle on the side of the shoe, as my proper control does.

21.     Likewise, the Ezell Mini Boot LOC stimulus has a tie closure and a pronounced heel while in contrast, the primary stimuli in question, and the proper control used for my survey, have neither of these features.

22.     As a result of using these invalid controls, in my professional opinion, the Ezell surveys do not extract relevant survey noise.  Therefore, Mr. Ezell's survey results cannot be validated, and in my opinion, should not be considered by the factfinder.

## VII.     Summary of Opinions: Secondary meaning survey question is invalid

23.     The core question that Mr. Ezell's two secondary meaning surveys asked is, *"Do you associate the overall appearance of this boot with any particular brand or brands?"*  The responses were *"Yes", "No" and "Don't Know".*  There are two primary concerns with this

8

question.  Firstly, it referred to the alleged trade dress's association with a "brand" and not a specific "source", which could be misleading.  Secondly, and importantly, those that associate this trade dress with one OR multiple brands would both answer "Yes."  As a result, this question is compromised. In my opinion, this question is leading the respondent and influencing their responses to claim "Yes," which Mr. Ezell improperly concluded that the alleged trade dress is associated with one rather than multiple sources. Only those that could not name a brand or brands they associate with this trade dress were asked the follow up question, *"Do you associate the overall appearance of this boot with one brand or more than one brand?"*

24.    A proper secondary meaning question would have been, "From the design of this product, do you believe that this shoe design comes from one source/ manufacturer or is it a generic design that is used by different casual shoe manufacturers?" with closed ended responses stating, "I associate the shoe design with one source/ manufacturer," "I associate the shoe design with multiple sources/ manufacturers," or "Don't know."  This was the proper question I used in my survey.  The Ezell surveys failed to ask this question.

### VIII.    Summary of Opinions: Multiple likelihood of confusion questions are invalid

25.    Mr. Ezell's two likelihood of confusion surveys divides the primary issue of confusion across eight survey questions.  This most definitely complicated the survey taking process and possibly confused respondents – therefore, possibly not soliciting their honest responses. His survey first asks, *"Who do you believe makes or puts out these boots?"  "Why do you say that?"*  Next, survey respondents were asked questions three and four, *"What other brand(s), if any, are made or put out by whoever you believe makes or puts out these boots?"  "Why do you say that?"*  The fifth and sixth question then asked *"Do you believe that whoever makes or puts out the boot shown has the authorization or approval of any other company(s) or brand(s), and if so, what company(s) or brand(s). "Why do you say that?"*  Finally, the seventh question and eighth question then asked, *"Do you believe that whoever makes or puts out the boot shown has a business affiliation or business connection with any other company(s) or*

9

*brand(s), and, if so, with what company(s) or brand(s).* A follow up question then asked*, "Why do you say that?"*

26.    These eight Ezell questions present numerous concerns.  Perhaps primary among these concerns is that this long series of questions complicate the issue of confusion.  A much more direct and court-compliant way to assess potential confusion, as was done in the survey that I conducted for this issue, was to ask the primary question, *"Based on the designs of these shoes, do you believe that they are: • the same products? • come from the same or affiliated sources/manufactures? • or are **not** the same products nor come from the same or affiliated sources/manufacturers*?"  The proper clear and understandable closed ended responses would have been*: "I believe that these shoes are the same products.", "I believe that these shoes come from the same or affiliated sources/manufacturers"," I believe that these shoes are **not** the same nor do they come from the same or affiliated sources/manufacturers"* or *"Don't know/ Can't tell"*. Since the Ezell surveys over complicated this direct question, I have concerns that it may have distracted respondents from providing their honest answers.

### IX.    Summary of Opinions: Secondary Meaning and Likelihood of Confusion were not analyzed in the context of the purchase experience

27.    A proper secondary meaning and likelihood of confusion survey seeks to analyze the trade dress in question both as it appears on the product (exploring pre and post-sale confusion) and as consumers engage the products at the point of sale (point of sale confusion)[2] All four of Mr. Ezell's surveys failed to analyze the trade dress in question in the context of the purchase experience.  As a result, his survey results are invalid and his opinions expressed upon them are irrelevant.

---

[2] In addition to initial interest confusion and post-sale confusion, US trademark law has long recognized point of-sale confusion. In most infringement cases, a plaintiff must demonstrate that direct purchasers are likely to be confused. (s*ee, e.g., Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1295, n.14 (11th Cir. 2018) (citing 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:7 (5th ed.)).

10

28. Based on the concerns outlined above, I conclude that the results of the Ezell surveys and Mr. Ezell's expressed opinions based on these results to be irrelevant to the issues in this case. I recommend that the factfinder not consider these results.

**X. Proper Survey Results: All three UGG shoes in question have not acquired distinctiveness nor secondary meaning.**

29. In contrast to the Ezell surveys, a proper survey was designed and tested the secondary meaning/distinctiveness of the trade dress of each of the three UGGs products in question, the UGG Classic Ultra Mini, and the UGG Bailey Button Boot and the UGG Tasman Slipper (which Ezell surveys and the Franklyn survey failed to test). This proper survey, detailed below, indicates that the three UGG shoes in question are perceived to come from multiple sources rather than one source, and as a result, the alleged dresses of these three UGG shoes have not acquired distinctiveness nor secondary meaning.

30. In summary, the results of the survey fielded for this report (filed with this report under the documents Exhibit B – UGG Shoes Final Freqs 10-5-24.xlsx) indicates:

UGG Bailey Button boot's 27.5% primary score minus its 43.5% control score (Q10a1 minus Q10b1) results in a **negative 16%** net secondary meaning associating this trade dress with one unique source.

UGG Classic Ultra Mini boot's 33.5% primary minus its 34.5% control core (Q10a3– Q10b3) results in a **negative 1%** net secondary meaning associating this trade dress with one unique source.

UGG Tasman Slipper's  24% primary minus its 19.5% control score (Q10a2 – Q10b2) results in a **5**% net secondary meaning associating this trade dress with one unique source.

31. My survey also asked a follow-up question putting all three UGG shoes in question into the context of the retail environments where they are sold (point of sale). These

11

results clearly support the findings outlined above.  When analyzed in the context of the retail environment, all three UGG shoes alleged trade dresses show a primary secondary meaning result of 34% minus a 17.5% control secondary meaning result, indicating a net secondary meaning result of **16.5%** for all three UGGS products in question.

32.     All of these results above are exceptionally well below the +50% generally-accepted requirement to rule on secondary meaning[3], and therefore, the alleged trade dresses of the three UGG shoes in question have not acquired distinction nor secondary meaning.

33.     The design and findings of this survey are explained in further detail in the remainder of this report and detailed in the raw and tabulated survey results submitted as separate documents with this report, as listed in Appendix 1.

## XI.    Investigation Performed

34.     In order to form and substantiate an opinion on the acquired secondary meaning of the three UGG shoes' alleged trade dresses, I designed a court-compliant survey among the relevant consuming public of casual shoes. The full survey questionnaire and its tabulated results are submitted as separate documents along with this report. While courts also review a series of other criteria to determine if a trade dress has acquired distinctiveness or secondary meaning, "the strongest and most relevant evidence regarding whether a mark (or trade dress) has acquired secondary meaning . . . is evidence by a public opinion survey or poll"[4] , which is why I relied on these surveys in developing my opinions expressed in this report.

---

[3]"To establish secondary meaning, 50% or more responses of "one company" is generally acceptable, although lower percentages have been accepted." Cynthia Cohen, "Secondary Meaning Surveys, citing: Jacoby, J. (2013). Cleaning, Aggregating, Analyzing, Evaluating, and Reporting Data, *Trademark Surveys, Vol. 1, Designing, Implementing, and Evaluating Surveys*, ABA Section of Intellectual Property Law, Chicago, IL, p. 891.3

[4] Ink Markers, Order No. 30 at 27, *"*From Trademarks to Brands", Deven R. Desai, 64 *Florida Law Review* 981 (2012).

[6]Manual for Complex Litigation, Fourth Edition, 2004.

