Brent H. Blakely (SBN 157292)
bblakely@blakelylawgroup.com
Jamie Fountain (SBN 316567)
jfountain@blakelylawgroup.com
Iain Hill (SBN 336825)
ihill@blakelylawgroup.com
BLAKELY LAW GROUP
1108 Manhattan Avenue, Suite B
Manhattan Beach, California 90266
Telephone: (310) 546-7400
Facsimile: (310) 546-7401
**Attorneys for Plaintiff**
**Deckers Outdoor Corporation**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DECKERS OUTDOOR CORPORATION, a Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>LAST BRAND, INC. dba QUINCE, a Delaware Corporation; and DOES 1-10, inclusive,<br><br>Defendants. | Case No.: 3:23-cv-04850-AMO<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Hearing<br><br>Date:      June 12, 2025<br>Time:     2:00 PM (PT)<br><br>Complaint Filed:    06/12/2023<br>Motion Filing Cut-Off:  03/10/2025<br>Pre-Trial Conference:  08/14/2025<br>Trial Date:      09/15/2025<br><br>Hon. Araceli Martínez-Olguín<br><br>**Redacted Pending Application to Seal** |

**TABLE OF CONTENTS**

I.    **ARGUMENT** ................................................................................ 1

    A.    **A Reasonable Jury Could Award Deckers its Lost Profits** ....... 1

    B.    **The Classic Ultra Mini and Tasman Trade Dresses Are NOT Generic** ............................................................................ 5

        1.    *Deckers Has Clearly Identified the Trade Dresses at Issue* ................................................................................ 5

        2.    *Quince's generic design arguments are unsupported and frivolous* .................................................................. 8

    C.    **The Tasman Trade Dress Has Achieved Secondary Meaning** .................................................................................. 11

    D.    **The '161 Patent is Not Invalid due to Functionality or Indefiniteness** .......................................................................... 16

        1.    *Quince's Claim of Indefiniteness* ................................. 16

        2.    *Quince's Claim of Functionality* .................................. 19

            a.    Quince has waived a functionality defense to the '161 Patent ........................................................ 19

            b.    The '161 Patent is non-functional .............................. 20

    E.    **Deckers should prevail on its state law claims** ........................... 24

II.    **ADDITIONAL EVIDENTIARY OBJECTIONS** ................................ 24

III.    **CONCLUSION** .......................................................................... 25

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF AUTHORITIES

## CASES

*Adidas Am., Inc. v. Skechers United States,*
  2017 U.S. Dist. LEXIS 122459, (D. Or. Aug. 3, 2017) .................... 6,7, 8, 9,  14

*Adidas-Salomon Ag v. Defendants Corp.,*
  228 F. Supp. 2d 1192 (D. Or. 2002) ................................................................. 11

*Advanced Cardiovascular Sys. v. Medtronic, Inc.,*
  1996 U.S. Dist. LEXIS 11700  (N.D. Cal. July 24, 2006) ......................... 19, 20

*Allergan USA Inc. v. Imprimis Pharmaceuticals, Inc.,*
  2019 WL 4546897 (CD Cal. Aug. 2, 2019) ...................................................... 4

*American Scientific Chemical, Inc. v. American Hosp. Supply Corp.,*
  690 F.2d 791, (9th Cir. 1982) ......................................................................... 16

*Amini Innovation Corp. v. McFerran Home Furnishings, Inc.,*
  68 F. Supp. 3d 1170, (C.D. Cal. 2014) ........................................................... 14

*Antonious v. Spalding & Evenflo Cos., In*c.,
  217 F.3d 849 (Fed. Cir. 1999) ................................................................... 18, 19

*Apple, Inc. v. Samsung Elecs. Co.,*
  2012 U.S. Dist. LEXIS 90889, (ND Cal. June 29, 2012) ................................. 25

*Art Attacks Ink, LLC v. MGA Entm't Inc.,*
  581 F.3d 1138, (9th Cir. 2009) ....................................................................... 11

*Audio Fidelity, Inc. v. High Fidelity Recordings, Inc.,*
  283 F.2d 551, (9th Cir. 1960) ................................................................... 15, 24

*Avia Group Int'l, Inc., v. L.A. Gear Cal., Inc.,*
  853 F.2d 1557, 1563 (Fed.Cir.1988) .............................................................. 21

*Axis Imex v. Sunset Bay Rattan*
  2009 U.S. Dist. LEXIS 2667, 8-9 (ND Cal. Jan. 7, 2009) ................................. 7

*Benefit Cosmetics v. Elf Cosmetics,*
  2024 WL 5135604 (ND Cal. Dec. 17, 2024)................................................. 9, 12

*Blumenthal Dist. v. Herman Miller,*
  2017 WL 3271706, (CD Cal. Aug. 1, 2017) ...................................................... 4

*Brookfield Communs., Inc. v. West Coast Entertainment Corp.,*
  174 F. 3d 1036, (9th Cir. 1999) ...................................................................... 14

*Carlini Enters. v. Paul Yaffe Design, Inc.,*
  2014 U.S. Dist. LEXIS 113941 (CD Cal. Aug. 15, 2014) ............................... 23

*Clamp Mfg. Co. v. Enco Mfg. Co.,*
  870 F.2d 512, 517 (9th Cir), cert denied, 493 U.S. 872 (1989)......................... 11

*Clicks Billiards*,
   251 F.3d at 1266 ......................................................................... 11

*Deckers Outdoor Corp. v. Rue Services Corp.*,
   No. CV13-06303-JVS (VBKx) 2014 WL 12588481 (CD Cal. Aug.
   29, 2014) ............................................................................... 22

*Deckers v. Fortune Dynamic*,
   2015 U.S. Dist. LEXIS 188274 (CD Cal. May 8, 2015) ................................... 8

*Deckers v. Next Step Group*,
   SDNY, Case No. 23-cv-02545 (ALC) ....................................................... 10

*Deckers v. Romeo & Juliette*,
   2017 U.S. Dist. LEXIS 91711 **7-8 (CD Cal. June 13, 2017)............. 9, 23, 25

*Deckers v. Steve Madden*,
   CDCAL; Case No. 24-cv-03131 JFW ...................................................... 10

*Dobson v. Dornan*,
   118 U.S. 10, 14, 6 S.Ct. 946 (1886)...................................................... 22

*Egyptian Goddess, Inc. v. Swisa, Inc.*,
   543 F.3d 665, (Fed.Cir.2008) ............................................................ 22

*Eli Lilly & Co. v. Barr Labs., Inc.*,
   251 F.3d 955, (Fed. Cir. 2001) ......................................................... 19

*Emeco Indus. v. Restoration Hardware*,
   2012 U.S. Dist. LEXIS 173965, *2 (NDCAL Dec. 6, 2012) ............................ 7

*Estate of Nunez v. Cty. of San Diego*,
   2018 WL 5817091 (SD Cal. Nov. 3, 2018) .............................................. 25

*Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*,
   796 F.3d 1312, (Fed. Cir. 2015) ............................................... 16, 20, 21

*Ex Parte Asano*,
   201 U.S.P.Q. 315, 317 (Bd. Pat. App. & Inter. 1978) .............................. 17

*Faberge, Inc. v. Saxony Products, Inc.*,
   605 F.2d 426, (9th Cir. 1979) ........................................................... 15

*Finnigan Corp. v. Int'l Trade Comm'n*,
   180 F.3d 1354, (Fed. Cir. 1999) ....................................................... 19

*FNBN-RESCON LLC v. Ritter*,
   2014 WL 979930, (D. Nev. Mar. 12, 2014) ........................................... 24

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*,
   618 F.3d 1025, (9th Cir. 2010) ............................................................ 4

*Gucci v. Guess*,
   843 F.Supp.2d 412 (S.D.N.Y. 2012) ..................................................... 4

*H.I.S.C., Inc. v. Franmar*,
  2016 U.S. Dist. LEXIS 178188  (SD Cal. 2016) ................................................. 7

*Hadco Prods., Inc. v. Lighting Corp. of Am.*,
  312 F. Supp. 1173, (E.D. Pa. 1970) ..................................................... 17

*Hadco v. Walter Kidde & Co.*,
  462 F.2d 1265 (3d Cir. 1972) ............................................................ 17

*Harris v. Estendicare Homes, Inc.*,
  829 F. Supp. 2d 1023, (WD Wash. Nov. 4, 2011) ........................................... 24

*Hope Roach Merchandising LLC v. Jammin Java Corp.*,
  747 Fed. Appx. 622 (9th Cir. 2019) ...................................................... 4

*HR U.S. LLC v. Mizco Int'l, Inc.*,
  2009 U.S. Dist. LEXIS 27056 at *17 (E.D.N.Y., Mar. 31, 2009) ... 16, 17, 18, 19

*Hupp v. Siroflex of Am., Inc.*,
  122 F3d 1456, (Fed. Cir. 1997) ........................................................ 20

*In re Homestore.com, Inc. Sec. Litig.*,
  347 F. Supp. 2d 769, (CD Cal. 2004) ................................................... 25

*Jason Scott Collection v. Trendily Furniture*,
  68 F.4th 1203, (9th Cir. 2023) .......................................................... 1

*Jason Scott Collection, Inc. v. Trendily Furniture, LLC*,
  68 F.4th 1203, (9th Cir. 2023) ........................................................ 12

*Kandypens, Inc. v. Puff Corp.*,
  2020 U.S. Dist. LEXIS 259022 *5 (CD Cal. Sept. 20, 2020) .......................... 19