35.     This survey was conducted between September 27 and October 5, 2024. This survey was conducted under my direction in accordance with the principles and standards delineated in the Manual for Complex Litigation, Fourth Edition, 2004, prepared for the Federal Judicial Center.[5] These principles provide the best assurance that the data collected is valid and can be relied upon to draw conclusions regarding consumer opinions. These principles provide that:

a.      The proper universe(s) should be properly chosen and defined;

b.      The sample of respondents chosen from the proper universe should be representative of that population;

c.      The questions asked should be clear and not leading;

d.      The data gathered should be accurately reported;

e.      The data should be analyzed in accordance with accepted statistical principles;

f.      The surveys should be conducted by qualified persons following proper interview procedures;

g.      The surveys should be conducted in anticipation of litigation and by persons not connected with the parties or counsel or by persons aware of its purpose in the litigation.[6]

36.     The sample selection, questions, questionnaire design, and interviewing procedures employed in the survey are designed in accordance with the generally accepted standards and procedures to meet the criteria for survey trustworthiness detailed in the Manual for Complex Litigation.[7] This includes the choice of close-ended answers in the screener so as not to bias the respondent or make them aware of the screener criteria.

V.      **Primary and Control Stimuli- to provide context and extract "survey noise"**

---

[6] *Id.*

[7] *Id.*

13

37.     The survey design followed the protocols of a "two room" survey, where the same questions were asked of both a primary segment and a separate control segment of the population. These questions were based on different stimuli. The primary stimuli compared the products in question. The control stimuli compared the shoes in question to a different casual shoe that was as similar to but not identical with the products in question. The purpose of this control was to extract any possible "survey noise", or those guessing, answering with predetermined perceptions or providing exaggerated responses to the primary stimuli questions. In establishing "net results" of the primary stimuli, the responses to this specific control questions were subtracted from those of the primary stimuli.

## VI.    Proper Qualifying Universe

38.     Addressing operational issues, the Reference Manual on Scientific Evidence states, "One of the first steps in designing a survey or in deciding whether an existing survey is relevant is to identify the target population (or universe). The target population consists of all elements (i.e., objects, individuals, or other social units) whose characteristics or perceptions the survey is intended to represent."[8]

39.     A series of screening questions were asked to confirm the proper universe of respondents. I determined that the appropriate universe for this survey would comprise 400 women (the primary audience for casual women's shoes such as the products in question) between the ages of 21 and 65 who had purchased casual shoes within the last two years and plan to do so again within the next two years.

40.      Based on my experience and credentials as a survey expert, it is my opinion that the respondents meeting this survey's screening requirements are representative of the relevant consuming public for casual women's shoes.

---

[8] Reference Manual on Scientific Evidence, Third Edition West Group, St. Paul, MN, 2011 ("Reference Manual"), prepared for the Federal Judicial Center

14

## XII.   Sample Size

41.    The Reference Guide to Survey Research states, "The surveyor's job generally is easier if a complete list of every eligible member of the population is available so that the sampling frame lists the identity of all members of the target population."[9] A complete list of all members of the universe for this inquiry was obviously not available, which means that a true probability sample was not possible. That is, there does not exist an exhaustive list of every woman between 21 and 65 who meets all of the screening requirements. Therefore, a non-probability sample of 400 qualified respondents was used. Non-probability samples of this size are and have been used to make consequential academic and business decisions and are also accepted into evidence in courts throughout the country.

## XIII.   Interviewing Medium – On-Line Survey

42.    The Council of American Survey Research Organizations, now Insights Association, reported that in 2012 their members conducted more surveys via the internet than by all other methods combined.[10] As an example of its pervasiveness, internet surveys were conducted 10 times more often than mall intercept surveys. The use of internet surveys is thus "in accordance with generally accepted standards of procedure in the field."[11]

43.    An on-line survey was an especially appropriate interviewing medium for this survey because it required showing specific stimuli in a specific order to a representative sample of respondents meeting the screening requirements previously discussed.

## XIV.   Sophistication of the Respondent Paneling and Survey Fielding Teams

44.    The survey was fielded by the internet survey firm, Illume, Inc. Illume is widely respected in the marketing research industry and has created hundreds of surveys that have been accepted by the courts and more than one thousand surveys for the marketing and branding

---

[9] *Id.*

[10] https://www.insightsassociation.org/issues-policies/glossary/council-american-survey-research-organisations

[11] Reference Guide on Survey Research, Shari Seidman Diamond, West Group, St. Paul, MN, 2011

industries. Illume programmed the study using the Sawtooth Software's Lighthouse Studio software suite as it does to program all of its surveys. Sawtooth Software has been providing market research data collection and analysis software since 1983. It uses IBM's SPSS software for data analysis. SPSS has been widely used for over 50 years and recognized as the forerunner in data analysis software. Illume also uses Sawtooth Software's web hosting services for hosting all of their surveys. All surveys are secure using TLS 1.2, AES with 128-bit encryption (High); ECDH_P256 with 256-bit exchange, which ensures optimal security.[12]

45.    Illume coordinated the respondent recruitment using the paneling firm Innovate MR. Innovate MR recruited respondents from a diverse blend of channels to ensure representativeness, including both online and offline publishers, social networks like Facebook, web and SMS databases, advertising networks, and television ad placement. They use a dynamic profiling system that captures and localizes data points based on geography and tracked respondent behavior longitudinally using advanced algorithmic solutions designed to evaluate their profile on an ongoing basis, which ensures accuracy and authenticity is maintained.[13]

46.    Illume tracked the time required for each respondent to complete the survey. The data from those who completed the survey too quickly or too slowly was eliminated so as to extract "speeders" and "laggers" or those that might not have been giving the survey their full attention or getting information from outside sources.

## XV.    "Double Blind" Protocol and Meeting all Acceptable Survey Standards

47.    Because of the way the questions were crafted, and because at no time were the parties' names or identities disclosed to Illume or Innovate MR, neither the survey programmer nor the respondents knew the purpose of the survey. In addition, there was no question which suggested the survey's sponsor or purpose. This "double blind" protocol means that neither the programmer nor the respondents could intentionally or unintentionally influence the results.

---

[12] http://www.illume-research.com/aboutus.html.
[13] https://www.innovatemr.com/panels/consumer-panel/

In my expert opinion, all seven of the standards delineated in the Manual for Complex Litigation, Fourth Edition, 2004 were observed in this survey. Furthermore, the following additional safeguards were observed:

a.      Respondents were told to answer honestly and not to guess.

b.      Respondents who needed glasses to properly see the stimuli were required to wear them.

c.      Respondents were told that it was permissible to have no opinion about a subject, and thus that they should not feel the need to guess at an answer nor receive any information from an outside source.

d.      A control protocol was used to account for survey "noise."

e.      If respondents had any extraordinary knowledge, e.g. if they or their family members worked at an ad agency, consumer research firm, a law firm, a computer technology or e-commerce firm, they were emitted from the pool.

f.      If they were taking the survey on their phone and therefore not able to properly see the stimuli they were emitted from the pool.

g.      Finally, the survey was "double blinded": neither the survey company nor the respondents knew the sponsor or the purpose of the study; thus, neither could influence the results, if even unwittingly.

## VII.   Survey Screeners – Securing the Relevant Consuming Public

48.      This next section summarizes the questions and findings of the survey conducted for this case. Please refer to the survey screener and questionnaire document that was submitted with this report, entitled Exhibit A – RWallaceDeckervLastBrandSM-LOC Survey 9_27_24.pdf

49.      Before qualifying for these surveys by appropriately answering the screening questions, potential respondents were asked: "Do you agree to answer the questions without help or assistance, answer truthfully and not to guess?" Only those who responded "Yes" were admitted to the survey pool.  Because the great majority of the relevant consuming public of

17

these products are women, a later question asked what gender these respondents associate with. Results were only calculated from those who responded "female" to this question.

50.     Admitted respondents were then asked the screening questions that ensured they were part of the relevant consuming public of past and potential future purchasers of casual shoes. It asked, "[i]n the last 12 months have you purchased or been involved in the purchase of casual shoes, and are you planning to purchase or be involved in the purchase of casual shoes in the next 12 months?" Only those that responded "Yes" to these questions were admitted into the survey. They were asked their age, and only those between 21 and 65 were admitted. They were also asked if they wear eyeglasses, and if so, if they would ensure they would be wearing them to take the survey. Only those that responded "Yes" to these questions were admitted into the survey.

51.     A series of control questions were asked so that respondents were not biased into thinking that the survey was only about casual shoes. It read "[i]n the last 12 months have you purchased or been involved in the purchase of golfing equipment, including golf balls, and are you planning to purchase or be involved in the purchase of a golfing equipment, including golf balls, in the next 12 months?" All responses to this control question were accepted into the survey.