*King Tuna, Inc. v. Anova Food, Inc.*,
  2009 WL 650732,  (C.D. Cal. Mar. 10, 2009) ........................................... 24

*L.A. Gear, Inc. v. Thom McAn Shoe Co.*,
  988 F.2d 1117, (Fed. Cir. 1993) ............................................. 19, 20, 21

*Levi Strauss & Co. v. Blue Bell, Inc.*,
  778 F.2d 1352, (9th Cir. 1985) ........................................................ 15

*Lindy Pen Co., Inc. v. Bic Pen Corp.*,
  982 F.2d 1400, (9th Cir. 1993) .......................................................... 1

*McCarthy*
  § 30:79 ........................................................................ 2, 4, 5, 7, 15

*Microsoft Corp. v. i4i Ltd. P'ship*,
  564 U.S. 91, (2011) ................................................................. 16, 20

*Nash-Perry v. City of Bakersfield*,
  2021 WL 3883681 (ED Cal. Aug. 31, 2021) ............................................. 24

*Nat'l Lead Co. v. Dannenfelser*,
  223 F.2d 195, (9th Cir. 1955) ......................................................... 11

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
   134 S. Ct. 2120, (2014) ................................................................... 17

*NEXxUS Products Co. v. Gentle Concepts, Inc.*,
   1993 WL 496824, (M.D. Fla. Apr. 30, 1993) ................................... 14

*Non Dang Foods v. Kangnman1957*,
   2024 WL 5440253 (CD Cal. Aug. 29, 2024) ...................................... 8

*Oakley, Inc. v. Predator Outdoor Products, LLC*,
   8:11-CV-00456-JVS-PLA (CD Cal., March 7, 2012) ........................ 23

*Oasis Indus. v. G.K.L. Corp.*,
   1996 U.S. Dist. LEXIS 1057, 19-20 (N.D. Ill. Jan. 31, 1996) ......... 17

*Orr v. Bank of Am.*,
   285 F.3d 764, (9th Cir. 2002) .......................................................... 9

*P & P Imps. LLC v. Johnson Enters., LLC*,
   46 F.4th  953, (9th Cir. 2022) ........................................................ 12

*Park B. Smith*,
   2008 U.S. Dist. LEXIS 19800, 2008 WL 650339, ........................... 17

*Pfizer, Inc. v. Apotex, Inc.*,
   480 F.3d 1348 (2007) ...................................................................... 16

*Playboy Enterprises, Inc. v. Baccarat Clothing Co.*,
   692 F.2d 1272, (9th Cir. 1982) ........................................................ 1

*Rachel v. Banana Republic, Inc.*,
   831 F.2d 1503, (9th Cir. 1987) ........................................................ 7

*Roland Corp. v. Inmusicbrands, Inc.*,
   2017 U.S. Dist. LEXIS 17571 (ND Cal. Feb. 14, 2022) ................... 19

*Rosco, Inc. v. Mirror Lite Co.*,
    304 F.3d 1373, (Fed. Cir. 2002) ............................................... 20, 21

*Salt Optics. v. Jand*,
   2011 U.S. Dist. LEXIS 156237, 7-8 (CD Cal. Mar. 4, 2011) ............ 7

*Sandoz Inz. v. Amgen Inc.*,
   2023 WL 4681569, (CD Cal. June 29, 2023) ..................................... 2

*Sharper Image Corp. v. Target Corp.*,
   425 F.Supp.2d 1056, (ND Cal., 2006) ............................................ 21

*Skydive Arizona. v. Quattrocchi*,
    673 F3d 1105, (9th Cir. 2012) ......................................................... 2

*Smith v. City of Oakland*,
   2007 WL 2288328 (ND Cal. Aug. 9, 2007) .................................... 25

*Spinmaster, Ltd. V. Zobmondo Entertainment, LLC*,
   944 F. Supp. 2d 830, (CD Cal. 2012) ............................................... 4

*Sport Dimension, Inc. v. Coleman Co.*,
    820 F.3d 1316, (Fed. Cir. 2016) ........................................................................ 22

*Times Three Clothier, LLC v. Spanx, Inc.*,
    2014 WL 1688130, (S.D.N.Y. Apr. 29, 2014) ............................................ 16, 19

*TrafFix Devices, Inc. v. Marketing Displays, Inc.*,
    532 U.S. 23, (2001) ........................................................................................... 5

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
    505 U.S. 763, 764 n.1. (1992) ........................................................................... 5

*Union Pac. Res. Co. v. Chesapeake Energy Corp.*,
    236 F.3d 684, (Fed. Cir. 2001) ......................................................................... 17

*Vans v. ACI*,
    2023 U.S. Dist. LEXIS 189978   (CD Cal. Oct. 11, 2023)................................... 6

*Vans v. Walmart*,
    2023 WL 6922833 *10 (CD Cal. Oct. 11, 2023)...................................... 3, 4, 14

*Vision Sports, Inc. v. Melville Corp.*,
    888 F.2d 609, (9th Cir. 1989) .................................................................. 5, 7, 11

*Zobmondo v. Falls Media*,
    602 F.3d 1108, (9th Cir. 2010) .......................................................................... 9

## STATUTES

15 U.S.C. § 1117(a).................................................................................................. 1

35 U.S.C. § 282 ................................................................................................ 16, 20

35 USC § 171 ......................................................................................................... 20

## OTHER AUTHORITIES

*Thomas McCarthy*,
    McCarthy on Trademarks, § 8:2 (4th ed. 2002) ................................................. 7

1    On March 10, 2025, Plaintiff Deckers filed its affirmative Motion seeking Summary

2  Judgment for liability on its Trade Dress Claims, which contains a detailed summary of the dispute.

3  ECF No. 124.  Consequently, much of the evidence supporting this opposition to Quince's Partial

4  Motion for Summary Judgment (ECF No.  142) ("Motion") is already in the record. *See* ECF Nos.

5  125 (Blakely Dec., Ex. 1-31); 126 (Bereda Dec., Ex. 1-16); 127 (de Beare Dec. Ex. 1); 128 (Ezell

6  Dec., Ex. 1-5); 129 (Franklyn Dec., Ex. 1-2); 130 (Joachimsthaler Dec., Ex. 1).  Rather than repeating

7  the very same facts and inundating the Court with much of the same evidence, where possible

8  Plaintiff will refer to the evidence already in the record. FRCP 56(c)(1)(A).

9  **I.    ARGUMENT**

10    **A.    A Reasonable Jury Could Award Deckers its Lost Profits**

11    The Lanham Act allows recovery of "any lost profits which the plaintiff would have earned

12  but for the infringement." *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993).

13  Quince's Motion for Summary Judgement on Deckers' lost profits should be denied because there is

14  ample evidence for a jury to decide that Quince's sales of UGG® dupes caused Deckers to lose sales.

15  The Lanham Act seeks to "take all the economic incentive out of trademark infringement" by

16  ensuring that a plaintiff will be compensated through an award. *Playboy Enterprises, Inc. v. Baccarat*

17  *Clothing Co.*, 692 F.2d 1272, 1274-75 (9th Cir. 1982); 15 U.S.C. § 1117(a) (providing multiple

18  remedies to a successful plaintiff, including actual damages).[1] Lost profits are available to a plaintiff

19  upon proof that the defendant's infringing activity caused the plaintiff to lose sales and earn less

20  profit than it would have but-for the infringement. *Jason Scott Collection v. Trendily Furniture*, 68

21  F.4th 1203, 1220 (9th Cir. 2023). To show causation, the plaintiff may rely on factual inferences and

---

[1] Pursuant to 15 U.S.C. §1117(a), Deckers can seek the following actual damages under the Lanham Act: (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. Ninth Circuit Model Jury Instruction 15.27 sets forth the following actual damages available to a plaintiff:  1) The injury to the plaintiff's reputation; 2) The injury to the plaintiff's goodwill, including injury to the plaintiff's general business reputation; 3) The lost profits that the plaintiff would have earned but for the defendant's infringement. Profit is determined by deducting all expenses from gross revenue; 4) The expense of preventing customers from being deceived; and 5) The cost of future corrective advertising reasonably required to correct any public confusion caused by the infringement. Quince's Motion is limited to Plaintiff's own lost profits at trial, e.g., #4.

need not disprove every conceivable intervening factor that might have impacted sales. *See* McCarthy § 30:79; *Sandoz Inz. v. Amgen Inc*., 2023 WL 4681569, at *3 (CD Cal. June 29, 2023). Separate from showing that the infringement caused harm, the plaintiff must also prove the amount of harm that should be recovered through damages. *Jason Scott*, 68 F.4th at 1222. The plaintiff's burden to show the amount of damages is deliberately lower, as the plaintiff is only required to show "substantial evidence to permit the jury to draw *reasonable inferences* and make a *fair and reasonable assessment*". *Skydive Arizona. v. Quattrocchi*, 673 F3d 1105, 1112 (9th Cir. 2012).

Evidence shows that Deckers and Quince share some overlapping customers and that sales were diverted from Deckers to Quince. The customer overlap is demonstrated through Joachimsthaler's studies. ECF 130, Ex. 1; *See Sandoz*, *3 (economic modeling is an appropriate manner for a plaintiff to show lost profits). Anecdotal evidence from individual customers bears out these expert opinions, showing both that Deckers/Quince customers overlap, and that some Deckers customers were diverted to the Accused Products. The following customer reviews --- are illustrative:



Supplemental ("Supp.") Blakely Dec., Ex. 1.