52.     Any respondent who might have extra-ordinary knowledge about the issues in this case was also extracted. These respondents included those that worked for, or had a family member that worked for, an advertising agency, a consumer research firm, a law firm, a shoe manufacturing firm or retailer. Any positive responses to these questions disqualified the respondent and their data was not collected. There was also a control response, namely a golf club manufacturer for which those respondents who selected it were allowed to proceed.

53.     Lastly, before the primary questions were asked, additional questions assured that the respondent could effectively see the stimuli by asking, "Are you taking this survey on… With closed ended responses being, a desktop/laptop, a tablet or a phone. Those who answered "a phone" were terminated and their data was not collected.

18

54.    To further ensure the accuracy of the results, the final screening question asked: "Please understand that we are only interested in your opinions or beliefs. If you don't have an opinion or belief or don't know the answer to a question, that is an acceptable answer. Do you agree not to guess or get information from the internet or any other source?" Only those that answered YES to this question proceeded with the survey.

## VIII.    Survey Results: Secondary Meaning-Primary Set Results

55.    This section of the report summarizes the secondary meaning questions and their results, again which are documented in the questionnaires and survey findings filed with this report in Exhibit A (RWallaceDeckervLastBrand SM-L-OC Survey 9_27_24.pdf) and Exhibit B – (UGG Shoes Final Freqs 10-5-24.xlsx and UGG Shoes Final Data 10-5-24 .xlsx).

56.    The first part of this survey asked exposed respondent to the following images of the Plaintiff's three products in question as they are engaged in person perhaps in the pre-sale or post-sale context.  All source-identifying elements in these photos were masked, including the logo/label on the heel counter and vamp of the shoe. Please refer to the images in the questionnaire itself for an accurate depiction of the stimuli used.  All sets of imagery were presented in randomized order so that no prior answer would bias results.



UGG Bailey Button boot

19



UGG Tasman Slipper



UGG Classic Ultra Mini

The survey asked:

*"Please review the following images as if you were shopping for casual shoes with the possible intent to purchase these products. In shopping for casual shoes, you first come across this product:"*

The survey then asked,

*"From the design of this product, do you believe that this shoe design comes from one source/ manufacturer or is it a generic design that is used by different casual shoe manufacturers?"*

57.     The tabulated results of this question are indicated in the charts below.  The first chart indicates the results from the UGG Bailey Button boots:

20

**Q10a1 - Based on the look and design of this product, do you believe that this shoe comes from one brand or source, or is it a generic design that is used by different casual shoe brands/sources?**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | I believe that this shoe design comes from only one unique source/manufacturer | 55 | 13.8 | 27.5 | 27.5 |
| | I believe that this shoe design is available from more than one source/manufacturer | 129 | 32.3 | 64.5 | 92.0 |
| | Don't know/can't tell | 16 | 4.0 | 8.0 | 100.0 |
| | Total | 200 | 50.0 | 100.0 | |
| Missing | System | 200 | 50.0 | | |
| Total | | 400 | 100.0 | | |

58.    In summary, this indicates that **27.5%** of relevant consumers believe that the UGG Bailey Button boots in question comes from one brand or source, while 64.5% believe that the alleged trade dress of the UGG Bailey Button boots in question is generic and comes from more than one source.

59.    A follow-up, open ended question was then asked to validate these responses (Q11a1).  It asked, "Why do you say that?"  Responses are cited exactly as they were captured with capitalizations, punctuation and possible misspellings. Typical responses included:

- **"Looks like a style that could be made by several manufacturers"**

- **"I saw that a lot of brands have this same style."**

- **"many brands make these kinds of shoes"**

- **"various brands offer these boots"**

21

60.    The chart below indicates the results from the UGG Tasman Slippers' secondary meaning:

**Q10a2 - Based on the look and design of this product, do you believe that this shoe comes from one brand or source, or is it a generic design that is used by different casual shoe brands/sources?**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | I believe that this shoe design comes from only one unique source/manufacturer | 48 | 12.0 | 24.0 | 24.0 |
| | I believe that this shoe design is available from more than one source/manufacturer | 133 | 33.3 | 66.5 | 90.5 |
| | Don't know/can't tell | 19 | 4.8 | 9.5 | 100.0 |
| | Total | 200 | 50.0 | 100.0 | |
| Missing | System | 200 | 50.0 | | |
| Total | | 400 | 100.0 | | |

61.    In summary, this indicates that **24.0%** of relevant consumers believe that the UGG Tasman Slippers in question comes from one brand or source, while 66.5% believe that the alleged trade dress of the UGG Tasman Slippers in question is generic and comes from more than one source.

62.    Again, the follow up open ended question "Why do you say that?" (Q11a2) was asked to validate these responses.  Typical responses included:

-    **"I have seen these from a name brand but also other companies"**

-    **"Looks like a design that could be made by several manufacturers"**

-    **"Have seen these types of shoes everywhere"**

-    **"i believe that many brands make these kind of styles"**

22

63.     The chart below indicates the results from the UGG Classic Ultra Mini boot's secondary meaning:

**Q10a3 - Based on the look and design of this product, do you believe that this shoe comes from one brand or source, or is it a generic design that is used by different casual shoe brands/sources?**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | I believe that this shoe design comes from only one unique source/manufacturer | 67 | 16.8 | 33.5 | 33.5 |
| | I believe that this shoe design is available from more than one source/manufacturer | 112 | 28.0 | 56.0 | 89.5 |
| | Don't know/can't tell | 21 | 5.3 | 10.5 | 100.0 |
| | Total | 200 | 50.0 | 100.0 | |
| Missing | System | 200 | 50.0 | | |
| Total | | 400 | 100.0 | | |

64.     In summary, this indicates that **33.5%** of relevant consumers believe that the UGG Classic Ultra Mini boots in question comes from one brand or source, while 56.0% believe that the alleged trade dress of the UGG Classic Ultra Mini boots in question is generic and comes from more than one source.

65.     Again, the follow up open ended question "Why do you say that?" (Q11a3) was asked to validate these responses.  Typical responses included:

- **"It looks like a style that could be made by several manufacturers"**

- **"These look like bearpaws, but there are other manufacturers who make very similar styles now."**

23

- **"These look like generic shoes. Cute but I would probably find something like this at Walmart."**

## IX.    Survey Results: Secondary Meaning- Control Set and Net Results

66.    As mentioned earlier, this survey employed a "two room design" using a test vs. control format. The test vs. control study design is used to determine "the impact of a variable of interest above and beyond the baseline level of impact of exogenous variables in the marketplace so as to extract "survey noise" or responses that may not accurately represent the opinions of the relevant consuming public because some respondents may not have been paying full attention or speeding though the survey".[14]

67.    In my experience, the courts most value survey results that extract any "survey noise". The process for extracting survey noise is to run a control portion of the survey or asking the identical questions to a separate segment of respondents based on different but similar stimuli. "In this scenario, a survey expert should create a stimulus that mimics the (primary stimuli) as closely as possible. It is good practice for a survey expert to … make sure that the stimuli and survey context are realistic, and not more infringing than the issue in question".[15]  As a result, I selected the following images of three products currently in the market that all have similar elements to the alleged UGG trade dresses, but in my analysis do not infringe on the alleged UGG shoes trade dresses. The survey exposed the control set of respondents to the following images of control products. Again, all source-identifying elements in these photos were masked. And again, all three sets of imagery were presented in randomized order so that no prior answer would bias results.

---

[14] Reference Guide on Survey Research, Shari Seidman Diamond, West Group, St. Paul, MN, 2011.

[15] *Western Publ'g Co. v. Publications Int'l, Ltd.*, No. 94-C-6803, 1995 U.S. Dist. LEXIS 5917, at *45 (N.D. Ill. May 2, 1995).