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

1    Additionally, Quince's own business documents and public facing website evidence that it

2  competes with Deckers – in a spreadsheet of AdWords produced by Quince the terms ████ and

3  ████ were included. ECF No. 125, Ex. 12. Quince even prominently displays that is competing

4  with UGG® on its website where it depicts a chart comparing their Accused Products with UGG®:



12  ECF No. 125, Ex. 28. Finally, Quince's CEO- affirmed during his deposition that Quince is *targeting*

13  Deckers' customers by stating "████████████████████████████████

14  ████████████████████████?" Supp. Blakely Dec., Ex. 2, p. 36:18-37:20.

15  This evidence of an overlapping customer base—that is, Deckers' customers who would buy

16  Quince's knock-offs—shows that Deckers and Quince compete. Deckers confirmed that Quince is

17  one of Deckers' competitors and its sales of dupes cuts into Deckers profits in the form of lost sales.

18  Supp. Bereda Decl, ¶ 2-7; *Vans v. Walmart,* 2023 WL 6922833 *10 (CD Cal. Oct. 11, 2023) ("An

19  employees' testimony, when based on knowledge of the plaintiff's business and sales data, that the

20  plaintiff has lost sales is strong evidence that a jury should decide the question of lost sales and

21  profits."). ████████████████████████████████

22  ████████████████████████████████████.

23  ECF 125, Ex. 1,[2] 2,[3] 3,[4] 4.[5]

---

[2] Burgos Depo, 28:18-25-29:1-9; 29:16-23; 42:13-15; 58:22-24; 60:20-22; 64:3-24; 73:3-6; 74:8-12; 79:11-17; 80:13-22;
[3] Gupta Depo, p. 21:11-15; 68:11-14; 12:20-13:9; Gupta Depo, p. 68:11-14
[4] Gupta Depo, p. 46:18-47:9
[5] Lippert Depo, p. 22:14-25:18; 47:7-25; 25:19-25; 35:25-14; 77:24-78:1; 84:21-85:15; 40:25-41:20

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

1    Because Deckers and Quince compete directly, a jury can infer that Quince's sales of

2    infringing boots/clogs diverted sales from Deckers to Quince. *Allergan USA Inc. v. Imprimis*

3    *Pharmaceuticals, Inc.*, 2019 WL 4546897 (CD Cal. Aug. 2, 2019) (rejecting defendant's reliance on

4    Out of the Box where, in false advertising case, parties were direct competitors and "the jury could

5    infer the fact of injury"). That inference is reasonable given the additional record evidence that the

6    Accused Products are confusingly similar to Deckers UGG® boots/clogs. For instance, consumer

7    surveys conducted by experts Matthew Ezell and David Franklyn showed post-sale confusion for

8    three separate models of Accused Shoes sold by Quince—each with an actionable level of net

9    confusion: 76.5%, 54.5%, and 34.6%. ECF 128, Ex. 3-4; ECF 129, Ex. 1; *see also Fortune Dynamic,*

10   *Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1035-38 (9th Cir. 2010) (survey

11   showing 11% net confusion was probative of actual confusion, particularly when proffered to oppose

12   summary judgment motion). Those survey findings are substantiated by █████████████

13   ███████████████████████████████████████████████████████

14   ███████ Supp. Blakely Dec., Ex. 1. Jurors can also infer that the profits made by Quince would

15   have been made by Deckers. McCarthy at §30:79; *Spinmaster, Ltd. V. Zobmondo Entertainment,*

16   *LLC*, 944 F. Supp. 2d 830, 845 (CD Cal. 2012) (Infringer's very close model of what plaintiff could

17   have achieved); *Blumenthal Dist. v. Herman Miller*, 2017 WL 3271706, *20 (CD Cal. Aug. 1, 2017)

18   (Infringer's profits were an approximate proxy for the amount of plaintiff's lost sales); *Hope Roach*

19   *Merchandising LLC v. Jammin Java Corp.*, 747 Fed. Appx. 622 (9th Cir. 2019) ("Because Jammin

20   Java's profits during the infringing period were a reasonable measure of Hope Road's damages, the

21   district court did not err in awarding damages in the amount of $2,458,835.20 to Hope Road.")

22       Quince's argument that consumers need to be confused at point-of-sale for there to be lost

23   sales is wrong for several reasons. At the outset, this case involves both initial interest and post-sale

24   confusion. Further, as the court held in *Vans v. Walmart* where the defendant made the same

25   argument in a case involving similar facts and theories of liability, "a reasonable jury could conclude

26   that some Walmart customers would have bought Vans had Walmart never offered their accused

27   shoes." 2023 WL 6922833 *10-11. *See also Gucci v. Guess*, 843 F.Supp.2d 412 (S.D.N.Y. 2012)

28   (Post-sale confusion is actionable when members of the public are confused as to the origin of the

products, which can lead to lost sales for the trademark owner, MSJ denied on damages).[6] Together, this evidence shows that Quince cannot meet its burden for summary judgment on lost profits. Quince set out to drive up its footwear sales by copying Deckers UGG® designs, and Quince succeeded. It sold significant numbers of Accused Products. Here, the record shows substantial evidence—from surveys, from customers, from company personnel—that can support a lost profits award. Quince is not entitled to summary judgment.

### B.    The Classic Ultra Mini and Tasman Trade Dresses Are NOT Generic

A claim for trade dress infringement has three elements: (1) the trade dress is nonfunctional; (2) the trade dress serves a source-identifying role either because it is inherently distinctive or has acquired secondary meaning; and (3) the defendant's product creates a likelihood of consumer confusion. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1258 (9th Cir. 2001). Unable to dispute the substantial likelihood of consumer confusion caused by Quince's knockoff boots/clogs, Quince instead challenges the sufficiency of Deckers' trade dress descriptions. Quince's arguments are inconsistent both with the law and the record in this case.

### 1.    *Deckers Has Clearly Identified the Trade Dresses at Issue*

"Trade dress" refers to the design or packaging of a product which serves to identify the product's source. *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 28 (2001). Trade Dress consists of a product's "total image and overall appearance," *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 764 n.1 (1992), and "may include features such as size, shape, color, color combinations, texture, or graphics." *Vision Sports, Inc. v. Melville Corp.*, 888 F. 2d 609, 613 (9th Cir. 1989). "Trade dress" refers to a product's combination of elements, not individual elements to be judged in a vacuum. "This has been the rule for close to a century." McCarthy on Trademarks and Unfair Competition § 8.2 (5th ed. 2023). The Ninth Circuit is in accord:

---

[6]The decision cited by Quince in this very same case, *Gucci v. Guess*, 868 F. Supp. 2d 207 (S.D.N.Y. 2012), involved post-trial motions after a bench trial. Significantly, while Gucci's claims for lost profits survived summary judgment, Gucci did not put into the record evidence of lost sales or brand harm, instead opting to pursue lost royalties. The court in *Gucci* declined to award a reasonable royalty because Gucci's expert's analysis was highly speculative. Contrary to what Quince suggests, the court in *Gucci* never ruled that a plaintiff cannot obtain lost profits for post-sale confusion. In fact, the court in *Gucci* ruled otherwise at the summary judgment stage.

1
2
3
4

We emphasize here that, in evaluating functionality as well as the other elements of a trade dress claim, it is crucial that we focus *not* on the individual elements, but rather on the overall visual impression that the combination and arrangement of those elements create. Trade dress is the composite tapestry of visual effects. Courts have repeatedly cautioned that, in trademark-and especially trade dress-cases, the mark must be examined as a whole, not by its individual constituent parts.

5

*Clicks*, 251 F.3d at 1259 (emphasis in original).

6

Deckers has specifically defined its Asserted Trade Dress for each of the three UGG®

7

products at issue as follows:

8

9
10
11
12
13
14
15
16
17
18

| **Classic Ultra Mini Trade Dress** | **Bailey Button Boot Trade Dress** | **Tasman Trade Dress** |
| --- | --- | --- |
| a. An ankle-high boot; <br> b. Classic suede boot styling; <br> c. An exaggerated, raised and exposed circular stitch pattern; <br> d. Exposed tufting; <br> e. A raised and rounded vamp; <br> f. A suede heel overlay on the boots exterior; <br> g. Fabric binding along the top of the boot and along the sole; <br> h. A thick, flat sole; and <br> i. A top line that is higher in the front and lower in the back. | a. Classic suede boot styling made famous by the UGG® brand; <br> b. Overlapping of front and rear panels on the lateral side of the boot shaft; <br> c. Curved top edges on the overlapping panels; <br> d. Exposed fleece-type lining edging the overlapping panels and top of the boot shaft; and <br> e. One or more buttons (depending on the height of the boot) prominently featured on the lateral side of the boot shaft adjacent the overlapping panels, on the front panel. | a. An embroidered braid around the opening of the upper; <br> b. A raised prominent seam on the front part of the upper running longitudinally down the center of the upper; <br> c. A raised and rounded dome shaped toe; <br> d. Brushed suede-like exterior; and <br> e. A thick, flat outsole. |

19
20

ECF 125, Ex. 11 at ¶ 22, 35, 48. In addition to the defined elements above, Deckers also included the following photographs exemplifying the Asserted Trade Dress as follows:

21

**Classic Ultra Mini Trade Dress      Bailey Button Boot Trade Dress      Tasman Trade Dress**

22
23
24

    

25
26
27

ECF 125, Ex. 11 at ¶ 23, 36, 49. Thus, Deckers has specifically defined the respective trade dresses at issue in this action. *See e.g.*, *adidas America, Inc. v. Skechers USA, Inc.* 2017 WL 3319190, at * 8 (D. Or. Aug. 3, 2017); *Vans v. ACI*, 2023 U.S. Dist. LEXIS 189978  *22-23 (CD Cal. Oct. 11, 2023).