24



Control boot          Control slipper          Control ankle high boot

68.    The control survey then asked the same question as the test survey,

*"From the design of this product, do you believe that this shoe design comes from one source/ manufacturer or is it a generic design that is used by different casual shoe manufacturers?"*

69.    The tabulated results of this question are indicated in the charts below.  The first chart indicates the results from the Control slipper (Q10b1)

**Q10b1 - Based on the look and design of this product, do you believe that this shoe comes from one brand or source, or is it a generic design that is used by different casual shoe brands/sources?**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | I believe that this shoe design comes from only one unique source/manufacturer | 38 | 9.5 | 19.0 | 19.0 |
| | I believe that this shoe design is available from more than one source/manufacturer | 154 | 38.5 | 77.0 | 96.0 |
| | Don't know/can't tell | 8 | 2.0 | 4.0 | 100.0 |
| | Total | 200 | 50.0 | 100.0 | |
| Missing | System | 200 | 50.0 | | |
| Total | | 400 | 100.0 | | |

25

70.     In summary, when the 19.0% control slipper results are subtracted from the 24.0% UGG Tasman Slipper results it indicates a net secondary meaning of **5%,** clearly proving that the trade dress of the UGG Tasman Slipper in question is generic, is perceived to comes from more than one source, and has not established secondary meaning.

71.     Again, the open-ended question "Why did you say that?" was asked to validate these responses (Q11b1).  Typical responses included:

- **"Looks like a pretty basic shoe; I have seen that style in many forms."**

- **"It seems like a very common slipper."**

- **"I've seen many similar shoes to this design."**

72.     The control boot was then tested, and the tabulated results of this question are indicated in the chart below.  The chart indicates the results from the control boot (Q10b2)

**Q10b2 - Based on the look and design of this product, do you believe that this shoe comes from one brand or source, or is it a generic design that is used by different casual shoe brands/sources?**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | I believe that this shoe design comes from only one unique source/manufacturer | 87 | 21.8 | 43.5 | 43.5 |
| | I believe that this shoe design is available from more than one source/manufacturer | 76 | 19.0 | 38.0 | 81.5 |
| | Don't know/can't tell | 37 | 9.3 | 18.5 | 100.0 |
| | Total | 200 | 50.0 | 100.0 | |
| Missing | System | 200 | 50.0 | | |
| Total | | 400 | 100.0 | | |

73.    In summary, when the 43.5% control boot results are subtracted from the 27.5% UGG Bailey Button boot results it indicates a net secondary meaning of **negative 16%** proving that the trade dress of the UGG Bailey Button boots in question is generic, is perceived to come from more than one source, and has not established secondary meaning.

74.    Again, the open-ended question "Why did you say that?" was asked to validate these responses (Q11b2).  Typical responses included:

- **"I have seen similar design in many places."**

- **"I think it's pretty generic. I would expect to find that style in a lot of places. It's very popular."**

- **"I've seen that type of design for several brands in store and online"**

75.  The chart below indicates the results from the control ankle high boot (Q10b3)

**Q10b3 - Based on the look and design of this product, do you believe that this shoe comes from one brand or source, or is it a generic design that is used by different casual shoe brands/sources?**

|  |  | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | I believe that this shoe design comes from only one unique source/manufacturer | 69 | 17.3 | 34.5 | 34.5 |
|  | I believe that this shoe design is available from more than one source/manufacturer | 122 | 30.5 | 61.0 | 95.5 |
|  | Don't know/can't tell | 9 | 2.3 | 4.5 | 100.0 |
|  | Total | 200 | 50.0 | 100.0 |  |
| Missing | System | 200 | 50.0 |  |  |
| Total |  | 400 | 100.0 |  |  |

27

76.     In summary, when the 34.5% control ankle high boot results are subtracted from the 33.5% UGG Classic Ultra Mini boot results, it indicates a net secondary meaning of **negative 1%**, proving that the trade dress of the UGG Classic Ultra Mini boots in question are generic, is perceived to comes from more than one source, and has not established secondary meaning.

77.     Again, the open-ended question "Why did you say that?" was asked to validate these responses (Q11b3).  Typical responses included:

- **"Again, very basic. I've seen similar items at discount stores and also shoe stores."**

- **"It's a very common looking shoe."**

- **"Have seen this style shoe offered by multiple brands"**

X.     **Survey Results: Secondary Meaning in Context to the Retail Environment (Point-of-Sale)- Primary Set, Control Set and Net Results**

78.     This section of the report summarizes the secondary meaning of the three UGG products' alleged trade dresses in the context of the point of sale buying experience.  Again, this is documented in Exhibit A (RWallaceDeckervLastBrandSM-LOC Survey 9_27_24.pdf) and its results in Exhibit B (UGG Shoes Final Freqs 10-5-24.xlsx and UGG Shoes Final Data 10-5-24 .xlsx) added to this report.

79.     This portion of the survey begins with the question: "Now please consider the context as to where you would see these products for sale." And the following stimuli were used. Again, any source identifying information was extracted.

28





29



The question asked:

"Based on the look and design of these three products, do you believe that these shoes come from one brand or source, or are they a generic design that is used by different casual shoe brands/ sources?

I believe that these shoe designs come from only one unique source/manufacturer

I believe that these shoe designs are generic and is available from more than one source/manufacturer

Don't know/can't tell

80.    The same question was asked of the control set using the following stimuli:





31



81.     The data tables for each of these questions appear in the Exhibit B results.  For brevity the following highlights the primary, control and net results for the three tested UGG shoes.

82.     In summary, when the 17.5% control ankle high boot (Q12b) results are subtracted from the 34.0% UGG Classic Ultra Mini boot results(Q12a), it indicates a net secondary meaning of **16.5%**.

83.     Again, the open-ended question "Why did you say that?" was asked to validate these responses (Q11b3).  Typical responses included:

-   **"Again, very basic. I've seen similar items at discount stores and also shoe stores."**

-   **"It's a very common looking shoe."**

-   **"Have seen this style shoe offered by multiple brands"**

32

84.    I am not an attorney, but it is my understanding that courts traditionally require a minimum net results finding of a majority of respondents (more than 50%)[16] in order to rule that secondary meaning exists. This survey's net findings of **5%** the UGG Tasman Slipper, **negative 16%** for the UGG Bailey Button boot, **negative 1%** for the UGG Classic Ultra Mini boot and the cumulative **16.5%** for all three of these products when viewed in context of the purchase experience all fall well below this +50% standard. These results clearly indicate that the alleged trade dresses of the UGG shoes in question are generic and have not acquired secondary meaning.

## XI.    Survey Results - Likelihood of confusion

85.    Again, I am not an attorney, but it is my understanding that the courts have determined that an alleged trade dress that has not established secondary meaning has no protection against likely confusion with another product. Stated more plainly, if secondary meaning is not proven then there can be no likelihood of confusion.[17]  As a result, my analysis could have rested on this fact, however, in order to further re-confirm the possible presence of confusion between the products in question, my survey asked the following questions.

86.    This section of the report summarizes the likelihood of confusion questions and their results as confirmed by the survey conducted for this matter, again which are documented in Exhibit A (RWallaceDeckervLastBrandSM-LOC Survey 9_27_24.pdf) and its results in Exhibit B (UGG Shoes Final Freqs 10-5-24.xlsx and UGG Shoes Final Data 10-5-24 .xlsx) added to this report.)

---

[16] To establish secondary meaning, 50% or more responses of "one company" is generally acceptable, although lower percentages have been accepted." Cynthia Cohen, "Secondary Meaning Surveys, citing: Jacoby, J. (2013). Cleaning, Aggregating, Analyzing, Evaluating, and Reporting Data, *Trademark Surveys, Vol. 1, Designing, Implementing, and Evaluating Surveys*, ABA Section of Intellectual Property Law, Chicago, IL, p. 891
[17] "likelihood of confusion "issue is never reached if secondary meaning is not proved." Vincent Palladino "Secondary Meaning Surveys" by, citing. Spraying Sys. Co., 762 F. Supp. at 779 n.6.,  Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC, 2009 WL 6812111 (S.D. Fl. Oct. 13, 2009)

87.    The first primary question exposed primary set respondents to the UGG and Quince boots in question:



88.    The second primary question exposed primary set respondents to the UGG and Quince slippers in question:



89.    The third primary question exposed primary set respondents to the UGG and Last Brand ankle high boots in question:

34



90.    In contrast, the control set was exposed to each of the three UGG products and the control product for each of them:





 

It asked

Based on the designs of these shoes, do you believe that they:

  • are the same products?

  • come from the same or affiliated sources/manufacturers?

  • or are **not** the same products nor come from the same or affiliated sources/manufacturers?