28

Quince cannot credibly claim that Deckers failed to adequately define the trade dress of the UGG® Classic Ultra Mini and Tasman, or that Deckers has not identified a commercial product embodying the trade dresses. ECF No. 125, Ex. 11. At the outset, arguments where Defendant attacks individual elements of the trade dress fail because "[i]t has been well-established for a century that courts examine the total combination of elements that make up a trade dress. *Adidas*, 2017 U.S. Dist. LEXIS at *12; McCarthy § 8:2 ("A defendant cannot avoid liability for infringing a trade dress by segregating out individual elements of the trade dress as defined by plaintiff and arguing that no one of these is valid and protectable in and of itself."). In fact, the Ninth Circuit has stressed the importance of evaluating the total appearance of the product, not on individual elements. *Vision Sports* at 613; *Rachel v. Banana Republic, Inc.*, 831 F.2d 1503, 1506 (9th Cir. 1987); *Clicks* at 1259. It is equally well established that a picture exemplar provided in combination with elements regarding the shape, size, and placement of specific features of a trade dress sufficiently identifies the trade dress with particularity. See e.g. *H.I.S.C., Inc. v. Franmar*, 2016 U.S. Dist. LEXIS 178188 *15 (SD Cal. 2016); *Emeco Indus. v. Restoration Hardware*, 2012 U.S. Dist. LEXIS 173965, *2 (NDCAL Dec. 6, 2012) (the complaint sufficiently identifies the claimed trade dress, given said trade dress is described in both narrative and pictorial forms); *Salt Optics. v. Jand*, 2011 U.S. Dist. LEXIS 156237, 7-8 (CD Cal. Mar. 4, 2011); *Axis Imex v. Sunset Bay Rattan* 2009 U.S. Dist. LEXIS 2667, 8-9 (ND Cal. Jan. 7, 2009).

Defendant's arguments do not change this result. First, where Deckers does not claim to "own the trade dress in 'classic suede boot styling", "exposed tufting" or "ankle high boots".  Whether these isolated elements are generic has no bearing on the overall trade dress and courts routinely reject this divide and conquer approach.  See e.g., *Adidas,* 2017 U.S. LEXIS at *15; *Clicks* at 1259 ("The Ninth Circuit has repeatedly rejected this 'divide and conquer approach.")

Again, "[i]t has been well-established for a century that courts examine the total combination of elements that make up a trade dress." *Adidas*, 2017 U.S. Dist. LEXIS 122459, at *12; *see* McCarthy § 8:2 ("A defendant cannot avoid liability for infringing a trade dress by segregating out individual elements of the trade dress as defined by plaintiff and arguing that no one of these is valid and protectable in and of itself.")  In fact, the Ninth Circuit has "stressed the importance of evaluating

the establishment's combination of visual elements that, taken together, may create a distinctive visual impression" as "[t]rade dress is the composite tapestry of visual effects." *Adidas*, 2017 U.S. Dist. LEXIS 122459, at *12 (citing *Clicks Billiards* at 1259).  As discussed above, a picture exemplar provided in combination with pleadings regarding the shape, size, and placement of specific features of a trade dress sufficiently identifies the trade dress with particularity.  Indeed, the court in *Deckers v. Fortune Dynamic*, 2015 U.S. Dist. LEXIS 188274 (CD Cal. May 8, 2015) has already ruled that the Bailey Button Boot Trade Dress is described with "sufficient particularity:"

> [A]s discussed in the Background section above, the quoted "***classic suede boot styling" element is only one of five bullet points of information describing the Bailey Button Boot Trade Dress.*** [] Plaintiff explains that the suede boot also features overlapping panels on the boot shaft, curved edges on those overlapping panels with exposed fleece-type edges, and one or more prominent buttons on the shaft adjacent to the overlapping panels. [] Additionally, Plaintiff includes three images depicting the Bailey Button Boot Trade Dress that further convey the collective appearance and placement of these elements. [] Defendants maintain that the pictures do not answer the crucial question of "what the claimed article looks like," [] ***the images do depict how the elements come together to form the claimed trade dress***. Other courts have concluded that listing the elements of a trade dress and providing an image of a product bearing the dress sufficiently identifies the trade dress over which plaintiff claims exclusive rights, and this Court similarly agrees that Plaintiff has described the Bailey Button Boot Trade Dress with sufficient particularity in this case.

*Id*. at *8. To the extent there is any ambiguity with these or any other elements, this is resolved by the pictures of the UGG® Classic Ultra Mini and Tasman shown in the Complaint. Indeed, none of the cases cited by Defendant support its contentions that vagueness or genericness as to one element would render the entire trade dress indefinite despite identification of separate, more specific elements.

### 2.    Quince's generic design arguments are unsupported and frivolous

Again, Quince's "divide and conquer" genericness analysis is erroneous as a matter of law. The test is not whether the individual elements are generic. Rather, it is the combination of those elements that must be nondistinctive to render a trade dress unprotectable. *Adidas v. Skechers*, at *6; *Sun Non Dang Foods v. Kangnman1957*, 2024 WL 5440253 at *5 (CD Cal. Aug. 29, 2024). Defendant has identified various screenshots that it pulled from Google and now asserts are evidence that the UGG® Classic Ultra Mini and Tasman are basic forms of footwear commonly used in the

industry. ECF No. 142, pg. 20, UMF Nos. 19, 20 & 27. Defendant has not, however, produced any admissible evidence that the foregoing references were in public use (offered for sale, sold, or described in publication) prior to the date Deckers first began selling its products.

"A trial court can only consider admissible evidence in ruling on a motion for summary judgment." *Orr v. Bank of Am.*, 285 F.3d 764, 773 (9th Cir. 2002). Hearsay, which is an out of court statement used to prove the truth of the matter asserted, is not admissible. FRE 801(c), 802. Not only are the website screen shots purportedly depicting other products hearsay, but Defendant has also failed to authenticate any of them and therefore they are inadmissible. *See* FRE 901(a). As the Court held in *Deckers v. Romeo & Juliette*, 2017 U.S. Dist. LEXIS 91711 **7-8 (CD Cal. June 13, 2017):

> "The Court also notes that Defendants fail to authenticate any of the pictures that they contend correspond to this boot style. This is problematic in two ways. First, of course, if the pictures are not authenticated, they are inadmissible on summary judgment for the purpose of an obviousness analysis. *Orr*, 285 F.3d at 773. Second, because there is no evidence showing that these pictures actually correspond to this boot style, the evidence purporting to prove the date this boot style was publicly available is meaningless. All we know is that some boot called "Rebels Cayenne boot" was offered for sale between 2004 and 2008; there is no evidence that the boots in these pictures (which form the entire basis of the obviousness analysis) are in fact the "Rebels Cayenne boot," and thus there no evidence that the boots in those pictures were offered for sale in the relevant time frame."

Similarly, the screenshots proffered by Quince cannot be considered third-party uses for purposes of the genericness analysis. *Id*; *See e.g., Adidas v. Skechers*, 2017 WL 3319190 at *11 (D. Or. Aug. 3, 2017) ("Skechers has not provided other relevant information regarding these third-party shoes such as where the shoes were sold and whether adidas was aware of them or had taken action against them."); *Zombondo v. Falls Media*, 602 F.3d 1108, 1119 (9th Cir. 2010) (denying summary judgment because the defendant's evidence of third-party use did not account for sales figures and distribution locations."); *Benefit Cosmetics v. Elf Cosmetics*, 2024 WL 5135604 (ND Cal. Dec. 17, 2024) (Evidence insufficient to establish that asserted trade dress is common or widespread in the market.)

A careful review of the references cited by Quince demonstrates there is no foundation for the arguments it now asserts to this Court. The fourteen ankle-high sheepskin boots cited in Comeau's report were all pulled off the Internet. Other than potentially demonstrating that these boots were being offered for sale online on January 17, 2025, no other information is provided. Significantly, no information is provided as to whether these boots predated the UGG® Classic Ultra Mini's

introduction into the market in 2020. There is a reason why this is significant – these boots are all dupes of original UGG® designs.  For instance, on January 25, 2023, Deckers sued Next Step Group dba Cushionaire for infringing several Deckers' design patents and trade dress, including but not limited to the Classic Ultra Mini Trade Dress and the '161 Patent, both of which are at issue in this case. *See Deckers v. Next Step Group*, SDNY, Case No. 23-cv-02545 (ALC). The Cushionaire Women's Hip was specifically identified as an infringing product in that case. *See Deckers v. Next Step Group*, ECF No. 64. In fact, Next Step Group initiated an Inter Partes Review of the '161 Patent which was soundly rejected by the Patent Trial and Appeal Board and similarly rejected Next Step Group's purported prior art for failure to authenticate. Supp. Blakely Dec. Ex. 3. Similarly, on April 16, 2024, Deckers sued Steve Madden in connection with its knockoff of the UGG® Classic Ultra Mini, the "Cabin Tan Suede." *See Deckers v. Steve Madden*, CDCAL; Case No. 24-cv-03131 JFW. Romeo & Juliette, which owns the Bearpaw brand, has a history of knocking off Deckers' intellectual property, and the Shorty Booty is simply another example of this. Indeed, Deckers has previously obtained a $5.5 million jury verdict against Romeo in connection with its infringement of the Bailey Button boot at issue in this case, which is also at issue in this case. Supp. Blakely Dec., Ex. 4. Several of these other boots appear to be "inspired" by the UGG® Classic Mini, which was first sold in 2006, and not examples (even if authenticated) of common prior use of the Classic Ultra Mini Trade Dress, which was first introduced in 2020.[7]

**UGG® Classic Mini**   **UGG® Classic Ultra Mini**

 

---

[7] Quince engages in a sleight of hand when it asserts, falsely, that 16 of these products predated Deckers' launch of the Ultra Mini. ECF No. 142, pg. 5, ¶20. Paragraph 163 of Comeau's report shows a list of Chinese design patents that are clearly inspired by the Classic Mini, launched in 2006, not the Ultra Mini, launched in 2020.  None of these Chinese Patents establish that any of these boots were ever sold in commerce, and if so, when, where, and how many. Stated otherwise, they provide none of the information necessary for this Court to determine whether a trade dress is generic.