91. In summary, the primary set of button boot products showed 7% believing that the stimuli shown are the same shoe and 13.5% believing that they are from affiliated sources, for a combined result of **20.5% confusion.**  In contrast, the control set of button boot products showed 3.5% believing that the boot stimuli are the same shoe and 26% believing that they are from affiliated sources, for a combined result of **29.5% confusion.**  When the control 29.5% confusion is subtracted from the primary 20.5% confusion **the net confusion score is negative 9%**

92. The UGG Tasman Slipper product showed similar net results.  In summary the primary set viewing the sandal products showed 11% believing that the stimuli shown are the same shoe and 26% believing that they are from affiliated sources, for a combined result of **37% confusion.**  In contrast, the control set of slipper products showed 9.0% believing that the slipper stimuli are the same shoe and 26% believing that they are from affiliated sources, for a combined result of **35% confusion.**  When the control 35% confusion is subtracted from the primary 37% confusion **the net confusion score is 2%**.

93.     The UGG Classic Ultra Mini boot showed similar net results.  In summary the primary set viewing the ankle high boot products showed 20% believing that the stimuli shown are the same shoe and 25% believing that they are from affiliated sources, for a combined result of **45% confusion.**  In contrast, the control set of ankle high boot products showed 15.0% believing that the sandal stimuli are the same shoe and 38% believing that they are from affiliated sources, for a combined result of **53% confusion.**  When the control 53% confusion is subtracted from the primary 45% confusion **the net confusion score is negative 2%.**

94.     Again, these results clearly substantiate that confusion does not exist between the products in question.  However, to further validate this fact, the survey put the products in question into the context of the retail environments where they are sold and asked the question:

> "Now please review these specific products as you would see them for sale.  This first product is sold on this specific website and others:



95.     The following product is sold on multiple websites



96.     The sandal products asked

Now please review these specific products as you would see them for sale.  This first product is sold on this specific website



This second product is sold on multiple websites.



97.    The ankle high boot question asked:

Please now review two other products as you would see them for sale on line. The

39

first shoe was sold at the same site as the shoes below, but is no longer sold there. Please

see an image below of the site where this shoe is still currently sold



This second product is sold on multiple websites.



40

98.     The control set saw the same three UGG images along with the following control images of the control shoes as represented for sale.



41



99.    All were then followed by the same question:

Having now viewed these two products in the context of a typical on-line purchase experience, do you believe that they are the same products or from the same or affiliated

42

sources, or do you believe they are different products from different non-affiliated resources?

> They are the same products or from the same/affiliated sources

> They are different products from different non-affiliated sources

> Don't know/ Can tell

100.    In summary, the primary set of button boot products showed **10.5% confusion,** believing that the stimuli shown are the same shoe or are shoes from affiliated sources.   In contrast, the control set of button boot products showed **7.5% confusion** believing that the UGG and control boot stimuli are the same shoe or are shoes from affiliated sources. When the control 7.5% confusion is subtracted from the primary 10.5% confusion **the net confusion score is 3%**

101.    The UGG Tasman Slipper product showed similar net results.  In summary the primary set viewing the slipper product showed 12.5% believing that the stimuli shown are the same shoe or are shoes from affiliated sources. In contrast, the control set of slipper products showed 25.5% believing that the slipper stimuli are the same shoe or are shoes from affiliated sources. When the control 25.5% confusion is subtracted from the primary 12.5% confusion **the net confusion score is negative 13%.**

102.    The UGG Classic Ultra Mini boot showed similar net results.  In summary the primary set viewing the ankle high boot product showed 23.5% believing that the stimuli shown are the same shoe or are shoes from affiliated sources. In contrast, the control set of ankle high boot products showed 30% believing that the ankle high boot stimuli are the same shoe or are shoes from affiliated sources.   When the control 30% confusion is subtracted from the primary 23.5% confusion **the net confusion score is negative 6.5%.**

103.    Again, I am not an attorney, but it is my understanding that the courts have determined that a minimum of a net 15% likelihood of confusion is required to rule that

confusion exists between the products tested.[18]  All of the likelihood of confusion scores detailed above are clearly well under this standard.  As a result, I conclude that there is no relevant likelihood of confusion between any of the products in question.

### XII.    Additional Findings: Logos, labels of brand names on shoes and packaging and purchase channel would further reduce any likelihood of confusion in real life.

104.    While all source-identifying elements, including UGG logos and brand names, were intentionally masked in the survey to ensure any confusion or the lack thereof are based on elements of the trade dress, I understand that courts would consider the likelihood of confusion in real-life "marketplace" by examining the "total effect of the ... product and package on the eye and mind of an ordinary purchaser."[19]

105.    I understand that prominent markings of the brand name on the shoe and the packaging would minimize or even zero out both point-of-sale and post-sale confusion.[20]

106.    In the process of survey design, I noticed the following facts that would likely further reduce or remove any residual confusion by sporadic respondents found in the survey.

107.    The three UGG products all have the UGG logo prominently displayed on multiple areas of the shoe—UGG Bailey Button boot (UGG brand markings on the heel counter and outsole), UGG Tasman Slipper (UGG brand markings on the vamp and outsole), UGG Classic Ultra Mini boot (UGG brand markings on the heel counter and outsole).

---

[18] "Courts will often state that a survey finding 15% or more is sufficient to support likelihood of confusion, while under 15% suggests no likelihood of confusion." *See, e.g., 1-800 CONTACTS, INC. v. Lens. com, Inc.,* 722 F. 3d 1229, 1248-49 (10th Cir. 2013)

[19] *Skechers U.S.A., Inc. v. Vans, Inc.*, 2007 WL 4181677, at *6 (C.D. Cal. Nov. 20, 2007) (citing *First Brands Corp. v. Fred Meyer, Inc.,* 809 F.2d 1378, 1383–84 (9th Cir.1987) and *Packman v. Chicago Tribune Co.,* 267 F.3d 628, 644 (7th Cir.2001) ( "Different packaging, coloring, and labeling can be significant factors in determining whether there is a likelihood of confusion.")).

[20] *Id.*, at *6 (C.D. Cal. Nov. 20, 2007) (where "the accused shoes contain prominent markings indicating Skechers' brand" and Skechers "sells its shoes in boxes that prominently display the brand," holding that "it is thus unlikely that purchasers would be confused at the point of sale" and that "[p]lainly legible permanent brand markings can also avoid post-sale consumer confusion.") (citation omitted); *Lindy Pen Co. v. Bic Pen Corp.,* 725 F.2d 1240, 1245 (9th Cir.1984) (finding no likelihood of confusion where "the [alleged infringer's] trademarks ... were prominently and repeatedly displayed on the pens and all packaging and promotional materials.").

44

| | |
|---|---|
| **UGG Bailey Button boot** |  |
| **UGG Tasman Slipper** | |

| | |
|---|---|
| **UGG Classic Ultra Mini boot** |  |

108. All three UGG products come in packaging that have brand names prominently displayed.



109. Additionally, all three Quince products also prominently display the Quince brand name on both the shoes and their packaging.



| | |
|---|---|
| Quince Australian Shearling Button Boot | |
| Quince Australian Shearling Clog Slippers | |
| Quince Australian Shearling Mini Boot | |

47



110.    Importantly, I also understand that Quince products **are only sold** online at Quince's website while UGG products are sold through UGG's own online and brick and mortar stores and third-party online and brick and mortar stores. As a result, consumers cannot engage the Quince and UGGs products during the same shopping experience. And, all of these purchasing channels also prominently display the products' logos and brand names on the shoes and their packaging, further differentiating these products at the point of sale. *See*, *e.g.*, www.quince.com; www.ugg.com; 2024-08-15 Deckers Rule 30(b)(6) Deposition of Lisa Bereda ("Q. And at a UGG DTC brick and mortar store, so either retail or outlet, what kind of branding

48

is there in the store? A. What kind of branding? I mean, that depends on the store, but, generally, you're going to have an UGG sign on the outside of the store, you're going to have UGG point of purchase material within the store. … But, generally, you will see use of the UGG trademark. Q. When you say the UGG trademark, you mean the [UGG] word []trademark[]? A. Yes.").

111.    Given the prominent display of brand names in both UGG and Quince products and packages and the difference in purchasing channels, any confusion that was found in the survey should be further discounted when assessing the likelihood of confusion.