For the same reasons, Quince's arguments concerning the Tasman are fatally flawed. The screenshots in Paragraph 131 of Comeau's Report, which were pulled from the Internet, provide absolutely no information whatsoever as to when these goods first appeared in commerce, where they were sold, in what quantity, and, significantly, whether they are knockoffs of the UGG® Tasman.

In the end, Quince cannot establish with admissible evidence that a single product closely resembling the UGG® Classic Ultra Mini or the Tasman was being sold in commerce prior to the introduction of these iconic items. Quince has certainly fallen well short of establishing any widespread use or a common design. *See Nat'l Lead Co. v. Dannenfelser*, 223 F.2d 195, 204 (9th Cir. 1955) (considering and rejecting, evidence of third-party use because use within the relevant market, for paint, was de minimis).

### C.    The Tasman Trade Dress Has Achieved Secondary Meaning

Quince contends that if this Court grants its *Daubert* motions in connection with de Beare and Franklyn, Wallace's Frankenstein-survey would be unrebutted evidence of a lack of secondary meaning on the Tasman thereby warranting summary judgment. This nonsensical argument demonstrates either an ignorance of trademark law or a willingness to ignore trademark law.

"To succeed on a trade dress infringement based on product design, the plaintiff must show that her design has attained secondary meaning." *Art Attacks Ink, LLC v. MGA Entm't Inc.*, 581 F.3d 1138, 1145 (9th Cir. 2009). When deciding whether secondary meaning exists for a particular trade dress, courts consider such things as: (1) whether actual purchasers associate the dress with the source; (2) the degree and manner of advertising by the party seeking protection; (3) the length and manner of use of the dress, and (4) whether the use by the party seeking protection has been exclusive. *See Clamp Mfg. Co. v. Enco Mfg. Co.*, 870 F.2d 512, 517 (9th Cir), cert denied, 493 U.S. 872 (1989). Other considerations such as sales success and attempts by others to imitate the mark also favor finding secondary meaning. *See Clicks Billiards*, 251 F.3d at 1266. Finally, if a defendant deliberately copies a trade-dress, a strong inference arises of secondary-meaning. *Id.*; *Vision Sports* at 615 (9th Cir. 1989) ("[P]roof of copying strongly supports an inference of secondary meaning."); *Adidas-Salomon Ag v. Defendants Corp.*, 228 F. Supp. 2d 1192 (D. Or. 2002). That is because competitors generally copy "to realize upon a secondary meaning that is in existence." *P & P Imps.*

*LLC v. Johnson Enters., LLC*, 46 F.4th 953, 961-2 (9th Cir. 2022); *see* also *Jason Scott Collection, Inc. v. Trendily Furniture, LLC*, 68 F.4th 1203, 1214-5 (9th Cir. 2023).  As this Court can surmise from the foregoing, while surveys may provide evidence of secondary meaning, such evidence is not required. See, e.g., *Clicks Billiards*, 251 F.3d at 1262; *Benefit Cosmetics v. Elf Cosmetics*, 2024 WL 5135604 at *13. (E.l.f.'s assertion that lack of a secondary meaning survey "warrants an adverse inference" is unavailing.  There is no controlling Ninth Circuit authority for this position; instead, the Ninth Circuit repeatedly has held that "direct evidence of secondary meaning—such as ... survey evidence showing end-consumer recognition—[…] is not a requirement.)

The UGG® Tasman has enjoyed significant sales numbers over the past decade. Introduced over twenty years ago, the Tasman has sold over ███████████ generating over $███████. ECF 126, Ex. 8, 12. The success of the Tasman is due in part to Deckers extensive advertising and marketing efforts. Deckers spent approximately $███████ on advertising and marketing associated with the UGG® brand and its products, including the UGG® Tasman. ECF 126, Ex. 16. The strong secondary meaning of the Asserted Trade Dress is also demonstrated by the extensive celebrity and social media coverage that each product has received. ECF 126, Ex. 4, 8, 13; *See adidas America*, 890 F.3d at 754 ("Also indicative of secondary meaning is the considerable amount of unsolicited media coverage praising the Stan Smith's influence and iconic status as one of the most famous sneakers of all time"). Deckers UGG® Tasman has not only caught consumer and celebrity attention, but also that of competitors who have attempted to sell their knockoffs. ECF 126, Ex. 5, 10, 14. Deckers has filed numerous lawsuits against infringers, including but not limited to Romeo and Juliette (Bearpaw), Target, Cushionaire, Walmart, Steve Madden, Gap, and others in connection with the UGG® Classic Ultra Mini, Bailey Button and/or Tasman. ECF 126, Ex. 5, 10, 14.

Likewise, there is considerable evidence in the record of Quince's deliberate copying of UGG's designs. Here, Quince cannot deny that it knew of the existence of the UGG® brand, or its products, including the UGG® Classic Ultra Mini, UGG® Tasman, and UGG® Bailey Button. ECF

125, Ex.1,[8] 2,[9] 4,[10] 8,[11] 19, 21. In fact, Quince admitted to selecting prospective manufacturing partners for the Accused Products with an eye towards who has manufactured UGG® products and/or could produce a similar product. ECF 125, Ex. 4.[12] During deposition, Quince's 30(b)(6) witness, and Sr. Merchandising Manager, admitted that she was familiar with the UGG® Tasman and UGG® Classic Ultra Mini and, in fact, owned a pair of UGG® Classic Ultra Mini. ECF 125, Ex. 1,[13] 8.[14] Likewise, Quince's CEO admitted he was familiar with the UGG® Bailey Button prior to the lawsuit, and Quince's discovery responses indicated familiarity with all three products prior to the lawsuit. ECF 125, Ex. 2.[15]

Nor can Quince deny that it intended the Accused Products to be UGG® look-a-likes. Quince admitted that its business practice is to ███████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████. ECF 125, Ex. 1,[16] 15, 16. It then admitted that it ████ ██████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████. ECF 125,  Ex. 1,[17] 2,[18] 4,[19] 8,[20] 17, 18, 19, 21. Quince's intent to create an undistinguishable look-a-like is further exemplified by email communications demonstrating Quince's intent to copy the care label on authentic UGG® products, and by the only two changes it

---

[8] Burgos Depo, p. 28:18-25-29:1-9; 29:16-23; 42:13-15; 58:22-24; 60:20-22; 64:3-24; 73:3-6; 74:8-12
[9] Gupta Depo, p. 68:11-14; 12:20-13:9
[10] Lippert Depo, p. 25:19-25
[11] Defendant's Supplemental Response to Interrogatory, Set One, No. 23 (2024.09.26); Defendant's Supplemental Response to Interrogatory, Set One, No. 24 (2024.09.26); Defendant's Supplemental Response to Interrogatory, Set One, No. 8 (2024.09.26))
[12] Lippert Depo, p. 35:25-14; 77:24-78:1; 84:21-85:15; 40:25-41:20
[13] Burgos Depo, p. 28:18-25-29:1-9; 29:16-23
[14] Defendant's Supplemental Response to Interrogatory, Set One, No. 8, 24 (2024.09.26)
[15] Gupta Depo, p. 12:20-13:9
[16] Burgos Depo, p. 23:25-25:2; 78:24-79:4; 79:11-17; 80:13-22
[17] Burgos Depo, p. 58:22-24; 60:20-22; 64:3-24; 73:3-6; 74:8-12; 42:13-15; 28:18-25-29:1-9; 29:16-23
[18] Gupta Depo, p. 12:20-13:9; 68:11-14
[19] Lippert Depo, p. 25:19-25
[20] Defendant's Supplemental Response to Interrogatory, Set One, No. 8, 23, 24 (2024.09.26)

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

made to the Accused Products: changing the outsole so it did not say "UGG" and making the fabric of waterproof. ECF 125, Ex.1,[21] 17, 20.

Quince's deliberate copying is further evidenced by the search terms it uses to direct consumers to its UGG dupes: ███████████████████████████████████████████ ██████████████████████████████████████████. ECF 125, Ex. 12. *See e.g.*, *Adidas America v. Skechers*, 890 F. 3d 747, 755 (9th Cir. 2018) ("We agree with the district court that 'the only reason 'adidas Stan Smithy' is a useful search term is that consumers associate the term with a distinctive and recognizable shoe made by adidas."); *Vision Sports* at 615 ("Proof of copying strongly supports an inference of secondary meaning."); *Brookfield Communs., Inc. v. West Coast Entertainment Corp.,* 174 F. 3d 1036, 1064 (9th Cir. 1999) ("Using another's trademark in one's metatags is much like posting a sign with another's trademark in front of one's store.")