### XIII.    Additional Findings: All three UGG trade dresses are generic as evidenced by numerous similar products.

112.    It is my understanding that "generic product designs are unprotectible even upon a showing of secondary meaning."[21] Courts defined genericness in terms of both "commonness" — "if the product design is so **common** in the industry that it cannot be said to identify a particular source" ; and "generality" — "if the product design is the basic form of a type of product."[22] I also understand that extensive third-party use of similar trade dresses weighs against a finding of secondary meaning in the first place.[23]

---

[21] *Walker & Zanger, Inc. v. Paragon Indus., Inc.*, 549 F. Supp. 2d 1168, 1174 (N.D. Cal. 2007); *Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.,* 280 F.3d 619, 638 (6th Cir.2002) (finding generic product configurations unprotectable despite secondary meaning evidence because "no designer should have a monopoly on designs regarded by the public as the basic form of a particular item").

[22] *Id.*; *Luv n' Care, Ltd. v. Regent Baby Prod. Corp.*, 986 F. Supp. 2d 400, 408 (S.D.N.Y. 2013) ("The level of generality at which a trade dress is described, as well as the fact that a similar trade dress is already being used by manufacturers of other kinds of products, may indicate that that dress is no more than a concept or idea to be applied to particular products.").

[23] *Carter-Wallace*, *Inc*. *v. Procter & Gamble Co*., 434 F.2d 794, 802 (9th Cir. 1970) (finding that a lack of  exclusivity based on third party use weighs against a finding of secondary meaning); *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1015 (9th Cir. 1985) ("Factors considered in determining whether a secondary meaning has been achieved include: (1) whether actual purchases of the product bearing the claimed trademark associate the trademark with the producer, (2) the degree and manner of advertising under the claimed trademark, (3) the length and manner of use of the claimed trademark and, (4) whether use of the claimed trademark has been exclusive.").

113.    When prompted the three UGG products, the typical responses of consumers include "I saw that a lot of brands have this same style;" "many brands make these kinds of shoes;" "various brands offer these boots."[24]

114.    Many third-party brands produce shoes that are similar to the three UGG shoes at issue in this case.

115.    Below is a list of products offered by other brands that are similar to UGG Bailey Button boot.



| | |
|---|---|
| | "Vera" by Lamo Footwear[25] |
| | "Pegia Moa Genuine Suede Button Women's Boots" by PEGIA UK LTD[26] |

---

[24] *Supra*, at 16.
[25] https://lamofootwear.com/products/vera
[26] https://pegia.com/products/pegia-moa-genuine-suede-button-womens-boots-beige

|  | "Women's CLEARANCE Sheepskin Toggle Winter Boots" by Leather-Moccasins[27] |

116.    Below is a list of products offered by other brands that are similar to UGG

Tasman Slipper.



| | "Beach by Matisse Zen Slipper" by DSW Shoe Warehouse, Inc.[28] |
| | "Zurich Slipper" by Altar'd State[29] |

---

[27] https://www.leather-moccasins.com/products/womens-sheepskin-toggle-boots
[28] https://www.dsw.com/product/beach-by-matisse-zen-slipper/571827?activeColor=cognac
[29] https://www.altardstate.com/as/sale/sale-shoes/zurich-slipper/002065_ZURICH-0052.html



| | |
|---|---|
| | "JULES" by Lamo Footwear[30] |
| | "Women's Sheepskin Slip-On Slippers" by Leather-Moccasins[31] |
| | "Women's Martis Slipper" by Bearpaw[32] |

---

[30] https://lamofootwear.com/products/jules
[31] https://www.leather-moccasins.com/products/womens-sheepskin-slippers-slip-on
[32] https://www.amazon.com/dp/B0CB3W38GW

52

| | |
|---|---|
|  | "GZ Classic Grizzly" by Halflinger[33] |
| | Slipper by Halflinger[34] |
| | "Original Clog – Suede" by Simple[35] |
| | "Women's Original 108 Vegan Wool Clog" by Stegmann[36] |

---

[33] https://www.zappos.com/p/unisex-haflinger-gz-classic-grizzly-chocolate/product/7802052/color/18
[34] https://www.amazon.com/dp/B07H4Q5WG8
[35] https://simpleshoes.com/products/original-clog-suede?variant=39704768544826
[36] https://www.stegmannusa.com/products/womens-original-108-vegan-wool-clog?variant=43018260316340

53

117.    Below is a list of products offered by other brands that are similar to UGG Classic Ultra Mini boot.



| | |
|---|---|
| | "CABIN TAN SUEDE" by Steve Madden[37] |
| | "DELUXE ULTRA SHORT UGG BOOTS - CHESTNUT" by UGG BOOTS MADE IN AUSTRALIA[38] |
| | "OXFORD MINI UGG BOOTS – CHESTNUT" by UGG BOOTS MADE IN AUSTRALIA[39] |

---

[37] https://www.stevemadden.com/products/cabin-tan-suede
[38] https://www.realuggboots.com.au/products/deluxe-ultra-short-ugg-boots
[39] https://www.realuggboots.com.au/products/oxford-mini-ugg-boots

54

| | |
|---|---|
|  | "WOMEN'S CLASSIC ULTRA MINI" by UGG Since 1974[40] |
| | "Boston Mini Boots" by The Boston Boots[41] |
| | "CUSHIONAIRE Women's Hip Genuine Suede pull on boot +Memory Foam" by Cushionaire[42] |

---

[40] https://www.uggsince1974.com.au/products/womens-ugg-boots-classic-ultra-mini-genuine-australian-made-sheepskin-ugg-boots
[41] https://thebostonboots.com/products/mini-boots
[42] https://cushionaire.com/products/hip?variant=4341810154725

55



| | |
|---|---|
| | "Womens Fireside" by Dearfoams[43] |
| | "Joey Mini Ugg Boots" by UGG STORE[44] |
| | "Classic 4" Boot - Women's Boots" by Lamo Footwear[45] |

---

[43] https://www.dearfoams.com/womens-fireside-by-dearfoams-riverland-genuine-shearling-micro-bootie/31191-00243-7.html

[44] https://www.uggs.com.au/product/joey-mini-ugg-boots/

[45] https://lamofootwear.com/products/classic-4-boot

| | |
|---|---|
|  | "COSY ULTRA SHORT BLACK" by Australia Luxe Collective[46] |
|  | "Bearpaw Shorty Bootie" by DSW Shoe Warehouse, Inc.[47] |
|  | "Lakeland Leather Grey Ladies Sheepskin Mini Boot Slippers" by NEXT Group[48] |

[46] https://australialuxeco.com/collections/womens-boots/products/cos205n-bl?variant=39417482936390
[47] https://www.dsw.com/product/bearpaw-shorty-bootie/541735
[48] https://www.next.us/en/style/st310444/c14423

57

| | |
|---|---|
|  | "Women's Wicked Good Slippers, Ankle Boots" by L.L.Bean[49] |

118.    I believe this further validates that the alleged trade dress which the Plaintiff is trying to exclusively own and prevent others from using has, in fact, been used extensively by third parties and not exclusively by Plaintiff. In my expert opinion, trade dresses like these cannot be owned by one of the many brands that use it.

## XVI.    Conclusion

119.    As an expert in brand communications, the above results of the court-compliant surveys prove to me that there is no significant association been the three UGG shoe's alleged trade dress and any specific unique source, and therefore, the UGG shoes in question have not acquired relevant distinctiveness nor secondary meaning.  It is my understanding that if secondary meaning is not established, there can be no likelihood of confusion.  However, my survey also proves that the consuming public does not confuse the products in question as coming from the same or affiliated sources.

120.    I hold these opinions within a reasonable degree of certainty based on the survey results and my 40-plus year experience in the branding industry. I respectfully reserve the right

---

[49] https://global.llbean.com/llb/shop/125872.html

to amend this declaration with further comments in the event that additional information becomes available.

121.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 7, 2025

Rob Wallace

59

**Appendix 1:    Documents submitted with this report**

**Exhibit A:  Survey screeners/questionnaires**

RWallaceDeckervLastBrand SM-L-OC Survey 9_27_24.pdf

**Exhibit B. Survey Results**

UGG Shoes Final Freqs 10-5-24.xlsx

UGG Shoes Final Data 10-5-24.xlsx

**Appendix 2:   Documents Cited**

All documents cited or referenced in this report

Second Amended Complaint

Shari Seidman Diamond, "Reference Guide on Survey Research" in the *Reference Manual on Scientific*
*Evidence, Third*, (Federal Judicial Center, 2011),

https://www.pinterest.com/pin/revamp-a-vamped-up-etymology--308004062026030944/

*Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1295, n.14 (11th Cir. 2018) (citing 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:7 (5th ed.)