Finally, the high degree of similarity between the Accused Products and the respective UGG® products raises an inference of intent to confuse. *See Adidas America*, 149 F. Supp. 3d at 1244 ("given the striking similarity between the shoes, there is but one inference to draw: that Skechers knowingly adopted a mark very similar to the Stan Smith to draw off the success of adidas's iconic shoe."); *Amini Innovation Corp. v. McFerran Home Furnishings, Inc*., 68 F. Supp. 3d 1170, 1175 (C.D. Cal. 2014) (similarity is "circumstantial evidence of intentional copying*"); NEXxUS Products Co. v. Gentle Concepts, Inc.,* 1993 WL 496824, at *7 (M.D. Fla. Apr. 30, 1993) ("[s]uch similarity could not have been accomplished ... without a deliberate intent to copy"). This is especially true given that Quince has copied numerous UGG® designs. *Vans v. Walmart* at *29.





UGG® Classic Ultra Mini                          Quince Mini Boot

---

[21] Burgos Depo, p. 46:4-17; 52:9-22

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**





UGG® Bailey Button              Quince Button Boot

UGG® Tasman              Quince Clog Boot

Defendant's intentional and close copying of Deckers' Asserted Trade Dress, alone, is sufficient to establish secondary meaning in the Asserted Trade Dress. ECF 125, Ex.1,[22] 2,[23] 4,[24] 8,[25] 19, 21; *Faberge, Inc. v. Saxony Products, Inc.*, 605 F.2d 426, 428 (9th Cir. 1979). "There is no logical reason for the precise copying save an attempt to realize upon a secondary meaning that is in existence." *Audio Fidelity, Inc. v. High Fidelity Recordings, Inc.*, 283 F.2d 551, 558 (9th Cir. 1960).

Finally, Deckers has provided an expert survey demonstrating that the Tasman has achieved secondary meaning. *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1358 (9th Cir. 1985) ("An expert survey of purchasers can provide the most persuasive evidence on secondary meaning."). Deckers provided an *Eveready* survey conducted by Franklyn for the UGG® Tasman in the post-sale context, which is relevant to a finding of secondary meaning. ECF 129, Ex. 1; 2 *McCarthy* § 15:11 ("If there is reliable evidence of actual customer confusion, then it follows logically that there must also be some secondary meaning in the senior user's designation. If people were not aware of the trademark significance of the senior mark, how could they be confused as to source or affiliation?");

---

[22] Burgos Depo, p. 28:18-25-29:1-9; 29:16-23; 42:13-15; 58:22-24; 60:20-22; 64:3-24; 73:3-6; 74:8-12
[23] Gupta Depo, p. 68:11-14; 12:20-13:9
[24] Lippert Depo, p. 25:19-25
[25] Defendant's Supplemental Response to Interrogatory, Set One, No. 23 (2024.09.26); Defendant's Supplemental Response to Interrogatory, Set One, No. 24 (2024.09.26); Defendant's Supplemental Response to Interrogatory, Set One, No. 8 (2024.09.26))

1    *see also American Scientific Chemical, Inc. v. American Hosp. Supply Corp*., 690 F.2d 791, 793 (9th

2    Cir. 1982).

3    **D.      The '161 Patent is Not Invalid due to Functionality or Indefiniteness**

4          The `161 Patent is entitled to a presumption of validity under 35 U.S.C. § 282. As the Federal

5    Circuit has consistently held, this presumption can only be overcome by clear and convincing

6    evidence of invalidity. *See, e.g., Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011). The

7    burden of proving invalidity rests solely on the challenger. *Pfizer, Inc. v. Apotex, Inc*., 480 F.3d 1348

8    (2007). Quince wholly fails to apply correct law to either of its §112 arguments and egregiously

9    misrepresents patent functionality by omitting from discussion-alternative designs.

10         Whether, as Quince's §112 argument relies, a designer in a vacuum might interpret a design

11   feature one way or another in a hypothetical product is not the inquiry. "[G]enerally these types of

12   lines on a footwear upper could represent either pleats/seams or contours." ECF 142, p. 24.  Rather,

13   the inquiry turns on whether a designer viewing the disputed feature, in the context of the actual

14   patent, would understand the design as a whole. "[I]n order for a design patent to be invalidated for

15   indefiniteness, errors and inconsistencies in the patent drawings must be material and of such

16   magnitude that the overall appearance of the design is unclear." *HR U.S. LLC v. Mizco Int'l, Inc*.,

17   2009 U.S. Dist. LEXIS 27056 at *17 (E.D.N.Y., Mar. 31, 2009); citing MPEP §§ 1503.02, 1504.04.

18   Quince also misapplies *Spanx*, which asks whether any figure drawing is so different from the others

19   that a designer, thus perceiving multiple inventions from the figures, "could only guess as to which of

20   these designs is claimed." *Times Three Clothier, LLC v. Spanx, Inc*., 2014 WL 1688130, at *7

21   (S.D.N.Y. Apr. 29, 2014). However, despite relying on computer enhanced reconstructions of the

22   Deckers' patent figures, (a practice found nowhere in case law and improper), Quince offers no

23   support to that end. Deckers offers ample evidence to the contrary.Finally, in regard to patent

24   functionality Quince omits alternative designs from its analysis or misapplies any of the other *PHG*

25   factors. "[W]here the existence of alternative designs is not dispositive of the invalidity inquiry, the

26   district court may look to several other [PHG] factors for its analysis." *Ethicon Endo-Surgery, Inc. v.*

27   *Covidien, Inc*., 796 F.3d 1312, 1330 (Fed. Cir. 2015).

28                    *1.      Quince's Claim of Indefiniteness*

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

The Supreme Court held that "a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014).  While the court in *Nautilus* rejected the "insolubly ambiguous" standard, it did not change the definiteness inquiry, which "focuses on whether those skilled in the art would understand the scope of the claim when the claim is read in light of the rest of the specification." *Union Pac. Res. Co. v. Chesapeake Energy Corp*., 236 F.3d 684, 692 (Fed. Cir. 2001). In fact, the court noted that "some modicum of uncertainty" must be tolerated, given the inherent limitations of language and because "absolute precision is unattainable." *Nautilus*, 134 S. Ct. at 2128-29.   "35 U.S.C. 112, P 2 does not require a blueprint type drawing of an exact scale." *Oasis Indus. v. G.K.L. Corp*., 1996 U.S. Dist. LEXIS 1057, 19-20 (N.D. Ill. Jan. 31, 1996) citing *Ex parte Asano*, 201 U.S.P.Q. (BNA) 315 (1978).  Inconsistencies between the figures of the drawing which do not preclude the overall understanding of the drawing, as a whole, are an insufficient basis for holding a design indefinite. *Id*. "[I]n order for a design patent to be invalidated for indefiniteness, errors and inconsistencies in the patent drawings must be material and of such magnitude that the overall appearance of the design is unclear." *HR U.S. LLC v. Mizco Int'l, Inc.*, 2009 U.S. Dist. LEXIS 27056 at *17 (E.D.N.Y., Mar. 31, 2009); MPEP §§ 1503.02, 1504.04; *Park B. Smith*, 2008 U.S. Dist. LEXIS 19800, 2008 WL 650339, at *6 (citing MPEP § 1503.02 and rejecting, in dicta, invalidity challenge); *Hadco Prods., Inc. v. Lighting Corp. of Am*., 312 F. Supp. 1173, 1181 (E.D. Pa. 1970) (finding, after trial, patent not invalid for indefiniteness where "errors and inconsistencies in the drawings as issued are inconsequential"), vacated on other grounds; *Hadco v. Walter Kidde & Co*., 462 F.2d 1265 (3d Cir. 1972); *Ex Parte Asano*, 201 U.S.P.Q. 315, 317 (Bd. Pat. App. & Inter. 1978) (reversing rejection of patent application with numerous minor inconsistencies and explaining that "[m]echanical drawing errors and inconsistencies between the figures of the drawing, which do not preclude the overall understanding of the drawing as a whole are an insufficient basis for holding the design both indefinite and insufficiently disclosed under 35 USC 112").

Quince's argument that the highlighted lines could indicate pleats or seams; while also stating they might represent contours, stems from its expert's misinterpretation of the drawings. For a person

skilled in the art, the context provided by looking at all Figures 1 – 7 resolves any such questions. "For instance, if a line appears on the vamp or toe in one figure and is absent in others, it is reasonable for a designer to determine it represents a contour or shading rather than a seam. This holistic approach aligns with how design patents are intended to be interpreted." Supp. De Beare Dec., Ex. 1, p. 39.

Defendants' inconsistency argument boils down to a claim that where the seam across the top of the footwear in FIG. 1-4 is smooth, it purportedly appears to protrude in FIG. 6. However, as deBeare explains:

> In design patents generally, each Figure serves as part of a collective visual description of the overall design. Figure 6, being the top view of the '161 Patent, focuses primarily on presenting the overall shape and structure of the boot's opening as seen from above. In footwear design, that is what a top view is supposed to do. What Mr. Comeau refers to as a "knob" he sees on the top view is not the focus of the top view; instead, the emphasis here lies on the opening's contour and shape, notably, the overall design coherence from the top perspective.

> If one were to consider the "knob," it is my opinion as a designer, that it does not depict a protrusion or an inconsistency but rather an element representing both sides of the two horizontal lines shown in Figures 3 and Figure 4. From a design perspective, this interpretation aligns with the intent of the figures and what I understand from several decades in the footwear industry as the conventions used in drafting design patents. It is my opinion, the lines shown in Figures 3 and 4 provide the visual foundation for understanding this detail and clearly depict the same invention, and Figure 6 simply shows this element from a different perspective to support the same invention.