Cynthia Cohen, "Secondary Meaning Surveys', citing: Jacoby, J. (2013). "Cleaning, Aggregating, Analyzing, Evaluating, and Reporting Data", *Trademark Surveys, Vol. 1, Designing, Implementing, and Evaluating Surveys*, ABA Section of Intellectual Property Law, Chicago, IL

Ink Markers, Order No. 30 at 27, *"*From Trademarks to Brands", Deven R. Desai, *Florida Law Review* 981(2012),

Union Carbide Corporation, Plaintiff-appellant, v. Ever-ready Incorporated, a corporation, and Mark Gilbert, An individual, Defendants-appellees, 531 F.2d 366 (7th Cir. 1976)." Justia Law. N.p., n.d. Web. 17 July 2017

Manual for Complex Litigation, Fourth Edition, 2004.

61

Vincent Palladino "Secondary Meaning Surveys" by, citing. Spraying Sys. Co., 762 F. Supp. at 779 n.6., Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC, 2009 WL 6812111 (S.D. Fl. Oct. 13, 2009)

Daniel J. Barsky, "Federal Circuit Establishes New Test for Trade-Dress Secondary Meaning" https://www.ilnipinsider.com/2018/11/federal-circuit-establishes-new-test-for-trade-dress-secondary-meaning

http://law.justia.com/cases/federal/appellate-courts/F2/531/366/203240/.

https://www.insightsassociation.org/issues-policies/glossary/council-american-survey-research-organisations-casro.

http://www.illume-research.com/aboutus.html.

https://www.innovatemr.com/panels/consumer-panel/

2024-08-15 Deckers Rule 30(b)(6) Deposition of Lisa Bereda

Western Publ'g Co. v. Publications Int'l, Ltd., No. 94-C-6803, 1995 U.S. Dist. LEXIS 5917, at *45 (N.D. Ill. May 2,1995)

Skechers U.S.A., Inc. v. Vans, Inc., 2007 WL 4181677, at *6 (C.D. Cal. Nov. 20, 2007) (citing First Brands Corp. v. Fred Meyer, Inc., 809 F.2d 1378, 1383–84 (9th Cir.1987)

Packman v. Chicago Tribune Co., 267 F.3d 628, 644 (7th Cir.2001))

Walker & Zanger, Inc. v. Paragon Indus., Inc., 549 F. Supp. 2d 1168, 1174 (N.D. Cal. 2007);

Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc., 280 F.3d 619, 638 (6th Cir.2002)

Luv n' Care, Ltd. v. Regent Baby Prod. Corp., 986 F. Supp. 2d 400, 408 (S.D.N.Y. 2013)

62

Carter-Wallace, Inc. v. Procter & Gamble Co., 434 F.2d 794, 802 (9th Cir. 1970)

Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1015 (9th Cir. 1985)

**Appendix 3:  Curriculum Vitae of Robert Wallace**

**Rob Wallace   Expert Witness: Brand identity**

917-860-0319

Rob@bestofbreedbranding.com

www.RobWallaceExpert.com

As the former managing partner of Wallace Church, Inc., one of the most recognized and accomplished brand identity strategy and design consultancies, I have more than thirty years of expertise in all aspects of branding strategy and design analysis for national and global brands. My core expertise is the ability to create and differentiate brand experiences that drive consumer awareness and purchase behavior.

Clients include Procter & Gamble, Coca-Cola, Unilever, Pfizer, Dell, Pepsico, Revlon, Target, The Home Depot, Johnson & Johnson, Bacardi, E&J Gallo, Mattel, Anheuser Busch, PNC Bank, Kroger, L'Oreal, s/Miracle Gro and more than 40 national/global consumer product marketers of equal caliber.

**Areas of Expertise:**

Trademark/Trade Dress          Planning/Analysis

Package/Product Design

Licensing

Intellectual Property

Marketing Strategy

Brand Communications

Visual Brand identity

Advertising Claims

Consumer Research

Copyright Damages

Consumer Research

64

**Industry Experience:**

| | |
|---|---|
| Food | Personal Care |
| Beverage | OTC and Rx Drugs |
| Home Products | HBA/Beauty Care |
| Wellness | Technology Brands |
| Toys/Sporting Goods | Hard Goods |
| Beer/Wine/Spirits | B to B |
| Apparel | Retailer Brands |
| Financial Services | |

**Background:**

Best of Breed Branding Consortium, LLC          June 2014 – Present

Managing Partner

- Actively manage a consortium of branding communications consultancies.

- Provide strategic consulting on all branding issues including brand name development, brand identity, graphic and structural package design, trademark and copyright development, and integration across advertising and all other brand communications.

Wallace Church, Inc.,          1985 – June 2014

Managing Partner, Strategy

- Actively manage one of the world's most respected brand identity design consultancies.

- Provide strategic consulting on all branding issues including brand name development, brand identity, graphic and structural package design, trademark and copyright development, and integration across advertising and all other brand communications.

Peter Cris Advertising, Inc., New York, NY          1984 – 1985

Vice President, Marketing

- Provided both the strategic and creative force for this regional advertising agency.

- Acted as primary liaison between clients and creative department.

65

Modular Marketing, Inc., New York, NY                1982 – 1984

Senior Account Manager

•     Managed select client relationships through all creative and strategic aspects of project management for this marketing communications consultancy.

•     Designed and developed brand promotion programs, corporate communications and brand identity assignments.

Grey Advertising, Inc., New York, NY                1981 – 1982

Senior Account Manager

•     Actively participated in one of the world's largest advertising agencies through the Market Horizons function, consulting with core clients on advertising and new brand communications opportunities.

**Education:**

MBA coursework, The New School, New York, NY        1981 – 1983

BA, English, Gettysburg College, Gettysburg, PA        1977 – 1981

**Professional Activities:**

•     Expert speaker on brand identity design at more than 40 marketing, design and research industry events across the US, UK, Europe, Latin America and Asia

•     Author of numerous articles and published case histories on brand identity design in the Wall Street Journal, Forbes, Marketing Week, Design Management Journal, Package Design Magazine and numerous other publications,

•     Co-Author "Really Good Package Design Explained," Rockport Press, 09

•     Lecturer on brand identity at Columbia Business School, Georgetown University, Seton Hall, University of Texas, School of Visual Arts Masters in Branding and other MBA programs of leading universities

•     Board of Directors, Design Management Institute, 2010-Current

•     Co-Chair of the Design Management Institute Design Value Project, 2012

66

- Distinguished Faculty Member, Path to Purchase Institute, speaker at national conference for the last 8 years
- Founder "The Strategic Design Firm Leadership Summit" BXP Live event

**Professional Memberships:**

Board of Directors, the Design Management Institute,

Co-Chair Design Value Project, the Design Management Institute

Distinguished Faculty, Path to Purchase Institute

American Marketing Association

Color Marketing Group

American Institute of Graphic Arts

**Appendix 4:  Partial List of Prior Cases**

I have served as an expert witness on branding related issues on more than 95 prior occasions.  In the last five years, I have been served on:

•       GDM Enterprises, LLC (Pure Cosmetics) v Astral Health & Beauty, INC., (PUR Cosmetics), U.S. District Court, Western District of Missouri, 2019

•       BAMA ICEE LLC et al v J&J Snack Foods Corp et al., US District Court, Northern District of Alabama, 2019

•       The Black & Decker Corporation, et al v HARBOR FREIGHT TOOLS USA, INC., Report for Mediation, 2019

•       1231 Barrage Inc et al v. Automobile Dealers Assoc of Greater Philadelphia et al, Philadelphia County Court of Common Pleas, 2019

•       Christopher Hayden v. Eagles Nest Outfitters, Inc. et al US District Court Western District of North Carolina, 2019

•       Chantel Ray Finch v Weigh Down Workshop Ministries, Inc. et al, US District Court, Eastern District of Virginia, Norfolk Division, 2019

•       Mambu Bayoh v. AfroPunk Fest 2015, et al., U.S. District Court, Southern District of New York, 2019

•       Scorocs LLC v. Innovations for Poverty Action Inc., US District Court, Western District of Missouri, At Kansas City, 2019