As the Supreme Court stated in *Nautilus*, "[o]ne must bear in mind, moreover, that patents are 'not addressed to lawyers, or even to the public generally,' but rather to those skilled in the relevant art." *Nautilus*, 134 S. Ct. at 2128. In *HR U.S. LLC v. Mizco*, the court held that inconsistencies did not make the patent indefinite, as all but one of the inconsistencies "involve[d] the situation where multiple views are consistent and only a single view is inconsistent," and that where one of the figures was "somewhat unclear as to th[at] feature," one skilled in the art would look to the other figure. *HR U.S. LLC v. Mizco*, 2009 U.S. Dist. LEXIS 27056 at *24 citing to *Antonious v. Spalding & Evenflo Cos., Inc.*, 217 F.3d 849 (Fed. Cir. 1999) (unpublished case) (court reversed summary judgment that had invalidated design patents, explaining that where Figures 2 and 3 "plainly showed" a feature that was allegedly shown inconsistently in Figure 4, "a person of skill in the art would

18

primarily look to Figures 2 and 3 to determine the shape of the [disputed feature], and any associated discrepancies in Figure 4 would not be sufficient to preclude a person from gaining an overall understanding of the total substance of the designs.")

The case of *Times Three Clothier, LLC v. Spanx, Inc.*, 2014 U.S. Dist. LEXIS 59448 (S.D.N.Y. Apr. 29, 2014) is entirely distinguishable because half of the figures depicted the ornamental line of the patent at issue in one way and the other half of the figures an entirely different way. *Id.* at 22. The present situation is more analogous to that of *HR U.S. LLC v. Mizco* and *Antonious v. Spalding*, where one can resolve any potential inconsistencies between FIG. 1-4 and FIG 6 by considering the design as a whole: "The "knob" in Figure 6 is consistent with how the design would appear when viewed from above, given the natural curves and dimensions of the shaft and instep. It is neither a protrusion nor an error but rather a detail that would be understood by a designer skilled in the art and by an ordinary observer." Supp. de Beare Dec., Ex. 1, p. 41.

In sum, a designer skilled in the art, viewing the design as an ordinary observer, would have no difficulty understanding the scope of the design with reasonable certainty from the figures in the '161 Patent as they provide a clear and cohesive visual representation of the singular claimed design.

### 2.    *Quince's Claim of Functionality*

#### a.    Quince has waived a functionality defense to the '161 Patent

"Invalidity due to functionality is an affirmative defense to a claim of infringement of a design patent." *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1123 (Fed. Cir. 1993). Patent invalidity contentions require parties to crystallize their theories of the case early in the litigation and to adhere to those theories once they have been disclosed. *Kandypens, Inc. v. Puff Corp.*, 2020 U.S. Dist. LEXIS 259022 *5 (CD Cal. Sept. 20, 2020). Patent invalidity for reasons such as functionality must be plead as an affirmative defense. *Eli Lilly & Co. v. Barr Labs., Inc.,* 251 F.3d 955, 962 (Fed. Cir. 2001); see also, *Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1365 (Fed. Cir. 1999); *Advanced Cardiovascular Sys. v. Medtronic, Inc.*, 1996 U.S. Dist. LEXIS 11700 **9-10 (N.D. Cal. July 24, 2006); *Roland Corp. v. Inmusicbrands, Inc.*, 2017 U.S. Dist. LEXIS 17571 (ND Cal. Feb. 14, 2022). Quince failed to allege functionality as an affirmative defense to the '161 Patent

in its Answer.[26]  ECF No. 26.  Defendant's failure to allege patent functionality precludes it from raising this affirmative defense, in the first instance, in its Motion for Summary Judgment. See, *Advanced Cardiovascular Sys. v. Medtronic, Inc*., 1996 U.S. Dist. LEXIS 11700 **9-10 (ND Cal. July 24, 2006) (Striking defendant's affirmative defense that the patent "'is invalid, void, and unenforceable for failure to satisfy the requirements of patentability […]'" on the grounds that it was not pled with the minimal specificity necessary to give the plaintiff fair notice of the defense).

### b.    The '161 Patent is non-functional

Design patents enjoy the same presumption of validity as utility patents under 35 USC § 282. *L.A. Gear, Inc. v. Thom McAn Shoe Co*., 988 F.2d 1117, 1123 (Fed. Cir. 1993); 35 USC § 171. Thus, Quince has the burden to prove invalidity of the '161 Patent by clear and convincing evidence. *Microsoft v. i4i Ltd. P'ship*, 564 U.S. 91 (2011); *L.A. Gear*, 988 F.2d at 1124. Courts employ a "stringent" standard as it applies to invalidating design patents on grounds of functionality. *Rosco, Inc. v. Mirror Lite Co*., 304 F.3d 1373, 1378 (Fed. Cir. 2002).  In determining whether a claimed design is primarily functional, "[t]he function of the article itself must not be confused with 'functionality' of the design of the article." *Hupp v. Siroflex of Am., Inc*., 122 F3d 1456, 1462 (Fed. Cir. 1997). The overall appearance of the article, the claimed design viewed in its entirety—is the basis of the relevant inquiry, not the functionality of elements of the claimed design viewed in isolation. *Ethicon Endo-Surgery, Inc. v. Covidien, Inc*., 796 F.3d 1312, 1329 (Fed. Cir. 2015). The determination of whether a patented design is dictated by the function of the article of manufacture must ultimately rest on an analysis of its overall appearance. The Federal Circuit has not mandated applying any particular test for determining whether a claimed design is dictated by its function and therefore impermissibly functional. However, the Federal Circuit has often focused on the availability of alternative designs as an important—if not dispositive—factor in evaluating the legal functionality of a claimed design. If there are several ways to achieve the same function, the article, in this case, footwear – the claimed design of the '161 Patent, it is more likely to serve a primarily ornamental

---

[26] Deckers filed this present lawsuit on June 6, 2023. ECF No. 1. The first time Quince mentioned the affirmative defense of patent functionality was in November 2024 during expert discovery.

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

1   purpose. *Ethicon Endo-Surgery, Inc. v. Covidien, Inc*., 796 F.3d 1312, 1328 (Fed. Cir. 2015); *LA*

2   *Gear, at* 1123. A court should not exclude elements of a design based on functionality exclusions

3   unless it is the only possible form that could perform the function. *L.A. Gear, Inc. v. Thom McAn*

4   *Shoe Co*., 988 F.2d 1117, 1123 (Fed. Cir. 1993). "When there are several ways to achieve the

5   function of an article of manufacture, the design of the article is more likely to serve a primarily

6   ornamental purpose." *Id*. de Baere offers over thirty pages of alternative designs analysis for each

7   element of the '161 at issue. Supp. de Baere Dec., Ex. 1, p. 38-74. She repeatedly confirms both that

8   "elements in the design [and the] overall appearance clearly [are] not dictated by function." *Ethicon*

9   at 1330 (addressing the last *PHG* factor).

10      Defendant dissects the claims of the Patent in Suit into various purported "functional"

11  features.  However, the fact that a particular feature of a design performs a function does not mean

12  that the feature cannot be part of a claimed design. *Sharper Image Corp. v. Target Corp*., 425

13  F.Supp.2d 1056, 1068 (ND Cal., 2006) (where Court construed design patent in accordance with the

14  figures depicted in the patent). "[T]he utility of each of the various elements that compromise the

15  design is not the relevant inquiry… The elements of the design may indeed serve a purpose, but it is

16  the ornamental aspect that is the basis of the design patent." *L.A. Gear*, 988 F.2d at 1123.  As the

17  Federal Circuit has explained in relation to a dispute over a design patent for shoes,

18          There is no dispute that shoes are functional and that certain features of the shoe
            designs in issue perform functions. However, a distinction exists between the
19          functionality of an article or features thereof and the functionality of the
            particular design of such article or features thereof that perform a function. Were that
20          not true, it would not be possible to obtain a design patent on a utilitarian article of
            manufacture, or to obtain both design and utility patents on the same article.
21

22  *Avia Group Int'l, Inc., v. L.A. Gear Cal., Inc*., 853 F.2d 1557, 1563 (Fed.Cir.1988)

23      In *L.A. Gear, Inc.*, the Court found that "elements of the '081 design, such as the delta wing

24  or the side mesh, also provide support for the foot does not mean that the specific design of each

25  element, and the combination of these elements into the patented design, is dictated by primarily

26  functional considerations. The elements of the design may indeed serve a utilitarian purpose, but it is

27  the ornamental aspect that is the basis of the design patent." *L.A. Gear,* 988 F.2d at 1123. Similarly,

28  in *Rosco, Inc. v. Mirror Lite Co*., the court found that elements of oval convex mirror used on school

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

buses that were claimed to offer superior field of vision and increased aerodynamics were nevertheless ornamental rather than functional because there was no showing "that there are no [other] designs that have the same functional capabilities" as the patented elements. 304 F.3d at 1378-79. Each element of the '161 Patent and the overall design are at least in part ornamental.