•       Good L Corp v. Fasteners for Retail, Inc., US District Court, Middle District of Tennessee, 2019

68

- Sunny Days Entertainment LLC v. Traxxas L.P., US District Court, District of South Carolina Greenville Division, 2019

- Venus Et Fleur, LLC v. Affordable Luxury NY, Inc dba Pret a Fleur, et al, US Court, Southern District of New York, 2019

• Rhino Metals Inc, v Sturdy Gun Safe Inc, US District Court, District Idaho, 2019

- American Customer Satisfaction Index, LLC v Genesys Telecommunications Laboratories, et al, US District Court, Eastern District of Michigan, Southern Division, 2020

- I.M. Wilson, Inc v Obchtchestvo S Ogranitchennoy Otvetsvennostyou "Grichko", et al, US Distinct Court, Eastern District of Pennsylvania, 2020

- Country Life v. The Hain Celestial Group, Inc, US District Court, Eastern District of New York, 2020

- New NGC, Inc, et al v. Alpinebay, Inc, US District Court, For the Northern District of Illinois, Eastern Division, 2020

- P&P Imports v. Johnson Enterprises, LLC et al, US District Court for the Central District of California, 2020

- New NGC, Inc, et al v. Alpinebay, Inc, US District Court, for the Northern District of Illinois, Eastern Division, 2020

- Otter Products, LLC et al v. Bigbirds, LLC et als, US District Court, for the District of Colorado, 2020

69

• Sulzer Mixpak, A.D. v. DXM Co LTD et als, US District Court, for the Southern District of New York, 2020

• Jalinski Advisory Group, Inc. v. JBL Financial Services, Inc., US District Court, for the Eastern District of Missouri, Eastern Division, 2020

• American Customer Satisfaction Index, LLC v ForeSee Results, et al, US District Court, Eastern District of Michigan, Southern Division, 2021

• Jalinski Advisory Group, Inc. v. Franklin Advisory Group, Inc., US District Court, for the Eastern District of Pennsylvania, 2021

• Restoration Hardware, Inc., *et al*., v. Bugalow Home, LLC, US District Court, for the Southern District of Ohio, Eastern Division, 2020

• American Medical Experts, LLC v. Ronny Nizar Hamad, Prime Medical Experts, LLC et al, US District Court, for the Eastern District of Virginia, 2020

• American Customer Satisfaction Index, LLC v ForeSee Results, et al, US District Court, Eastern District of Michigan, Southern Division, 2021

• Thrive Natural Care Inc. v. Thrive Causemetics, Inc, US District Court, Central District of California, 2021

• BMC Software, Inc v. Baker Hughes, a GE Company et al, US District Court, Southern District of California, 2021

• Abbott Laboratories, Freestyle Libre, Reexamination Trade Dress Proceedings in the United States Patent and Trademark Office (USPTO), 2021

• Orange Bang, Inc. and Monster Energy Company v. Vital Pharmaceuticals, Inc., American Arbitration Association, Los Angeles Regional Office, 2021

70

- Diamond Assets v Device Cycles, et al., US District Court, Western District of Wisconsin, 2021

- I&I Hair Corp v Beauty Plus Trading Co, Inc. et al., US District Court, Northern District of Texas Dallas Division, 2022

- Glam & Glitz Nail Design Inc. v. IGel Beauty, LLC, et al., US District Court for the Central District of California, 2022

- Certain Casual Footware and Packaging Thereof, et al., US International Trade Commission, Washington DC, 2022

- Simpson Strong-Tie Company, Inc v Mitek, Inc, US District Court for the Northern District of California, 2022

- Opulent Treasures, Inc v Portofino International, US District Court for the Central District of California, 2022

- Macy's IP Holdings, LLC v Aroma350, Inc., US District Court for the Southern District of New York, 2022

- Independent BDSI Owners Association et. al v. Super Bee Holdings, American Arbitration Association, 2022

- Ace Group International, LC and Ace Group Bowery LLC v. 225 Bowery, LLC, Arbitration Administered by the International Chamber of Commerce, 2022

- Woodstock Ventures et al v. Woodstock Roots, LLC., US District Court for the Southern District of New York, 2022

- Pecararo Latteria, LLC Trademark Application., United States Patent and Trademark Office, 2022

71

• Purple Innovation, LLC v. Responsive Surface Technology et al, U.S. District Court for the District of Utah, 2023

• Harmony Hospice Care LLC., V. Comfortbrook Hospice Et Al. Court of Appeals Eighth District Cuyahoga County Ohio, 2023

• Santa Barbara Polo Club, Inc. and Sb Members, LLC v. Lifestyle Licensing B.V. And Lifestyle Equities C.V., American Arbitration Association International Centre for Dispute Resolution, 2023

• FoxFactory v Dong Yongqiang United States Patent and Trademark Office, Trademark Trial and Appeal Board, 2024

• Rebel Athletic v. Jim Lundberg D/B/A Cs Athletic D/B/A Cheerstix et al., U.S. District Court for the Northern District of Illinois, Eastern Division, 2024

• Laguinitas Brewing Co. et al v. Solura. LLC D/B/A Bucanero, U.S. District Court for the Southern District of Florida, 2024

• Ray Scott Fuss v. Fredrick M Bensch, U.S. District Court for the Northern District of Georgia, Atlanta Division, 2024

• Enviodigm Inc v. Apple Inc, et als, Superior Court for the State of California, for the County of Santa Clara, 2024

72

• Skims Body, Inc v. Vaughn Associates, Inc Trademark Application., United States Patent and Trademark Office, 2024

• Deckers Outdoor v. Primark US Corp, U.S. District Court for the Northern District of Massachusetts, 2024

**Appendix 5:**

**Partial List of Authored Books and Articles**

I have written a number of peer-reviewed brand identity articles, contributed to branding texts, and have been interviewed by The Wall Street Journal, The New York Times, and more than a dozen branding and marketing communications industry publications. I have spoken at more than 30 marketing communications and design industry events across North and South America, the UK, Europe and Asia.  I have lectured on brand identity at Columbia Business School, Georgetown University, The University of Texas, and other leading universities. I have conducted webinar events with more than 1,600 participants on the topic of design process and design thinking.

I was on the Board of Directors of the Design Management Institute, the most prominent global design industry association, and I co-chair its Design Value Project. I am a Distinguished Faculty Member of the Path to Purchase Institute.  Please see my current CV for a listing of these and other accomplishments.

I coauthored a book entitled "Really Good Packaging Explained", released in 2009 by Rockport Publishers.  I was also a contributing author with Robin Landa and the book" Build Your Own Brand", Rockport, 2013.  I also wrote the forward to Christopher Durham's book, "52 The My Private Brand Project", Folio28, 2014

In the past 15 years I have written the following articles:

- "The Tropicana Trouble and How It May Have Been Prevented", Package Digest, 2009
- "Blood, Sweat and Tiers, Building Optimal Brand Identity Architectures", GAIN, AIGA Journal of Business and Design, June 2008
- "Heinz Turns Iconic Authenticity into Fresh Relevance", The Hub, September 2007
- "Design ROI Envisioned", Step Inside Design, July/August 2007
- "Be Smart Be Simple", Design Management Review, Spring 2006
- "Proving our Value: Measuring Package Design's Return on Investment", Design Management Journal, Summer 2001

- "The High Cost of Saving Money", Package Digest, Summer 2000
- "Icons, Your Brand's Visual Essence, Brandweek, Spring 2000

I have coauthored an article with Pamela De Cesare, former Associate Director of Package Communications, Kraft Foods, Inc., entitled "Amazing Pace, Shared Views on the Design Process", Design Management Journal, Spring 2000.

In the past several years I have posed more than two dozen articles and posts on Wallace Church's web site: http://wallacechurch.tumblr.com/ these include but are not limited to:

• "Quantifying Design's Value"

• "Design RI Re-Envisioned",

• "Cutting through the Sea of Sameness"

• "Architecting a Brand Experience"

• "The National Color" and more

I am the founder of the Linked In Group- "Relevant Disruption in Branding" https://www.linkedin.com/groups?home=&gid=7422931 where I have posted more than 10 articles including:

• "Right Here, Right NOW!"

• "Fashion Touchdown"

• "Color is Key"

• "Cool Customization"

• "Relevance for Right Now"

• "Shape Language"

75

• "Visual Vampires"

_____