Two years into this case and at the summary judgment stage, Quince asks this Court for the first time to essentially reset the scheduling order with a formal claim construction.  Not only is this request untimely, but it is also unwarranted. The NDCA Patent Local Rules do not require formal claim construction in design patent cases, and for good reason. "Words cannot easily describe ornamental designs. *See Dobson v. Dornan*, 118 U.S. 10, 14, 6 S.Ct. 946 (1886) (explaining that a claim "is better represented by the photographic illustration than it could be by any description, and a description would probably not be intelligible without the illustration"). A design patent's claim is thus often better represented by illustrations than a written claim construction. *Egyptian Goddess, Inc. v. Swisa, Inc*., 543 F.3d 665, 679 (Fed.Cir.2008). Also, detailed verbal claim constructions increase "the risk of placing undue emphasis on particular features of the design and the risk that a finder of fact will focus on each individual described feature in the verbal description rather than on the design as a whole." *Id*. at 680; *Sport Dimension, Inc. v. Coleman Co*., 820 F.3d 1316, 1320 (Fed. Cir. 2016).

In this case an elegant yet straightforward design is at issue. The '161 figures clearly depict the claimed invention. No additional verbiage-by-claim construction need be read into the scope of Deckers' unambiguous patent.  Indeed, several courts have already come to this very same conclusion concerning one of the boots at issue in this case, the UGG® Baily Button, which was protected by the now expired '999 Patent. *Deckers Outdoor Corp. v. Rue Services Corp*., No. CV13-06303-JVS (VBKx) 2014 WL 12588481 (CD Cal. Aug. 29, 2014) (The defendants proposed lengthy written constructions for each patent describing in detail each boot's design. Court declined to adopt a written construction for either, holding that "the depictions [in the patent drawings] speak for

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

1    themselves."); *Deckers Outdoor Corp. v. Romeo and Juliette Inc.* (Bearpaw)., No. 5-cv-02812-ODW

2    (CWx) 2016 WL 7017219 (CD Cal. Dec. 1, 2016) (same).[27]

3        Courts have also avoided claim constructions that verbally separate the functional features

4    wherein the functions can be achieved in another way. *See e.g. Oakley, Inc. v. Predator Outdoor*

5    *Products, LLC*, 8:11-CV-00456-JVS-PLA (CD Cal., March 7, 2012) (While Oakley's design patent

6    for an electronically enabled eyeglass "provides for a convenient placement of housing for electronics

7    in eyewear, it does not depict the only possible placement for that housing, nor is the size and shape

8    in Oakley's design compelled by the function it carries out," and consequently determined that a

9    construction of the design patent identifying certain features as functional was unwarranted); *Dahon*,

10   2012 U.S. Dist. LEXIS 177673, 6-9 (where court construed design patent for a folding bicycle frame

11   as "The ornamental design for a folding bicycle frame, as shown in Figures 1-8"of the patent);

12   *Carlini Enters. v. Paul Yaffe Design, Inc.*, 2014 U.S. Dist. LEXIS 113941 *8 (CD Cal. Aug. 15,

13   2014) (on claim construction of ornamental design for motorcycle handlebars, the Court found it

14   appropriate to defer to the figures in the design patents in-suit).

15       Like the footwear in *LA Gear*, the eyewear in *Oakley*, the bicycle frame in *Dahon*, and the

16   motorcycle handlebars in *Carlini*, while some features of the Patent in Suit may serve certain

17   functional purposes, none of these features are essential to the functioning of the boot and could have

18   been designed in numerous other ways to achieve the same functions. It is the overall visual

19

20   _____

21   [27] Quince's reliance on an ambiguous claim construction in *Walmart* is similarly misplaced. In

22   *Walmart*, the court (newly appointed in 2020) surmised certain design elements to be functional by
     considering their individual functional aspects isolated from the design as a whole, and expressly did

23   so without considering alternative designs, both in direct contravention of well-established precedent.
     "[T]he utility of each of the various elements that comprise the design is not the relevant inquiry with

24   respect to a design patent" because where a design is primarily functional or primarily ornamental
     requires viewing the claimed design "in its entirety." *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*,

25   796 F.3d 1312, 1329 (Fed. Cir. 2015). Indeed, the "availability of alternative designs [i]s an
     important—if not dispositive—factor in evaluating the legal functionality of a claimed design." *Id*.

26   Here, Deckers has produced over forty pages of expert alternative design analysis covering each
     element that Quince now deems "functional". Supp. de Baere Decl., Ex. 1, pp 41-73. Clearly, they

27   are not. For all the risks cautioned against in *Sport Dimension* (which rampantly manifested in
     *Walmart*) verbal claim construction is unnecessary and should be avoided, as Judge Selna (appointed

28   in 2003) agreed in the *Rue* case, and Judge Wright (appointed in 2007) agreed in *Romeo*.

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

appearance of several of the features in the Patent in Suit that make it distinctive to an ordinary

viewer, and that has created the popularity that has caused Defendants and others to copy said

designs. Indeed, there are many other ways of designing boots to perform the functions set forth by

Defendant and this is evidenced by the fact that there are numerous boots out there that perform the

same functions but look nothing like the UGG® boots that embody the Patent in Suit. In today's

marketplace, the primacy of appearance in the design of shoes cannot be ignored when analyzing

functionality. *L.A. Gear, Inc.*, 988 F.2d at 1123.

### E.    Deckers should prevail on its state law claims

As the standard for trade dress infringement is the same under both state and federal law, for

the reasons discussed above, Deckers should also prevail on its state law claims for trade dress

infringement and unfair competition. *Audio Fidelity Inc. v. High Fidelity Recordings, Inc.*, 283 F.2d

551, 554-555 (9th Cir. 1960).

## II.    <u>ADDITIONAL EVIDENTIARY OBJECTIONS</u>

<u>All Defendant's expert reports are unauthenticated and inadmissible</u>: "[F]or an expert opinion to be

considered on summary judgment, it must be accompanied by a proper affidavit or deposition

testimony; courts in the Ninth Circuit have routinely held that unsworn expert reports are

inadmissible." *FNBN-RESCON LLC v. Ritter*, 2014 WL 979930, at *5 (D. Nev. Mar. 12, 2014)

(citation and internal quotations omitted); *King Tuna, Inc. v. Anova Food, Inc*., 2009 WL 650732, at

*1 (C.D. Cal. Mar. 10, 2009) (expert report can be verified by deposition for summary judgment).

Quince's counsel's, Xinlin Morrow, declaration attaches Defendant's expert reports: Comeau

Rebuttal Report, ECF Nos. 142-11&18; Brady Rebuttal Report, ECF No. 142-15; Comeau Expert

Report, ECF No. 1420-16. None of these reports are authenticated by expert affidavit or deposition.

The Ninth Circuit has universally held, "it is not sufficient for the report of an expert to be attached to

the declaration of counsel, who cannot testify about the expert's statements." *Nash-Perry v. City of*

*Bakersfield*, 2021 WL 3883681 at *6 (ED Cal. Aug. 31, 2021); *See also Harris v. Estendicare*

*Homes, Inc*., 829 F. Supp. 2d 1023, 1027 (WD Wash. Nov. 4, 2011) (striking as hearsay the expert

report submitted in opposition to summary judgment because "counsel attached [the] reports to his

declaration, but he is not competent testify about the matters therein"); *Estate of Nunez v. Cty. of San*

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

*Diego*, 2018 WL 5817091 (SD Cal. Nov. 3, 2018) (declining to consider expert reports that were not signed under penalty of perjury and were not accompanied by any separate sworn expert declaration); *Smith v. City of Oakland*, 2007 WL 2288328 at *4 (ND Cal. Aug. 9, 2007) (Although the report was signed by expert and attached to counsel's declaration, the report was not sworn to by expert and therefore not admissible for purpose of Rule 56).

Defendant's unauthenticated screenshots: Deckers objects to the admission of all screenshots Quince and its experts pulled from the Internet purportedly demonstrating basic forms in the market, including but not limited to the Comeau Rebuttal Report (ECF 142-11&18) ¶¶88, 123, 131, 163, 177, 191, 209. Foundation FRE 602; Speculation; Hearsay 801(c), 802; Failure to Authenticate FRE 901(a). Defendant has failed to authenticate any internet screenshots and they are therefore inadmissible. To be authenticated, some statement or affidavit from someone with knowledge is required. *In re Homestore.com, Inc. Sec. Litig.*, 347 F. Supp. 2d 769, 782-83 (CD Cal. 2004) ("for example, Homestore's web master or someone else with personal knowledge would be sufficient" to authenticate content of homestore.com printouts) Defendant has not submitted any affidavits from the webmaster or anyone else with personal knowledge of the various websites to lay foundation for the screenshots. Content on the webpages is thus nothing more than inadmissible hearsay. FRE 801, 802. Even then, the screenshots alone are insufficient to demonstrate that the items depicted therein were in public use - such as invoices and other indicia of actual sales in commerce, in the United States. *Deckers v. Romeo & Juliette*, 2017 U.S. Dist. LEXIS 91711 **6-15 (CD Cal. June 13, 2017); *Apple, Inc. v. Samsung Elecs. Co*., 2012 U.S. Dist. LEXIS 90889, at *38 (ND Cal. June 29, 2012) ("Other than Mr. Bogue's declaration, Samsung cites no evidence that Tablecloth was known or used in a publicly accessible manner, or that Tablecloth was in public use or on sale").

## III.    CONCLUSION

Based upon the foregoing, Deckers' respectfully requests that this Court deny Quince's Motion for Partial Summary Judgment in its entirety.

DATED:    March 24, 2025                    BLAKELY LAW GROUP

                                            By:    */s/*Brent H. Blakely
                                                   Brent H. Blakely
                                                   **Attorneys for Plaintiff**